The Honorable Jamal N. Whitehead

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MATTHEW WILDMAN,<br><br>Plaintiff,<br><br>v.<br><br>BOSCOV'S DEPARTMENT STORE, LLC,<br><br>Defendant. | Civil Action No. 2:26-cv-01952-JNW<br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANT BOSCOV'S DEPARTMENT STORE, LLC'S MOTION TO DISMISS**<br><br>Noted for Consideration: August 13, 2026 |

Defendant Boscov's Department Store ("Boscov's") respectfully requests that the Court take judicial notice, under Federal Rule of Evidence 201, of the existence and contents of six (6) separate complaints filed by Plaintiff Matthew Wildman in the Superior Court of Washington for King County, as follows:

- Complaint, Wildman v. LCT OpCo, LLC, King County Superior Court No. 26-2-13228-3, filed April 21, 2026, a copy of which is attached hereto as **Exhibit A**.

- Complaint, Wildman v. Hickory Farms, LLC, King County Superior Court No. 26-2-15375-2, filed May 8, 2026, a copy of which is attached hereto as **Exhibit B**.

- Complaint, Wildman v. Lenox Corp., King County Superior Court No. 26-2-15358-2, filed May 8, 2026, a copy of which is attached hereto as **Exhibit C**.

- Complaint, Wildman v. CookUnity, Inc., King County Superior Court No. 26-2-15588-7, filed May 11, 2026, a copy of which is attached hereto as **Exhibit D**.

- Complaint, Wildman v. Motorola Mobility, LLC, King County Superior Court No. 26-2-16060-1, filed May 14, 2026, a copy of which is attached hereto as **Exhibit E**.

DEFENDANT'S REQUEST FOR JUDICIAL NOTICE - 1
2:26-cv-01952-JNW

**FENNEMORE CRAIG, P.C.**
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

- Complaint, Wildman v. Philadelphia Inquirer, LLC, King County Superior Court No. 26-2-16754-1, filed May 21, 2026, a copy of which is attached hereto as **Exhibit F**.

The above-referenced six complaints are collectively referred to hereinafter as the "Complaints."

## I.    REQUEST

Boscov's asks the Court to take judicial notice of each of Exhibits A-F as a state-court filing and public court record.  Boscov's requests notice of: the fact that each of the Complaints was filed, the date of filing of each, the parties and case number identified in each, and the allegations and statements appearing on the face of each.  Defendant does not request that the Court take judicial notice of the truth of any factual allegation in any of the Complaints.

## II.    AUTHORITY & ARGUMENT

Federal Rule of Evidence 201 permits judicial notice of an adjudicative fact that is not subject to reasonable dispute because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018); Fed. R. Evid. 201(b).  A court should take judicial notice if a party requests it and supplies the necessary information.  Fed. R. Evid. 201(c)(2).  Court filings and other matters of public record are proper subjects of judicial notice.  *Khoja*, 899 F.3d at 999.

Each of the Complaints attached as Exhibits A-F hereto is a pleading filed in King County Superior Court.  The filing, caption, case number, date, and existence of the contents of each are capable of accurate and ready determination from the records of that court and are not reasonably subject to dispute.  Judicial notice is appropriate for the limited purpose of establishing what Plaintiff filed and what the pleading states on its face, and not for the truth of matters asserted therein.  *Lanfri v. Goodwill of Silicon Valley*, 762 F. Supp. 3d 849, 856 (N.D. Cal. 2024) (taking judicial notice of existence and contents of state court complaints, and not of truth of matters asserted therein).

Judicial notice of each of Exhibits A-F is relevant to Boscov's Motion to Dismiss.  Boscov's therefore respectfully requests that the Court take judicial notice of each of Exhibits A-F for this limited purpose.

DEFENDANT'S REQUEST FOR JUDICIAL NOTICE - 2
2:26-cv-01952-JNW

FENNEMORE CRAIG, P.C.
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

### III.    CONCLUSION

For the foregoing reasons, Boscov's respectfully requests that the Court take judicial notice of each of the Complaints (Exhibits A-F hereto), for the limited purpose of recognizing the existence, filing, and contents of those public court records, and not for the truth of any disputed factual assertions contained therein.

DATED:  July 16, 2026

**FENNEMORE CRAIG, P.C.**


By:    */s/Stephen C. Willey*

Stephen C. Willey, WSBA No. 24499
999 Third Avenue, Suite 600
Seattle, Washington 98104
Telephone: (206) 749-0500
Facsimile: (206) 749-0600
Email: swilley@fennemorelaw.com

**REED SMITH LLP**

Kya R. Coletta-Swidler (*Pro Hac Vice*)
Katherine J. Ellena (*Pro Hac Vice*)
515 South Flower Street, Suite 4300
Los Angeles, CA 90071
Telephone: (213) 457-8000
Email: kcoletta@reedsmith.com
Email: kellena@reedsmith.com

*Attorneys for Defendant Boscov's Department Store, LLC*

DEFENDANT'S REQUEST FOR JUDICIAL NOTICE - 3
2:26-cv-01952-JNW

**FENNEMORE CRAIG, P.C.**
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

# EXHIBIT A

FILED
2026 APR 21 03:47 PM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 26-2-13228-3 SEA

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR THE COUNTY OF KING

MATTHEW WILDMAN, on his own behalf
and on behalf of others similarly situated,

Plaintiff,

v.

LCT OpCo, LLC,

Defendant.

Case No.: _____

CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

Plaintiff Matthew Wildman, on his own behalf and on behalf of others similarly situated, on information and belief except to his own experiences and matters of public record, complains of Defendant LCT OpCo, LLC, formerly known as La Colombe Torrefaction, Inc., and doing business as La Colombe Coffee Workshop, (`La Colombe_) as follows:

## I.   INTRODUCTION

1.   In 1998, to protect Washington consumers from the annoyance and harassment caused by the burgeoning spam email industry, the Washington State Legislature enacted the Commercial Electronic Mail Act (CEMA), codified at chapter 190 of title 19 of the Revised Code of Washington (RCW).

2.   Among other things, CEMA prohibits transmitting a commercial email with `false

CLASS ACTION COMPLAINT
Page 1

STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 ; FAX 872.263-1109
straussborrelli.com

or misleading information in the subject line_ to the email address of a Washington resident._ RCW 19.190.020(1)(b).

3. Defendant La Colombe engages in the precise activity which CEMA prohibits.

4. La Colombe engages Washington consumers, including Plaintiff, with commercial emails featuring subject lines which employ various tactics to create a false sense of urgency in consumers˜minds´ and ultimately, from consumers˜wallets.

5. This false urgency wastes consumers˜time by enticing them to engage with the defendant˜s marketing efforts for fear of missing out. It also floods consumers˜email inboxes with repeated false notifications that the time to act´ i.e., purchase´ is short.

6. Through this deceptive time-sensitivity, La Colombe falsely narrows the field´ steering consumers away from shopping for better deals´ to its own products that must be purchased now.

7. Plaintiff challenges La Colombe's harassment of Washington consumers with deceptive marketing for violations of the Commercial Electronic Mail Act (RCW 19.190.020) and the Consumer Protection Act (RCW 19.86.020) for injuries caused, additionally seeking injunctive relief against such violations in the future.

## II.    JURISDICTION AND VENUE

8. The Court has jurisdiction of this case under RCW 2.08.010.

9. Venue is proper in King County under RCW 4.12.020(3) because Plaintiff's cause of action or some part of it arose in King County.

## III.    PARTIES

10. Plaintiff Matthew Wilman is a resident of King County, Washington.

11. Defendant LCT OpCo, LLC, formerly known as La Colombe Torrefaction, Inc.,

CLASS ACTION COMPLAINT
Page 2

STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100; FAX 872.263-1109
straussborrelli.com

does business nationally as `La Colombe_ or `La Colombe Coffee Workshop._ Its principal address is 2620 E. Tioga Street, Philadelphia, PA 19134-5415. La Colombe maintains a registered agent of Corporation Service Company, 5235 North Front Street, Harrisburg, PA 17110.

## IV.    FACTUAL ALLEGATIONS

A.    CEMA protects Washington consumers from deceptive spam emails.

12.    The Supreme Court of Washington has made clear: `[A]ll Internet users ŭ bear the cost of deceptive spam._ State v. Heckel, 143 Wn. 2d 824, 835 (2001) (en banc).

13.    In 1998, the Legislature found that the `volume of commercial electronic mail_ was `growing,_ generating an `increasing number of consumer complaints._ Laws of 1998, ch. 149, í 1.

14.    While it's been nearly three decades since CEMA's enactment, the problems caused by unsolicited commercial email, i.e. spam email, have grown exponentially.

15.    The problems, however, are not limited to email content. Subject lines of emails are framed to attract consumers˜ attention away from the spam barrage to a message that entices consumers to click and, ultimately, purchase.

16.    In 2003, the United States Congress found that `[m]any senders of unsolicited commercial electronic mail purposefully include misleading information in the messages˜ subject lines in order to induce the recipients to view the messages._ 15 U.S.C. í 7701(a)(8).

17.    In 2012, one study estimated that Americans bear `costs of almost $20 billion annually_ due to unsolicited commercial email. Justin M. Rao & David H. Reiley, The Economics of Spam, 26 J. of Econ. Perspectives 87, 88 (2012).

18.    Even when bulk commercial email marketers are operating under color of consumer consent, the reality is that `[m]ost privacy consent_´ especially under the `notice-and-choice_

CLASS ACTION COMPLAINT
Page 3

STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100; FAX 872.263-1109
straussborrelli.com

approach predominant in the United States' `is a fiction._ Daniel J. Solove, Murky Consent: An Approach to the Fictions of Consent in Privacy Law, 104 Boston Univ. L. Rev. 593, 596 (2024).

19.    Consumers therefore routinely `consent_ to receive flurries of commercial emails which they did not meaningfully request and in which they have no genuine interest.

20.    This includes emails sent to consumers from businesses with which they have no prior relationship' by virtue of commercial data brokers and commercial data sharing agreements.

21.    Simply conducting the routine affairs of daily life often exposes consumers to unanticipated and unwanted volumes of commercial email. `Nowadays, you need an email address for everything from opening a bank account to getting your dog's nails trimmed, and ŭ [o]nce you hand over your email address, companies often use it as an all-access pass to your inbox: Think of shopping websites that send account updates, deals, :we miss you˜ messages, and holiday promotions throughout the year. It's too much._ Kaitlyn Wells, Email Unsubscribe Services Don't Really Work, N.Y. Times Wirecutter (Aug. 19, 2024), https://perma.cc/U8S6-R8RU/.

22.    The Legislature presciently intended CEMA to `provide some immediate relief_ for these problems by prohibiting among other things commercial emails that `contain untrue or misleading information in the subject line._ Laws of 1998, ch. 149, í 1.

23.    CEMA thereby protects Washington consumers against the `harms resulting from deceptive commercial e-mails,_ which `resemble the type of harms remedied by nuisance or fraud actions._ Harbers v. Eddie Bauer, LLC, 415 F. Supp. 3d 999, 1008 (W.D. Wash. 2019).

24.    CEMA's `truthfulness requirements_ increase the costs of sending deceptive commercial emails and thereby reduce their volume. Heckel, 143 Wn. 2d at 836.

25.    CEMA's `truthfulness requirements_ thereby advance the statute's aim of protecting consumers `from the problems associated with commercial bulk e-mail_ while

CLASS ACTION COMPLAINT
Page 4

STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100; FAX 872.263-1109
straussborrelli.com

facilitating commerce `by eliminating fraud and deception._ Id.

26. CEMA `mean[s] exactly what it says_: in `broad_ but `patently clear_ language, CEMA unambiguously prohibits `sending Washington residents commercial e-mails that contain any false or misleading information in the subject lines of such e-mails._ Certification from U.S. Dist. Ct. for W. Dist. of Wash. in Brown v. Old Navy, LLC, 567 P.3d 38, 44, 46¯47 (Wash. 2025).

27. CEMA's protections do not depend on whether an email was (really or fictively) solicited by consumers, nor on whether consumers relied on any false or misleading statement contained in its subject line. See Harbers, 415 F. Supp. 3d at 1011.

28. The statute's only concern is to suppress false or misleading information in the subject line of commercial emails. See Brown, 567 P.3d at 44¯45.

B. The subject lines of La Colombe's marketing emails make false time scarcity claims.

29. One common way online marketers `manipulate consumer choice by inducing false beliefs_ is to create a false sense of urgency or to falsely claim that consumers ¯time to act is scarce. Fed. Trade Comm'n, Bringing Dark Patterns to Light 4 (2022), https://perma.cc/847M-EY69/; see also U.K. Competition & Mkts. Auth., Online Choice Architecture´ How Digital Design Can Harm Competition and Consumers 26 (2022), https://perma.cc/V 848-7TVV/.

30. The FTC has identified the `False Limited Time Message_ as one example of false time scarcity claims, in which the marketer creates `pressure to buy immediately by saying the offer is good only for a limited time or that the deal ends soon´ but without a deadline or with a meaningless deadline that just resets when reached._ Bringing Dark Patterns to Light, supra para. 29, at 22.

31. `False or misleading scarcity claims can change the behaviour of consumers._

CLASS ACTION COMPLAINT
Page 5

STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 ¿ FAX 872.263-1109
straussborreli.com

Online Choice Architecture, supra para. 29, at 27.

32.    Representations about the timing and duration of sales, discounts, and other special offers are fundamentally representations about prices, and such representations matter to ordinary consumers. See, e.g., Huiliang Zhao et al., Impact of Pricing and Product Information on Consumer Buying Behavior with Customer Satisfaction in a Mediating Role, 12 Frontiers in Psychology 720151 (2021), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC8710754/pdf/fpsyg-12-720151.pdf/.

33.    False scarcity claims are psychologically effective. As `considerable evidence_ suggests, `consumers react to scarcity and divert their attention to information where they might miss opportunities._ Online Choice Architecture, supra para. 29, at 26.

34.    Invoking this time pressure achieves a seller's aim to narrow the field of competitive products and deals, by `induc[ing] consumers to rely on heuristics (mental shortcuts), like limiting focus to a restricted set of attributes or deciding based on habit._ Id.

35.    Under time pressure, `consumers might take up an offer to minimise the uncertainty of passing it up._ Id.

36.    False time scarcity claims thus harm consumers by manipulatively distorting their decision-making to their detriment´ and the seller's benefit.

37.    Indeed, one 2019 study found that `customers who took timed deals rather than waiting to see wider options ended up worse off than those who waited._ Id. at 27.

38.    False time scarcity claims also harm market competition. Consumers learn to ignore scarcity claims, `meaning that when a product [or offer] is truly scarce, the seller will not be able to credibly communicate this information._ Id.

39.    These false time scarcity claims are a staple of La Colombe's email scheme to

CLASS ACTION COMPLAINT
Page 6

STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 ; FAX 872.263-1109
straussborreli.com

compel consumers to purchase its products.

40.    La Colombe is a retailer of coffee beans, draft coffee canned drinks, coffee capsules, and related coffee and beverage products/accessories. It sells its products through its website at www.lacolombe.com, through brick and mortar coffee shops, and through grocery retailers.

41.    To advertise the products, accessories, and other offers available on its website, La Colombe sends spam emails to consumers.

42.    Urgent Spam Emails. Unfortunately for those recipients, La Colombe regularly titles its emails with urgent subject headings that do not reflect the true availability of the advertised deal. This strategy is demonstrated in the examples discussed below.

43.    La Colombe has tailored its approach to fit a variety of offers, including promotion extensions. In these examples, La Colombe sends consumers emails to advertise an offer, promotion, or sale and represents in the subject headings of those emails that the promotion will end imminently. These emails present the promotional pricing as a scarce or time-limited opportunity. This strategy commands consumers˜ attention and pressures them to purchase from La Colombe ˜s website. Finally, once the originally advertised `deadline_ has passed, La Colombe knowingly extends the promotion to a new end date.

44.    While La Colombe may present these extensions as though they are a favor or some unexpected blessing to consumers, they are anything but. By pairing false time pressures with surprise extensions´ which are only disclosed once the original promotion has ended˜ La Colombe compels consumers to purchase quickly while withholding terms that consumers need so they can make informed buying decisions.

45.    This misleading marketing strategy allows La Colombe to maximize sales during

CLASS ACTION COMPLAINT
Page 7

STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 ; FAX 872.263.1109
straussborrelli.com

both the initial promotion, as well as the subsequent extension.

46.    A 2023 promotion provides an apt example of this strategy at work.

47.    On December 28, 2023, La Colombe sent a commercial email to consumers with the subject heading: `LAST CHANCE: Winter Warehouse Sale ▢ [.]

48.    The text of the email stated that the sale ended that night in a large banner across the top, reading: `The Winter Warehouse Sale Ends Tonight.

49.    Fine print at the bottom of the email stated that the offer was valid through 11:59pm PST on 12/28/2023, providing consumers with a precise and unambiguous deadline for the special pricing.

50.    But the promotion wasn't ending that day.

51.    The information contained within the subject heading of the December 28, 2023, email was false and misleading. By warning consumers that it was their last chance to participate in the promotion, La Colombe draws the consumer in using false urgency premised upon the false deadline.

52.    The next day, on December 29, 2023, La Colombe sent another commercial email to consumers with the subject heading: `SURPRISE! Up to 40% OFF Extended ▮

53.    The heading confirmed that the promotion would continue beyond the deadline that La Colombe previously, and unambiguously, communicated to consumers in its December 28, 2023, subject line.

54.    Thus, after warning consumers that the opportunity was ending, La Colombe extended the sale, thereby proving the falsity of its December 28, 2023, subject line. Consumers in receipt of the December 28 email were not at risk of missing the offer because La Colombe did not end the sale on December 28, as it originally advertised. The false deadline and the false time

CLASS ACTION COMPLAINT
Page 8

STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100; FAX 872.263.1109
straussborrelli.com

scarcity presented in the December 28 subject line are key elements in La Colombe's cohesive marketing strategy. These tactics are a coordinated marketing strategy designed on the front end and meant to compel consumers to purchase products from La Colombe's website.

55. The December 29 email confirms the falsity of the December 28 email, coyly presenting the `new_ deadline as a surprise gift for the recipient of the email, with waving hand emoji to heighten the sense of excitement and surprise. Despite the unambiguous deadline communicated to consumers in the December 28, 2023, subject line, the special pricing offer did not end on the advertised date.

56. The subject headings of these emails are designed for a busy consumer skimming their inbox. They draw the consumer in with false information that La Colombe knows to be inaccurate when it sends the initial email.

57. La Colombe continued this strategy in 2024.

58. On March 7, 2024, La Colombe sent a commercial email to consumers with the subject heading: `LAST CHANCE: 25% OFF Fridge Pack + Lattes! _

59. The text of the email confirmed that the promotion ended that night.

60. Later, on March 7, 2024, La Colombe sent another commercial email with the subject heading: `FINAL HOURS: 25% YOUR FAVORITE LATTE[.]_

61. The text at the bottom of the email indicated that the promotion covered select cold brews, fridge packs, and lattes.

62. But it wasn't the final hours for this promotion.

63. A mere four days later, on March 11, 2024, La Colombe sent another commercial email with the subject heading: `25% OFF (almost) EVERYTHING[.]_

64. The text at the bottom of the March 11 email indicated that the promotion

STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 ; FAX 872.263-1109
straussborrelli.com

comprised a greater variety of discounted merchandise than the March 7 email, offering 25% off an order (excluding subscriptions gift cards, K-cup pods, and previous orders).

65. The subject headings of the two March 7, 2024, emails were false and misleading. March 7 was not the `LAST CHANCE_ to obtain the advertised discount and certainly didn't comprise the `FINAL HOURS_ for the opportunity. The March 11 email confirms the falsity of the subject headings of the March 7 emails.

66. All of this is part of a coordinated marketing strategy to gin up urgency where there is none and create a mindset for consumers that they must act quickly to obtain a certain promotion that is not, in fact, ending when La Colombe says it is.

67. Then, on March 12, 2024, La Colombe sent another commercial email with the subject heading: `25% OFF Your NEW Morning Routine[.]_

68. The March 12 and March 11 emails confirm that consumers did not in fact have a few hours left on March 7 to obtain the special pricing.

69. Upon information and belief, coffee prices are consistently rising. Consumers are always looking for deals on products with rising prices, especially products integral to many consumers' everyday lives life caffeinated beverages. The false time scarcity pressures that La Colombe creates heighten this perception that a consumer's time is limited to act quickly and obtain the deal.

70. La Colombe followed the same routine later in 2024.

71. On May 20, 2024, La Colombe sent a commercial email with the subject heading: `TWO DAYS ONLY: 25% OFF ALL DRINKS ▓ [.]_

72. Upon information and belief, drinks are La Colombe's entire business ¯ selling canned coffee drinks, beans to make coffee drinks, and the like.

CLASS ACTION COMPLAINT
Page 10

STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100; FAX 872.263-1109
straussborrelli.com

73. The next day, on May 21, 2024, La Colombe sent another commercial email with the subject heading: `ENDS TONIGHT: 25% OFF ALL DRINKS[.]`

74. But it wasn't the final day for this promotion.

75. Only a few morning coffees later, on June 4, 2024, La Colombe was at it again, sending another commercial email with the subject heading: `25% OFF Gifts & Brews!`

76. Over the next few days, La Colombe would continue to send commercial emails with the same terms. On June 5, 2024, La Colombe sent another commercial email with the subject heading: `25% OFF " Gifts for Every Coffee Fan[.]` On June 6, 2024, it sent another commercial email with the subject heading: `25% OFF Your Favorite Brews & Gear ▓ [.]` And again on June 7, 2024, it sent another email with the subject heading: `LAST CHANCE: 25% OFF Gifts for Dads!`

77. The series of emails in June confirms that the urgency La Colombe created in its May 20 and 21 emails was nothing more than a marketing strategy to gin up consumer interest based on fake information. May 20 and 21 were not the final days to obtain this promotional pricing. La Colombe misrepresented the duration and availability of the promotion.

78. La Colombe often deploys this strategy, where it will spend a few days advertising a promotional price as time-limited in its commercial emails, and then promotes an identical deal a few weeks later.

79. In March 2025, La Colombe used this same strategy to market its draft latte beverage line.

80. On March 17, 2025, La Colombe sent a commercial email to consumers with the subject heading: `Almost Over: 20% OFF Cold Brew & Lattes[.]`

81. Text within the email confirmed that the promotion would end on March 18, 2025.

CLASS ACTION COMPLAINT
Page 11

STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100; FAX 872.263.1109
straussborrelli.com

82. On March 18, 2025, La Colombe sent another commercial email with the subject heading: `Last Chance for 20% OFF 🖼 _ Again on March 18, 2025, La Colombe sent another commercial email with the subject heading: `Ends Tonight 20% OFF Lattes & Cold Brew[.]_

83. But the promotion wasn't ending that night.

84. A mere four days later, on March 22, 2025, La Colombe sent another commercial email with the subject heading: `Ends Tonight: 20% OFF Draft Lattes_

85. The information contained in the subject headings of the March 18 emails was false and misleading. It was part of a marketing strategy designed to deceive consumers into thinking that the promotional pricing La Colombe offered on these products was imminently ending when in fact, it was not.

86. In August of 2025, La Colombe deployed the same strategy on its 12-packs.

87. On August 26, 2025, La Colombe sent a commercial email with the subject heading: `Hurry, $25 12-Packs Ends Tonight[.]_ Also on August 26, 2025, La Colombe sent a commercial email with the subject heading: `Stock Up: $25 12-Packs MM[.]_

88. But the promotion was not ending that night.

89. Together, the August 26, 2025, emails encourage the consumer to stock their larders while the promotional pricing is valid. The information in their subject headings was false and misleading.

90. On August 27, 2025, La Colombe sent another commercial email with the subject heading: `Surprise! $25 12-Packs Sale Extended MM[.]_

91. The subject heading of the August 27 email confirms the falsity of the August 26 email.

92. La Colombe was at it again this year.

CLASS ACTION COMPLAINT
Page 12

STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100; FAX 872.263-1109
straussborrelli.com

93. On January 8, 2026, La Colombe sent a commercial email to consumers with the subject heading: `ENDS TONIGHT: 25% OFF Bulk Brews`

94. But the promotion wasn't ending on January 8.

95. The next day on January 9, 2026, La Colombe sent another commercial email with the subject heading: `EXTENDED! 25% OFF Bulk Brews`

96. The January 9 email confirms the falsity of the information in the subject heading of the January 8 email.

97. Then on February 18, 2026, La Colombe sent another commercial email with the subject heading: `LAST CHANCE: 25% Off Coffee`

98. But it wasn't consumers' last chance to obtain this deal.

99. On February 19, 2026, La Colombe sent another commercial email with the subject heading: `Surprise! One More Day for Our Coffee Sale`

100. The information in the February 18 email was false and misleading ¯ it was not the last chance for consumers to obtain the promotion. La Colombe misrepresented the duration and availability of the promotion.

101. As the subject lines of its marketing emails demonstrate, La Colombe employs a strategy where it pressures consumers to make purchases from its website by falsely representing the limited availability of its offers.

102. These and other examples of La Colombe's commercial emails whose subject lines contain false or misleading statements are attached to this Class Action Complaint as Exhibit A.

C.    La Colombe knows when it sends emails to Washington residents.

103. A sophisticated commercial enterprise, like La Colombe, which is engaged in persistent marketing through mass email campaigns across the United States, has several ways of

CLASS ACTION COMPLAINT
Page 13

STRAUSS BORRELLI PLLC
980 North Michigan Ave. Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 ; FAX 872.263.1109
straussborrelli.com

knowing where the recipients of its marketing emails are located. The means it employs are peculiarly within its knowledge.

104. First, the sheer volume of email marketing that La Colombe engages in put it on notice that Washington residents would receive its emails.

105. Second, La Colombe may obtain location information tied to email addresses when consumers make purchases from La Colombe through digital platforms, or otherwise self-report such information to La Colombe.

106. Third, La Colombe may obtain location information tied to email addresses by tracking the IP addresses of devices used to open La Colombe emails, which in turn can be correlated to physical location (as illustrated, for example, by the website https://whatismyipaddress.com/).

107. Specifically, La Colombe appears to use third-party applications to manage its email marketing campaigns, including Listrak. These platforms should allow La Colombe to access a list of every email address that was sent a marketing email. It should also allow La Colombe to determine which email recipients viewed the emails and who clicked on any links within them.

108. Fourth, La Colombe may obtain location information tied to email addresses by purchasing consumer data from commercial data brokers such as Acxiom, Oracle, and Equifax, which sell access to databases linking email addresses to physical locations, among other identifiers.

109. Fifth, La Colombe may obtain location information tied to email addresses by using `identity resolution_ services offered by companies such as LiveRamp, which can connect consumers email addresses to their physical locations, among other identifiers.

CLASS ACTION COMPLAINT
Page 14

STRAUSS BORRELLI PLLC
980 North Michigan Ave_ Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 ; FAX 872.263-1109
straussborrelli.com

110. Sixth, La Colombe may obtain information that the recipients of its marketing emails are Washington residents because that information is available, upon request, from the registrant of the Internet domain names contained in the recipients' email addresses. See RCW 19.190.020(2).

111. It is thus highly probable that a seller of La Colombe's size and sophistication employs not just one but several means of tying consumers' email addresses to their physical locations, at least at the state level.

D. La Colombe violated Plaintiff's right under CEMA to be free from deceptive commercial emails.

112. La Colombe has spammed Plaintiff with commercial emails whose subject lines contain false or misleading statements in violation of his right to be free from such annoyance and harassment under CEMA.

113. For example, Plaintiff received an email containing false or misleading subject lines sent by La Colombe as described above in Section B, including:

    a. The December 28, 2023, email with the subject heading: `LAST CHANCE: Winter Warehouse Sale ▯ _

    b. The March 17, 2025 email with the subject heading: `Almost Over: 20% OFF Cold Brew & Lattes_

    c. The August 26, 2025 email with the subject heading: `Hurry, $25 12-Packs Ends Tonight_

114. The subject lines of these emails are false or misleading in violation of CEMA as described above.

115. These subject lines contained false statements of fact as to the `duration or availability of a promotion._ Brown, 567 P.3d at 47.

STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100; FAX 872.263-1109
straussborrelli.com

## V.    CLASS ALLEGATIONS

116.    Plaintiff brings this action under Civil Rule 23 on behalf of the following putative class ("Class"):

> All Washington citizens holding an email address to which Defendant sent or caused to be sent any email listed in Exhibit A during the Class Period.

117.    Excluded from this definition of the Class are Defendant's officers, directors, and employees; Defendant's parents, subsidiaries, affiliates, and any entity in which Defendant has a controlling interest; undersigned counsel for Plaintiff; and all judges and court staff to whom this action may be assigned, as well as their immediate family members.

118.    The Class Period extends from the date four years before this Class Action Complaint is filed to the date a class certification order is entered in this action.

119.    Plaintiff reserves the right to amend the Class definition as discovery reveals additional emails containing false or misleading information in the subject line that Defendant sent or caused to be sent during the Class Period to email addresses held by Washington residents.

120.    The Class is so numerous that joinder of all members is impracticable because the Class is estimated to minimally contain thousands of members.

121.    There are questions of law or fact common to the class, including without limitation whether Defendant sent commercial emails containing false or misleading information in the subject line; whether Defendant sent such emails to email addresses it knew or had to reason to know were held by Washington residents; whether Defendant's conduct violated CEMA; whether Defendant's violation of CEMA constituted a per se violation of the Consumer Protection Act, RCW 19.86.020 (CPA); and whether Defendant should be enjoined from such conduct.

122.    Plaintiff's claims are typical of the Class's because, among other reasons, Plaintiff and Class members share the same statutory rights under CEMA and the CPA, which Defendant

CLASS ACTION COMPLAINT
Page 16

STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 ; FAX 872.263-1109
straussborrelli.com

violated in the same way by the uniform false or misleading marketing messages it sent to all putative members.

123.   Plaintiff will fairly and adequately protect the Class's interests because, among other reasons, Plaintiff shares the Class's interest in avoiding unlawful false or misleading marketing; has no interest adverse to the Class; and has retained competent counsel extensively experienced in consumer protection and class action litigation.

124.   Defendant has acted on grounds generally applicable to the Class, in that, among other ways, it engaged in the uniform conduct of sending uniform commercial emails to Plaintiff and the Class, which violate CEMA and the CPA in the same way, and from which it may be enjoined as to Plaintiff and all Class members, thereby making appropriate final injunctive relief with respect to the Class as a whole.

125.   The questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, in that, among other ways, Defendant has violated their rights under the same laws by the same conduct, and the only matters for individual determination are the number of false or misleading emails received by each Class member and that Class member's resulting damages.

126.   A class action is superior to other available methods for the fair and efficient adjudication of the controversy because, among other reasons, the claims at issue may be too small to justify individual litigation and management of this action as a class presents no special difficulties.

CLASS ACTION COMPLAINT
Page 17

STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100; FAX 872.263-1109
straussborrelli.com

## VI.    CLAIMS TO RELIEF

### First Claim to Relief

### Violation of the Commercial Electronic Mail Act, RCW 19.190.020

127.    Plaintiff incorporates and realleges paragraphs 1-115 above.

128.    CEMA provides that `[n]o person may initiate the transmission, conspire with another to initiate the transmission, or assist the transmission, of a commercial electronic mail message ǔ to an electronic mail address that the sender knows, or has reason to know, is held by a Washington resident that ǔ [c]ontains false or misleading information in the subject line._ RCW 19.190.020(1)(b).

129.    Defendant is a `person_ within the meaning of CEMA. RCW 19.190.010(11).

130.    Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transition of `commercial electronic mail messages_ within the meaning of CEMA. RCW 19.190.010(2).

131.    Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages to electronic mail addresses that Defendant knew, or had reason to know, were held by Washington residents, including because Defendant knew that Plaintiff and putative members were Washington residents through `information is available, upon request, from the registrant of the internet domain name contained in the recipient's electronic mail address_. RCW 19.190.020(b)(2).

132.    Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages that contained false or misleading information in the subject line, as described herein, in violation of CEMA. RCW 19.190.020(1)(b).

133.    For Defendant's violation of CEMA, Plaintiff is entitled to all available relief,

CLASS ACTION COMPLAINT
Page 18

STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100; FAX 872.263-1109
straussborrelli.com

including an injunction against further violations.

## Second Claim to Relief

### Violation of the Consumer Protection Act, RCW 19.86.020

134. Plaintiff incorporates and realleges paragraphs 1-115 above.

135. The CPA provides that `[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful._ RCW 19.86.020.

136. A violation of CEMA is a per se violation of the CPA. RCW 19.190.030.

137. A violation of CEMA establishes all the elements necessary to bring a private action under the CPA. Wright v. Lyft, 189 Wn. 2d 718 (2017).

138. CEMA provides that `[n]o person may initiate the transmission, conspire with another to initiate the transmission, or assist the transmission, of a commercial electronic mail message ŭ to an electronic mail address that the sender knows, or has reason to know, is held by a Washington resident that ŭ [c]ontains false or misleading information in the subject line._ RCW 19.190.020(1)(b).

139. Defendant is a `person_ within the meaning of CEMA. RCW 19.190.010(11).

140. Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transition of `commercial electronic mail messages_ within the meaning of CEMA. RCW 19.190.010(2).

141. Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages to electronic mail addresses that Defendant knew, or had reason to know, were held by Washington residents.

142. Defendant initiated the transmission, conspired with another to initiate the

CLASS ACTION COMPLAINT
Page 19

STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 ; FAX 872.263-1109
straussborrelli.com

transmission, or assisted the transmission of such messages that contained false or misleading information in the subject line, as described herein, in violation of CEMA. RCW 19.190.020(1)(b).

143. For Defendant's violation of the CPA, Plaintiff and putative members are entitled to an injunction against further violations; the greater of Plaintiff's actual damages or liquidated damages of $500 per violation, trebled; and costs of the suit, including a reasonable attorney's fee.

## VII.   JURY DEMAND

144. Plaintiff will demand a jury trial by separate document in accordance with Local Civil Rule 38(b).

## VIII.   PRAYER FOR RELIEF

Plaintiff asks the Court to:

A.   Certify the proposed Class, appoint Plaintiff as Class representative, and appoint undersigned counsel as Class counsel;

B.   Enter a judgment in Plaintiff's and the Class's favor permanently enjoining Defendant from the unlawful conduct alleged;

C.   Enter a judgment in Plaintiff's and the Class's favor awarding actual or liquidated damages, trebled, according to proof;

D.   Award Plaintiff costs of suit, including reasonable attorneys' fees; and

E.   Order such further relief the Court finds appropriate.

[Counsel signatures to follow on next page.]

CLASS ACTION COMPLAINT
Page 20

STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100; FAX 872.263-1109
straussborrelli.com

Date: April 21, 2026

Respectfully submitted,

/s/ Samuel J. Strauss
Samuel J. Strauss, WSBA No. #46971
Raina C. Borrelli*
STRAUSS BORRELLI PLLC
980 N. Michigan Avenue, Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
sam@straussborrelli.com
raina@straussborrelli.com

Lynn A. Toops*
Natalie A. Lyons*
Ian R. Bensberg*
COHENMALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
ltoops@cohenmalad.com
nyons@cohenmalad.com
ibensberg@cohenmalad.com

Gerard J. Stranch, IV*
Michael C. Tackeff*
Andrew K. Murray*
STRANCH, JENNINGS &
GARVEY, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
gstranch@stranchlaw.com
mtackeff@stranchlaw.com
amurray@stranchlaw.com

Counsel for Plaintiff and the Putative Class

*Applications for admission
pro hac vice forthcoming

CLASS ACTION COMPLAINT
Page 21

# EXHIBIT B

FILED
2026 MAY 08 02:23 PM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 26-2-15375-2 SEA

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR THE COUNTY OF KING

MATTHEW WILDMAN, on his own behalf
and on behalf of others similarly situated,

Plaintiff,

v.

HICKORY FARMS, LLC,

Defendant.

Case No.: _____ SEA

CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

Plaintiff Matthew Wildman, on his own behalf and on behalf of others similarly situated, on information and belief except to his own experiences and matters of public record, complains of Hickory Farms, LLC (`Defendant_ or `Hickory Farms_), as follows:

## I.   INTRODUCTION

1.   In 1998, to protect Washington consumers from the annoyance and harassment caused by the burgeoning spam email industry, the Washington State Legislature enacted the Commercial Electronic Mail Act (CEMA), codified at chapter 190 of title 19 of the Revised Code of Washington (RCW).

2.   Among other things, CEMA prohibits transmitting a commercial email with `false or misleading information in the subject line_ to the email address of a Washington resident. RCW

CLASS ACTION COMPLAINT ~ 1

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ; FAX 872.863.1109
straussborrelli.com

19.190.020(1)(b).

3.    Defendant Hickory Farms engages in the precise activity which CEMA prohibits.

4.    Hickory Farms spams Washington consumers, including Plaintiff, with commercial emails featuring subject lines which employ various tactics to create a false sense of urgency in consumers' minds' and ultimately, from consumers' wallets.

5.    This false urgency wastes consumers' time by enticing them to engage with the defendant's marketing efforts for fear of missing out. It also floods consumers' email inboxes with repeated false notifications that the time to act' i.e., purchase' is short.

6.    Through this deceptive time-sensitivity, Hickory Farms falsely narrows the field' steering consumers away from shopping for better deals' to its own products that must be purchased now.

7.    Plaintiff challenges Hickory Farms' harassment of Washington consumers with deceptive marketing for violations of the Commercial Electronic Mail Act (RCW 19.190.020) and the Consumer Protection Act (RCW 19.86.020) for injuries caused, additionally seeking injunctive relief against such violations in the future.

## II.    JURISDICTION AND VENUE

8.    The Court has jurisdiction of this case under RCW 2.08.010.

9.    Venue is proper in King County under RCW 4.12.020(3) because Plaintiff's cause of action, or some part thereof, arose in King County.

## III.    PARTIES

10.    Plaintiff Matthew Wildman is a resident of King County, Washington.

11.    Defendant Hickory Farms, LLC, is a Delaware company with its principal address at 311 S. Wacker Dr., Suite 2030, Chicago, IL 60606, and a registered agent in the State of

CLASS ACTION COMPLAINT - 2

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ⸱ FAX 872.863.1109
straussborrelli.com

Washington at C T Corporation System, 711 Capitol Way S., Suite 204, Olympia, WA, 98501.

12.    Defendant sells its products in Washington through their website and are thus subject to personal jurisdiction in this Court. See, e.g., Ford Motor Co. v. Montana Eighth Jud. Dist. Ct., 592 U.S. 351 (2021).

## IV.    FACTUAL ALLEGATIONS

A.    CEMA protects Washington consumers from deceptive spam emails.

13.    The Supreme Court of Washington has made clear: `[A]ll Internet users ü   bear the cost of deceptive spam._ State v. Heckel, 143 Wn. 2d 824, 835 (2001) (en banc).

14.    In 1998, the Legislature found that the `volume of commercial electronic mail_ was `growing,_ generating an `increasing number of consumer complaints._ Laws of 1998, ch. 149, í 1.

15.    While it's been nearly three decades since CEMA's enactment, the problems caused by unsolicited commercial email, i.e. spam email, have grown exponentially.

16.    The problems, however, are not limited to email content. Subject lines of emails are framed to attract consumers" attention away from the spam barrage to a message that entices consumers to click and, ultimately, purchase.

17.    In 2003, the United States Congress found that `[m]any senders of unsolicited commercial electronic mail purposefully include misleading information in the messages" subject lines in order to induce the recipients to view the messages._ 15 U.S.C. í 7701(a)(8).

18.    In 2012, one study estimated that Americans bear `costs of almost $20 billion annually_ due to unsolicited commercial email. Justin M. Rao & David H. Reiley, The Economics of Spam, 26 J. of Econ. Perspectives 87, 88 (2012).

19.    Even when bulk commercial email marketers are operating under color of consumer

CLASS ACTION COMPLAINT ~ 3

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL 872.263.1100 ¿ FAX 872.863.1109
straussborrelli.com

consent, the reality is that '[m]ost privacy consent_' especially under the 'notice-and-choice_ approach predominant in the United States' 'is a fiction._ Daniel J. Solove, Murky Consent: An Approach to the Fictions of Consent in Privacy Law, 104 Boston Univ. L. Rev. 593, 596 (2024).

20.    Consumers therefore routinely 'consent_ to receive flurries of commercial emails which they did not meaningfully request and in which they have no genuine interest.

21.    This includes emails sent to consumers from businesses with which they have no prior relationship' by virtue of commercial data brokers and commercial data sharing agreements.

22.    Simply conducting the routine affairs of daily life often exposes consumers to unanticipated and unwanted volumes of commercial email. 'Nowadays, you need an email address for everything from opening a bank account to getting your dog's nails trimmed, and ŭ [o]nce you hand over your email address, companies often use it as an all-access pass to your inbox: Think of shopping websites that send account updates, deals, :we miss you"messages, and holiday promotions throughout the year. It's too much._ Kaitlyn Wells, Email Unsubscribe Services Don't Really Work, N.Y. Times Wirecutter (Aug. 19, 2024), https://perma.cc/U8S6-R8RU/.

23.    The Legislature presciently intended CEMA to 'provide some immediate relief_ for these problems by prohibiting among other things commercial emails that 'contain untrue or misleading information in the subject line._ Laws of 1998, ch. 149, í 1.

24.    CEMA thereby protects Washington consumers against the 'harms resulting from deceptive commercial e-mails,_ which 'resemble the type of harms remedied by nuisance or fraud actions._ Harbers v. Eddie Bauer, LLC, 415 F. Supp. 3d 999, 1008 (W.D. Wash. 2019).

25.    CEMA's 'truthfulness requirements_ increase the costs of sending deceptive commercial emails and thereby reduce their volume. Heckel, 143 Wn. 2d at 836.

26.    CEMA's 'truthfulness requirements_ thereby advance the statute's aim of

CLASS ACTION COMPLAINT - 4

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ; FAX 872.863.1109
straussborrelli.com

protecting consumers `from the problems associated with commercial bulk e-mail_ while facilitating commerce `by eliminating fraud and deception._ Id.

27.    CEMA `mean[s] exactly what it says_: in `broad_ but `patently clear_ language, CEMA unambiguously prohibits `sending Washington residents commercial e-mails that contain any false or misleading information in the subject lines of such e-mails._ Certification from U.S. Dist. Ct. for W. Dist. of Wash. in Brown v. Old Navy, LLC, 567 P.3d 38, 44, 46~47 (Wash. 2025).

28.    CEMA`s protections do not depend on whether an email was (really or fictively) solicited by consumers, nor on whether consumers relied on any false or misleading statement contained in its subject line. See Harbers, 415 F. Supp. 3d at 1011.

29.    The statute`s only concern is to suppress false or misleading information in the subject line of commercial emails. See Brown, 567 P.3d at 44~45.

B.    The subject lines of Hickory Farms`marketing emails make false time scarcity claims.

30.    One common way online marketers `manipulate consumer choice by inducing false beliefs_ is to create a false sense of urgency or to falsely claim that consumers`time to act is scarce. Fed. Trade Comm`n, Bringing Dark Patterns to Light 4 (2022), https://perma.cc/847M-EY69/; see also U.K. Competition & Mkts. Auth., Online Choice Architecture´ How Digital Design Can Harm Competition and Consumers 26 (2022), https://perma.cc/V848-7TVV/.

31.    The FTC has identified the `False Limited Time Message_ as one example of false time scarcity claims, in which the marketer creates `pressure to buy immediately by saying the offer is good only for a limited time or that the deal ends soon´ but without a deadline or with a meaningless deadline that just resets when reached._ Bringing Dark Patterns to Light, supra para. 30, at 22.

CLASS ACTION COMPLAINT ~ 5

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ¿ FAX 872.863.1109
straussborrelli.com

32.    'False or misleading scarcity claims can change the behavior of consumers._ Online Choice Architecture, supra para. 30, at 27.

33.    Representations about the timing and duration of sales, discounts, and other special offers are fundamentally representations about prices, and such representations matter to ordinary consumers. See, e.g., Huiliang Zhao et al., Impact of Pricing and Product Information on Consumer Buying Behavior with Customer Satisfaction in a Mediating Role, 12 Frontiers in Psychology         720151         (2021),         available         at https://pmc.ncbi.nlm.nih.gov/articles/PMC8710754/pdf/fpsyg-12-720151.pdf/.

34.    False scarcity claims are psychologically effective. As 'considerable evidence_ suggests, 'consumers react to scarcity and divert their attention to information where they might miss opportunities._ Online Choice Architecture, supra para. 30, at 26.

35.    Invoking this time pressure achieves a seller's aim to narrow the field of competitive products and deals, by 'induc[ing] consumers to rely on heuristics (mental shortcuts), like limiting focus to a restricted set of attributes or deciding based on habit._ Id.

36.    Under time pressure, 'consumers might take up an offer to minimize the uncertainty of passing it up._ Id.

37.    False time scarcity claims thus harm consumers by manipulatively distorting their decision-making to their detriment´ and the seller's benefit.

38.    Indeed, one 2019 study found that 'customers who took timed deals rather than waiting to see wider options ended up worse off than those who waited._ Id. at 27.

39.    False time scarcity claims also harm market competition. Consumers learn to ignore scarcity claims, 'meaning that when a product [or offer] is truly scarce, the seller will not be able to credibly communicate this information._ Id.

CLASS ACTION COMPLAINT ˜ 6

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ¿ FAX 872.863.1109
straussborrelli.com

40.    These false time scarcity claims are a staple of the defendant's marketing scheme to compel consumers to purchase its products.

41.    Hickory Farms is a food and gift retailer. The company's merchandise is available at its seasonal retail locations, through other brick-and-mortar retailers, and on its website, www.hickoryfarms.com.

42.    To advertise its products and encourage purchases, Hickory Farms routinely sends spam emails to consumers. These emails are part of a calculated marketing strategy that Defendant orchestrates in advance to maximize sales by distorting factual information about the duration and availability of its promotions.

43.    Urgent Spam Emails. Unfortunately for those recipients, Hickory Farms regularly titles its emails with urgent subject headings that do not reflect the true availability of the advertised deal. This strategy is demonstrated in the examples discussed below.

44.    Hickory Farms has tailored its approach to fit a number of offers, including promotion extensions. In these examples, Hickory Farms sends consumers marketing emails to advertise an offer, promotion, or sale. Then, it uses the subject lines of follow-up emails to present the promotional pricing as a scarce or time-limited opportunity. This strategy commands consumers' attention and pressures them to purchase from Defendant's website and retail locations. Finally, once the originally advertised `deadline_ has passed, Hickory Farms knowingly extends the promotion to a new end date.

45.    This misleading marketing strategy allows Hickory Farms to maximize sales during both the initial promotion, as well as the subsequent extension. While Hickory Farms may present these extensions as though they are a favor or unexpected blessing to consumers, they are anything but. By deploying false time pressure with surprise extensions' which are only disclosed once the

CLASS ACTION COMPLAINT - 7

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ¿ FAX 872.863.1109
straussborrelli.com

original promotion has ended` Hickory Farms compels consumers to purchase quickly while withholding terms that consumers need so they can make informed buying decisions. A 2022 `free_shipping promotion provides an apt example of this strategy at work.

46.     First, Hickory Farms sends consumers marketing emails advertising a new promotion. For instance, on June 10, 2022, it transmitted an email with the subject line: `4 days left! Get free shipping for Father`s Day[.]_ The body of the email encouraged recipients to `HURRY!_and `Snag a gift for Dad._

47.     For the next step in its scheme, Hickory Farms uses the subject lines of its follow-up emails to assert false time pressure on recipients. Such headlines urge consumers to purchase from Hickory Farms`website by warning them that the offer is coming to an end.

48.     Regarding the free shipping event, Hickory Farms followed up on its June 10 email by planting a crop of urgent subject lines in consumers`inboxes.

49.     On June 11, 2022, it transmitted an email with the subject heading: `Only two days left for free standard shipping!_

50.     The next day, June 12, 2022, Hickory Farms sent consumers yet another email warning of the promotion`s impending conclusion within its title: `Pssst! Free standard shipping ends tomorrow[.]_

51.     Later that day, it pelted consumers`inboxes with another email pressuring them to act fast using the subject line: `Time`s running out to get free Father`s Day shipping[.]_ Inside, the email featured a countdown timer indicating that the opportunity would end on June 13, 2022. Large text within the email also confirmed that the promotion, `ENDS TOMORROW!_

52.     Despite this unambiguous deadline concerning the end of the free shipping offer, the promotion did not conclude on June 13, 2022, as advertised. Instead of providing consumers

CLASS ACTION COMPLAINT - 8

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL 872.263.1100; FAX 872.363.1109
straussborrelli.com

with accurate terms, the retailer chose to keep them in the dark regarding the sale's end date and orchestrated a scheme to promulgate false information.

53.     In the final stage of its scheme, Hickory Farms extends the life of the promotion, proving the falsity of the deadline it first advertised. For the Father's Day free shipping offer, Hickory Farms revealed that the promotion would not conclude as advertised on June 13, 2022. An email transmitted on that date was titled, `..and here you were thinking you missed it (Free shipping extended!)[.]_ and stated that free shipping would continue to be available until the following day, June 14, 2022.

54.     The June 13 email confirms the misleading nature of Hickory Farms" previous subject lines. The company's free shipping offer didn't end on June 13, 2022. Instead, Hickory Farms continued to offer free shipping the following day. The false deadline for the free shipping promotion is simply one example and one element of Defendant's cohesive marketing strategy meant to compel consumers to purchase its merchandise.

55.     Hickory Farms redeployed its ruse for another shipping promotion a few months later; yet again pairing a false deadline with a surprise extension.

56.     An email sent on October 11, 2022, announced the beginning of the promotion in its subject line: `Attention Shoppers! 1 Day Free Shipping[.]_ Inside the email, large text made clear that the opportunity would last for `1 DAY ONLY!_

57.     Later that day, Hickory Farms transmitted another email to layer additional time pressure on consumers. That email carried the subject heading, `☐ Ends Tonight ☐ Free shipping[.]_ and featured a countdown timer ticking away the remaining time, down to the second, until the opportunity would end.

58.     However, to the detriment of consumers, both of the October 11, 2022, subject lines

CLASS ACTION COMPLAINT - 9

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100; FAX 872.863.1109
straussborrelli.com

communicated a false deadline. The free shipping promotion did not end on that date.

59.    The sale was still active on October 12, 2022. An email sent on that date was titled, `☐ Free Shipping offer extended! ☐ Ends Today! [,] and confirmed the falsity of the October 11, 2022, subject line.

60.    So, despite the unambiguous deadline that it communicated in its October 11, 2022, subject lines, Hickory Farms continued to offer the same promotion the day after the advertised deadline.

61.    By stuffing consumer inboxes with such misinformation, Hickory Farms ensures that email recipients lack the accurate details needed to make educated buying decisions. An additional example of Hickory Farms" deceptive practices occurred later that very same month.

62.    On October 21, 2022, Hickory Farms sent consumers a Halloween-themed email to advertise free shipping on select items. The email was titled: `You'll freak for this one-day deal!

63.    However, the free shipping offer was not a one-day deal.

64.    On October 22, 2022, Hickory Farms communicated the real end date of the promotion in an email with the subject line: `Extended: Your exclusive deal[.] As confirmed by the content of the email, Hickory Farms made the allegedly `one-day deal available for three days, not concluding the offer until October 23, 2022.

65.    In an example from the following month, Hickory Farms repeated its strategy for a Black Friday buy one, get one sale.

66.    On November 25, 2022, Hickory Farms transmitted an email with the subject line: `BOGO 50% is back! One day only! Inside, the email stated that the offer was a buy one, get one 50% off offer for gift sets priced at $45 or higher.

CLASS ACTION COMPLAINT " 10

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100; FAX 872.863.1109
straussborrelli.com

67.    Later that day, Hickory Farms sent consumers another email featuring a subject line heavy with time pressure: `⏰ Final Hours ⏰ Don't miss this BOGO 50% off!_ A countdown timer inside the email further emphasized the limited time remaining for consumers to participate in the opportunity.

68.    True to form, however, the deadline which Hickory Farms communicated to consumers in its November 25 subject lines was a false one.

69.    On November 26, 2022, one day after the promotion would supposedly end, Hickory Farms transmitted an email titled: `愿 Just in: BOGO 50% off extended[.]_

70.    The November 26 email confirmed that the `one day only_ and `Final hours_ warnings contained in the November 25, 2022, subject lines were merely misleading time pressure claims designed to deceive consumers rather than a reliable fact about the opportunity to save on multiple purchases.

71.    The following year, 2023, provides several additional examples of Hickory Farms" deceptive marketing scheme.

72.    On February 5, 2023, it sent consumers an email with the subject line: `Two days left: Free shipping for Valentine's Day!_

73.    Quickly thereafter, Hickory Farms continued to transmit subject lines meant to pressure consumers with false time scarcity claims.

74.    On February 6, 2023, it sent an email with the subject heading: `Free shipping ends tomorrow! Don't wait to order!_

75.    Then, on February 7, 2023, the day which Hickory Farms advertised as the deadline for the promotion, it sent an email titled: `Ends Today: Free Standard Shipping for V-Day[.]_

76.    The promotion, however, was `extended,_ confirming that the February 5, February

CLASS ACTION COMPLAINT - 11

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ¿ FAX 872.863.1109
straussborrelli.com

6, and February 7 subject lines were false.

77.    On February 8, 2023, Hickory Farms sent consumers an email announcing the extension within the email's subject line: `🎋 Surprise! 🎋 Free standard shipping is extended[.]`

78.    Each of the subject lines identified above are installments in Hickory Farms' scheme; steps evidencing Hickory Farms' coordinated marketing strategy to deceive consumers with false information about the duration and availability of its promotions.

79.    Hickory Farms also transmitted false and misleading subject lines in connection with its 2023 Easter promotion.

80.    On April 2, 2023, it sent an email titled: `Last Chance 🐰 25% Off Easter Sale[.]` Inside, large text appearing in all capital letters at the top of the email specified a free shipping offer and its deadline: `FREE SHIPPING ENDS TOMORROW ORDER BY 3PM EST[.]`

81.    The next day, April 3, 2023, Hickory Farms sent an email explicitly warning consumers about the limited time remaining for the free shipping offer within its subject line: `Last Day for Free Shipping by Easter!` A timer graphic inside the email counted down the remaining hours, minutes, and seconds until the opportunity's alleged end.

82.    Consistent with Hickory Farms' deceptive pattern, the April 3 subject line and the time pressure it leveraged against consumers were false.

83.    Later that day, Hickory Farms sent an email with the subject heading: `🥚 EGGS-TENDED free shipping!` Indeed, neither Hickory Farms' deception nor the Easter-themed shipping offer had concluded. Hickory Farms simply deployed its April 3, 2023, subject line to gin up consumer interest in its products ˜ not to provide consumers with reliable factual representations about when the free shipping opportunity ended.

84.    The following month, Hickory Farms repeated its scheme for yet another free

CLASS ACTION COMPLAINT ˜ 12

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ; FAX 872.863.1109
straussborrelli.com

shipping promotion.

85.    It transmitted an email to consumers on May 8, 2023, with the subject line: `Last day for free shipping on Mom's gift[.]_ Inside the email, a countdown graphic displayed the time remaining until the advertised end of the free shipping promotion.

86.    Much like the previous shipping promotion examples, the advertised end date for the holiday-themed free shipping offer was a fake deadline. Hickory Farms never intended to conclude the sale on May 8, despite the unambiguous deadline it communicated to consumers in its May 8, 2023, subject line.

87.    Later that day, Hickory Farms provided consumers with the real deadline for its free shipping promotion in an email titled: `Mother's Day Surprise! Free shipping is extended!_ As the body of the email confirmed, the actual end date for the promotion was May 9, 2023.

88.    Hickory Farms has paired false deadlines with surprise extensions to deceive customers about the duration of Father's Day offers as well.

89.    It did so in 2023, when advertising a free shipping promotion during the Father's Day holiday. The email subject lines which Hickory Farms transmitted to advertise the offer demonstrate the company's deceptive pattern:

    a.   June 12, 2023: `Free shipping ends today!_

    b.   June 12, 2023: `❑ Final hours for Free Shipping for Father's Day gifts!_

    c.   June 12, 2023: `Extended! Free shipping for Father's Day_ in an email that made clear `FREE STANDARD SHIPPING ENDS TOMORROW!_

90.    Thus, the free shipping opportunity didn't end on June 12, 2023, despite the clear deadline advertised in both earlier emails.

91.    October 2023 brought a `Falliday Sale_ which yielded additional examples of

CLASS ACTION COMPLAINT – 13

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL 872.263.1100 ; FAX 872.863.1109
straussborrelli.com

Hickory Farms˜ misleading marketing strategy.

92.    On October 10, 2023, it sent consumers an email titled: `Today Only! Save up to 20%[.]_ Text within the email warned consumers to `Hurry_ to save up to 20% off select items on Hickory Farms˜ website.

93.    Later that day, Hickory Farms applied additional pressure by pelting consumers with another email containing a subject line with false time scarcity claims: `Ending Soon! Save up to 20%[.]_ Text within the email emphasized that the opportunity was `TODAY ONLY!_

94.    October 10, 2023, however, was not the only day for the up to 20% off promotion.

95.    On October 11, 2023, Hickory Farms sent an email titled, `Sale E-x-t-e-n-d-e-d! Save up to 20%[,]_ which confirmed the falsity of the October 10 subject lines.

96.    Unfortunately for consumers, Hickory Farms continued to deploy deceptive email subject lines in December as well. For example, when Hickory Farms held a free shipping promotion, it falsely communicated a December 1, 2023, deadline for the offer, as demonstrated by the subject lines used to perpetuate the ruse:

   a.  December 11, 2023: `—Today only —Free shipping on almost everything!_

   b.  December 11, 2023: `  Final hours: free shipping on almost everything!  [.]_

   c.  December 11, 2023: Ho, ho, ho no! Free shipping ends   tonight!   [.]_

   d.  December 12, 2023: `Free shipping, no minimum is E-X-T-E-N-D-E-D!_

97.    The following week, Hickory Farms executed the scheme yet again as confirmed by the following email subject lines:

   a.  December 16, 2023: `Free shipping on almost everything! One. Day. Only!_

   b.  December 16, 2023: `☐  Final hours: free shipping on almost everything!

CLASS ACTION COMPLAINT ˜ 14

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100; FAX 872.863.1109
straussborrelli.com

⬚ [.]

c. December 16, 2023: `—Last chance for free shipping with no minimum purchase—[.]

d. December 17, 2023: `E-X-T-E-N-D-E-D! Free shipping, no minimum purchase!

98.    However, Hickory Farms was not content with two deceptive free shipping campaigns within the same month. The following day, it reprised its ruse while advertising a free standard shipping promotion in emails with the following subject headings:

a. December 18, 2023: `Last chance for free standard shipping!

b. December 18, 2023: ` ▦  ▦  Final hours for free standard shipping! ▦ ▦ [.]

c. December 18, 2023: ` ▧  Surprise! Free standard shipping is extended! ▧ [.]

99.    The last email confirmed that the free standard shipping offer would be available until December 20, 2023.

100.    Hickory Farms continued to transmit email subject lines with false and misleading information in 2024. Several examples arose in the context of free shipping promotions as these subject lines confirm:

a. June 9, 2024: `Free shipping ends tomorrow! Don't wait to order gifts for Father's Day!

b. June 10, 2024: ` ▧ ▧ Free shipping for Father's Day ends today! (Order by 3pm ET)[.]

CLASS ACTION COMPLAINT - 15

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100; FAX 872.863.1109
straussborrelli.com

c. June 10, 2024: ` ⏳ Free shipping EXTENDED! ⏳ _ in an email that made clear `FREE STANDARD SHIPPING ENDS TOMORROW!_

d. December 16, 2024: `Today only! FREE shipping SITEWIDE! 🚚 🚚 🚚 [.]_

e. December 16, 2024: Free shipping SITEWIDE today only ̈ procrastinators rejoice!_

f. December 16, 2024: `⏰ Tick-tock: FREE shipping SITEWIDE ends soon!_

g. December 16, 2024: ` ⏰ Last call: FREE shipping on EVERYTHING, ends tonight! ⏰ [.]_

h. December 17, 2024: `🎁 FREE shipping SITEWIDE extended ̄ Guaranteed Christmas delivery!_

101.    In other examples from 2024, Hickory Farms deployed deceptive subject lines to advertise discount promotions. For instance, it levied multiple emails at consumers in July 2024 to pressure them to participate in a 20% off `charcuterie essentials_ promotion. As these subject lines confirm, Hickory Farms communicated a false deadline so it could urge consumers to purchase quickly while concealing the promotion's true end date:

a. July 16, 2024: `Two days only! Save 20% on charcuterie essentials!_

b. July 16, 2024: `☀️ Ends tomorrow: 20% off Hot Summer Savings☀️ [.]_

c. July 17, 2024: `Final hours to save 20%! Sale ends tonight._

d. July 18, 2024: `Extended! Two more days to save 20%!_

102.    In a series of other examples from later in the year, Hickory Farms deceptively

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ; FAX 872.863.1189
straussborrelli.com

titled marketing emails in connection with its Falliday Sale which offered up to 20% off select items. As the subject lines below demonstrate, Hickory Farms first communicated an October 8, 2024, deadline for the promotion. It was not until October 8 had passed that Hickory Farms revealed the real deadline for the discount:

   a. October 8, 2024: `Today only! Save up to 20%[.]_

   b. October 8, 2024: `Summer Sausage, crackers and more...now on sale! (TODAY only)[.]_

   c. October 8, 2024: `☐ Final hours to say up to 20% + free shipping[.]_

   d. October 9, 2024: `E-X-T-E-N-D-E-D! Save up to 20% for one more day!_

103.    The following month, Hickory Farms revived its buy one, get one 50% off promotion. It also revived its misleading marketing strategy when advertising the sale.

104.    On November 29, 2024, it transmitted an email titled: `☐ BOGO 50% ends tonight! ☐ [.]_

105.    Then, on November 30, 2024, it sent an email with the subject line, `☐ E-X-T-E-N-D-E-D! Black Friday BOGO 50% is still here! ☐ [.]_ confirming the falsity of the November 29, 2024, subject line and the false end date which it contained.

106.    In 2025, Hickory Farms continued to send marketing emails which falsely represented the duration of its sales, discounts, and promotions to consumers.

107.    During a St. Patrick's Day-themed event, for example, it claimed reduced pricing would be available for a single day. Instead, Hickory Farms quickly extended the promotion, as demonstrated in the subject lines of the emails used to advertise the event:

   a. March 17, 2025: `☐ ☐ Lucky you! Save 71% on snacks today only

CLASS ACTION COMPLAINT - 17

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL 872.263.1100; FAX 872.863.1109
straussborrelli.com

□  □ [.]

   b.  March 17, 2025: `□  □  Ends Tonight! Save 71% on snacks □  □ [.]

   c.  March 18, 2025: `□  Extended! Save 71% on snacks + $5 shipping □ [.]

108.  Additional examples come from a Mother's Day promotion.

109.  On May 3, 2025, Hickory Farms transmitted an email with the subject line: `Hurry, only 3 days left for $5 shipping for Mom (Plus, save up to 25%)[.]

110.  On May 5, 2025, Hickory Farms returned to consumers" inboxes to continue misrepresenting the end date for the Mother's Day free shipping promotion. An email sent on that date carried the subject line: `$5 standard shipping for Mother's Day ends today! Don't miss out! Text within the email repeated the subject line's `Ends Today_ warning and affirmed that the offer was for `standard shipping.

111.  Both emails, along with their subject lines, however, misrepresented the duration of the standard shipping offer. May 5, 2025, was a false deadline which Hickory Farms communicated to consumers so they would purchase from Hickory Farms"website.

112.  Hickory Farms revealed the real end date for the standard shipping promotion within the title of an email sent on the evening of May 5, 2025: `EXTENDED! $5 standard shipping for Mother's Day ends tomorrow!

113.  Thus, the true deadline for the free standard shipping offer was May 6, 2025, not May 5, 2025, as the prior subject lines indicated.

114.  Hickory Farms celebrated Father's Day much the same way.

115.  It sent an email on June 8, 2025, warning that yet another standard shipping opportunity was coming to an end. The subject line was titled: `[ENDS TOMORROW] $5 standard shipping for Father's Day!

CLASS ACTION COMPLAINT - 18

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ; FAX 872.863.1109
straussborrelli.com

116.    The next day, June 9, 2025, Hickory Farms followed up with another email emphasizing the impending end of the promotion in its subject line: `Hurry! $5 Standard shipping for Father's Day ends today!`

117.    Again, both subject lines contained false information. Later, on June 9, 2025, Hickory Farms sent consumers an email titled: `$5 Standard shipping EXTENDED! Order by tomorrow at 3PM EST[.]`

118.    So, the true deadline for the standard shipping promotion was June 10, 2025, not June 9.

119.    Hickory Farms continued to transmit subject lines with false and misleading information relating to its shipping and discount promotions. Several additional examples arose in 2025 as these subject lines confirm:

a.    October 7, 2025: `[TODAY ONLY] Save up to 20% + Free shipping!`

b.    October 7, 2025: `Did you hear? Falliday Savings up to 20% + Free Shipping [TODAY ONLY][.]`

c.    October 7, 2025: `☐ Final hours to say up to 20% + free shipping[.]`

d.    October 8, 2025: `E-X-T-E-N-D-E-D! Save up to 20% for one more day!`

e.    November 28, 2025: `☐ BOGO 50% ends tonight! ☐ [.]`

f.    November 29, 2025: `[EXTENDED] BOGO 50% OFF holiday gifts is still here!`

g.    December 12, 2025: `☐ ☐ Today Only! Take 30% OFF + Free Shipping ☐ ☐ [.]`

h.    December 12, 2025: `☐ ENDS TONIGHT! 30% OFF + Free Shipping! ☐ [.]`

CLASS ACTION COMPLAINT - 19

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL 872.263.1100 ¿ FAX 872.863.1109
straussborrelli.com

   i.   December 13, 2025: `E-X-T-E-N-D-E-D |Save 30% + Free Shipping[.]

   j.   December 15, 2025: `Today only! FREE shipping SITEWIDE! ▫ ▫ ▫ [.]

   k.   December 15, 2025: `Free shipping SITEWIDE today only procrastinators rejoice!

   l.   December 15, 2025: `▫ Last call: FREE shipping on EVERYTHING, ends tonight! ▫ [.]

   m.   December 16, 2025: `▓ FREE shipping SITEWIDE extended ̄ Guaranteed Christmas delivery!

120.    As these examples demonstrate, Hickory Farms is engaged in a scheme where it pressures consumers to purchase products from its website using subject lines which falsely represent the availability of its offers.

C.    Hickory Farms knows when it sends emails to Washington residents.

121.    A sophisticated commercial enterprise, like Hickory Farms, which is engaged in persistent marketing through mass email campaigns across the United States, has several ways of knowing where the recipients of its marketing emails are located. The means it employs are peculiarly within its knowledge.

122.    First, the sheer volume of email marketing that Hickory Farms engages in put it on notice that Washington residents would receive its emails. For instance, for the years 2023 through 2025, Hickory Farms transmitted roughly 538 emails per year, 44 emails per month, 10 emails per week, and 1.47 emails per day.

123.    Second, Hickory Farms may obtain location information tied to email addresses when consumers make purchases from Hickory Farms through digital platforms, or otherwise self-

CLASS ACTION COMPLAINT - 20

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ; FAX 872.863.1109
straussborrelli.com

report such information to Hickory Farms.

124. Third, Hickory Farms may obtain location information tied to email addresses by tracking the IP addresses of devices used to open Hickory Farms emails, which in turn can be correlated to physical location (as illustrated, for example, by the website https://whatismyipaddress.com/).

125. Specifically, Hickory Farms appears to use Salesforce Marketing Cloud to manage its email marketing campaigns. This platform should allow Hickory Farms to access a list of every email address that was sent a marketing email. It should also allow Hickory Farms to determine who viewed the emails and who clicked on any links within them.

126. Fourth, Hickory Farms may obtain location information tied to email addresses by purchasing consumer data from commercial data brokers such as Acxiom, Oracle, and Equifax, which sell access to databases linking email addresses to physical locations, among other identifiers.

127. Fifth, Hickory Farms may obtain location information tied to email addresses by using `identity resolution_ services offered by companies such as LiveRamp, which can connect consumers"email addresses to their physical locations, among other identifiers.

128. Sixth, Hickory Farms may obtain information that the recipients of its marketing emails are Washington residents because that information is available, upon request, from the registrant of the Internet domain names contained in the recipients"email addresses. See RCW 19.190.020(2).

129. It is thus highly probable that a seller of Defendant"s size and sophistication employs not just one but several means of tying consumers" email addresses to their physical locations, at least at the state level.

CLASS ACTION COMPLAINT ¯ 21

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL 872.263.1100; FAX 872.863.1109
straussborrelli.com

D.   Hickory Farms violated Plaintiff's right under CEMA to be free from deceptive commercial emails.

130.   Hickory Farms has spammed Plaintiff with commercial emails whose subject lines contain false or misleading statements in violation of his right to be free from such annoyance and harassment under CEMA.

131.   For example, Plaintiff received the following emails from Hickory Farms:

a   An email sent on May 5, 2025, titled: `$5 standard shipping for Mother's Day ends today! Don't miss out!_ This email contained a false or misleading subject line sent by Hickory Farms as described above at paragraphs 108 through 113.

b.   An email sent on June 9, 2025, titled: `Hurry! $5 Standard shipping for Father's Day ends today!_ This email contained a false or misleading subject line sent by Hickory Farms as described above at paragraphs 114 through 117.

132.   The subject lines of these emails are false or misleading in violation of CEMA.

133.   The subject line contained false statements of fact as to the `duration or availability of a promotion._ Brown, 567 P.3d at 47.

V.   CLASS ALLEGATIONS

134.   Plaintiff brings this action under Civil Rule 23 on behalf of the following putative class (`Class_):

> All Washington residents who, during the Class Period, received a commercial email sent by the Defendant, on behalf of the Defendant, or with the Defendant's assistance, that contained messaging in the email subject line which misrepresented the facts of a sale, deal or promotion.

135.   Excluded from this definition of the Class are Defendant's officers, directors, and

CLASS ACTION COMPLAINT ˉ 22

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100; FAX 872.863.1109
straussborrelli.com

employees; Defendant's parents, subsidiaries, affiliates, and any entity in which Defendant has a controlling interest; undersigned counsel for Plaintiff; and all judges and court staff to whom this action may be assigned, as well as their immediate family members.

136. The Class Period extends from the date four years before this Class Action Complaint is filed to the date a class certification order is entered in this action.

137. Plaintiff reserves the right to amend the Class definition as discovery reveals additional emails containing false or misleading information in the subject line that Defendant sent or caused to be sent during the Class Period to email addresses held by Washington residents.

138. The Class is so numerous that joinder of all members is impracticable because the Class is estimated to minimally contain thousands of members.

139. There are questions of law or fact common to the class, including without limitation whether Defendant sent commercial emails containing false or misleading information in the subject line; whether Defendant sent such emails to email addresses it knew or had to reason to know were held by Washington residents; whether Defendant's conduct violated CEMA; whether Defendant's violation of CEMA constituted a per se violation of the Consumer Protection Act, RCW 19.86.020 (CPA); and whether Defendant should be enjoined from such conduct.

140. Plaintiff's claims are typical of the Class's because, among other reasons, Plaintiff and Class members share the same statutory rights under CEMA and the CPA, which Defendant violated in the same way by the uniform false or misleading marketing messages it sent to all putative members.

141. Plaintiff will fairly and adequately protect the Class's interests because, among other reasons, Plaintiff shares the Class's interest in avoiding unlawful false or misleading marketing; has no interest adverse to the Class; and has retained competent counsel extensively

CLASS ACTION COMPLAINT - 23

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ; FAX 872.863.1109
straussborrelli.com

experienced in consumer protection and class action litigation.

142.   Defendant has acted on grounds generally applicable to the Class, in that, among other ways, it engaged in the uniform conduct of sending uniform commercial emails to Plaintiff and the Class, which violate CEMA and the CPA in the same way, and from which it may be enjoined as to Plaintiff and all Class members, thereby making appropriate final injunctive relief with respect to the Class as a whole.

143.   The questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, in that, among other ways, Defendant has violated their rights under the same laws by the same conduct, and the only matters for individual determination are the number of false or misleading emails received by each Class member and that Class member's resulting damages.

144.   A class action is superior to other available methods for the fair and efficient adjudication of the controversy because, among other reasons, the claims at issue may be too small to justify individual litigation and management of this action as a class presents no special difficulties.

## VI.   CLAIMS TO RELIEF

### First Claim to Relief

#### Violation of the Commercial Electronic Mail Act, RCW 19.190.020

145.   Plaintiff incorporates and realleges paragraphs 1-133 above.

146.   CEMA provides that "[n]o person may initiate the transmission, conspire with another to initiate the transmission, or assist the transmission, of a commercial electronic mail message ... to an electronic mail address that the sender knows, or has reason to know, is held by a Washington resident that ... [c]ontains false or misleading information in the subject line.

CLASS ACTION COMPLAINT ˜ 24

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL 872.263.1100 ¿ FAX 872.863.1109
straussborrelli.com

RCW 19.190.020(1)(b).

147.    Defendant is a `person_ within the meaning of CEMA. RCW 19.190.010(11).

148.    Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transition of `commercial electronic mail messages_ within the meaning of CEMA. RCW 19.190.010(2).

149.    Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages to electronic mail addresses that Defendant knew, or had reason to know, were held by Washington residents, including because Defendant knew that Plaintiff and putative members were Washington residents through `information is available, upon request, from the registrant of the internet domain name contained in the recipient's electronic mail address_. RCW 19.190.020(b)(2).

150.    Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages that contained false or misleading information in the subject line, as described herein, in violation of CEMA. RCW 19.190.020(1)(b).

151.    For Defendant's violation of CEMA, Plaintiff is entitled to all available relief, including an injunction against further violations.

Second Claim to Relief

Violation of the Consumer Protection Act, RCW 19.86.020

152.    Plaintiff incorporates and realleges paragraphs 1-133 above.

153.    The CPA provides that `[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful._ RCW 19.86.020.

154.    A violation of CEMA is a per se violation of the CPA. RCW 19.190.030.

CLASS ACTION COMPLAINT - 25

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ; FAX 872.863.1109
straussborrelli.com

155. A violation of CEMA establishes all the elements necessary to bring a private action under the CPA. Wright v. Lyft, 189 Wn. 2d 718 (2017).

156. CEMA provides that `[n]o person may initiate the transmission, conspire with another to initiate the transmission, or assist the transmission, of a commercial electronic mail message ŭ to an electronic mail address that the sender knows, or has reason to know, is held by a Washington resident that ŭ [c]ontains false or misleading information in the subject line._ RCW 19.190.020(1)(b).

157. Defendant is a `person_ within the meaning of CEMA. RCW 19.190.010(11).

158. Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transition of `commercial electronic mail messages_ within the meaning of CEMA. RCW 19.190.010(2).

159. Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages to electronic mail addresses that Defendant knew, or had reason to know, were held by Washington residents.

160. Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages that contained false or misleading information in the subject line, as described herein, in violation of CEMA. RCW 19.190.020(1)(b).

161. For Defendant`s violation of the CPA, Plaintiff and putative members are entitled to an injunction against further violations; the greater of Plaintiff`s actual damages or liquidated damages of $500 per violation, trebled; and costs of the suit, including a reasonable attorney`s fee.

## VII.   JURY DEMAND

162. Plaintiff will demand a jury trial by separate document in accordance with Local Civil Rule 38(b).

CLASS ACTION COMPLAINT - 26

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ; FAX 872.863.1109
straussborrelli.com

## VIII.   PRAYER FOR RELIEF

Plaintiff asks that the Court:

A.      Certify the proposed Class, appoint Plaintiff as Class representative, and appoint undersigned counsel as Class counsel;

B.      Enter a judgment in Plaintiff's and the Class's favor permanently enjoining Defendant from the unlawful conduct alleged;

C.      Enter a judgment in Plaintiff's and the Class's favor awarding actual or liquidated damages, trebled, according to proof;

D.      Award Plaintiff costs of suit, including reasonable attorneys" fees; and

E.      Order such further relief the Court finds appropriate.

[Counsel signatures to follow on next page.]

CLASS ACTION COMPLAINT ¯ 27

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL 872.263.1100; FAX 872.863.1109
straussborrelli.com

Date:  May 8, 2026

Respectfully submitted,

/s/ Samuel J. Strauss

Samuel J. Strauss, WSBA No. #46971
Raina C. Borrelli*
STRAUSS BORRELLI PLLC
980 N. Michigan Avenue, Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
sam@straussborrelli.com
raina@straussborrelli.com

Lynn A. Toops*
Natalie A. Lyons*
Ian R. Bensberg*
COHENMALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
ltoops@cohenmalad.com
nlyons@cohenmalad.com
ibensberg@cohenmalad.com

Gerard J. Stranch, IV*
Michael C. Tackeff*
Andrew K. Murray*
STRANCH, JENNINGS &
GARVEY, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
gstranch@stranchlaw.com
mtackeff@stranchlaw.com
amurray@stranchlaw.com

Counsel for Plaintiff and the Putative Class

*Applications for admission
pro hac vice forthcoming

CLASS ACTION COMPLAINT - 28

# EXHIBIT C

FILED
2026 MAY 08 01:57 PM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 26-2-15358-2 SEA

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR THE COUNTY OF KING

MATTHEW WILDMAN, on his own behalf and on behalf of others similarly situated,

Plaintiff,

v.

LENOX CORP.,

Defendant.

Case No.: _____ SEA

CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

Plaintiff Matthew Wildman, on his own behalf and on behalf of others similarly situated, on information and belief except to his own experiences and matters of public record, complains of Defendant Lenox Corporation (`Lenox_) as follows:

## I.    INTRODUCTION

1.    In 1998, to protect Washington consumers from the annoyance and harassment caused by the burgeoning spam email industry, the Washington State Legislature enacted the Commercial Electronic Mail Act (CEMA), codified at chapter 190 of title 19 of the Revised Code of Washington (RCW).

2.    Among other things, CEMA prohibits transmitting a commercial email with `false or misleading information in the subject line_ to the email address of a Washington resident._ RCW

CLASS ACTION COMPLAINT ` 1

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ; FAX 872.863.1109
straussborrelli.com

19.190.020(1)(b).

3.    Lenox engages in the precise activity which CEMA prohibits.

4.    Lenox spams Washington consumers, including Plaintiff, with commercial emails featuring subject lines which employ various tactics to create a false sense of urgency in consumers" minds´ and ultimately, from consumers" wallets.

5.    This false urgency wastes consumers" time by enticing them to engage with the defendant's marketing efforts for fear of missing out. It also floods consumers" email inboxes with repeated false notifications that the time to act´ i.e., purchase´ is short.

6.    Through this deceptive time-sensitivity, Lenox falsely narrows the field´ steering consumers away from shopping for better deals´ to its own products that must be purchased now.

7.    Plaintiff challenges Lenox harassment of Washington consumers with deceptive marketing for violations of the Commercial Electronic Mail Act (RCW 19.190.020) and the Consumer Protection Act (RCW 19.86.020) for injuries caused, additionally seeking injunctive relief against such violations in the future.

## II.    JURISDICTION AND VENUE

8.    The Court has jurisdiction of this case under RCW 2.08.010.

9.    Venue is proper in King County under RCW 4.12.020(3) because Plaintiff's cause of action, or some part thereof, arose in King County.

10.    Defendant sells its products in Washington through its website and in brick-and-mortar stores and is thus subject to personal jurisdiction in this court. See, e.g., Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct., 592 U.S. 351 (2021).

## III.    PARTIES

11.    Plaintiff Matthew Wildman is a resident of King County, Washington.

12.    Defendant Lenox Corporation is incorporated in Delaware with its principal place

CLASS ACTION COMPLAINT ˜ 2

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ¿ FAX 872.263.1109
straussborrelli.com

of business at 1414 Radcliffe St., Bristol, PA 19007.

## IV.   FACTUAL ALLEGATIONS

A.   CEMA protects Washington consumers from deceptive spam emails.

13.   The Supreme Court of Washington has made clear: `[A]ll Internet users ŭ bear the cost of deceptive spam._ State v. Heckel, 143 Wn. 2d 824, 835 (2001) (en banc).

14.   In 1998, the Legislature found that the `volume of commercial electronic mail_ was `growing,_ generating an `increasing number of consumer complaints._ Laws of 1998, ch. 149, í 1.

15.   While it's been nearly three decades since CEMA's enactment, the problems caused by unsolicited commercial email, i.e. spam email, have grown exponentially.

16.   The problems, however, are not limited to email content. Subject lines of emails are framed to attract consumers" attention away from the spam barrage to a message that entices consumers to click and, ultimately, purchase.

17.   In 2003, the United States Congress found that `[m]any senders of unsolicited commercial electronic mail purposefully include misleading information in the messages" subject lines in order to induce the recipients to view the messages._ 15 U.S.C. í 7701(a)(8).

18.   In 2012, one study estimated that Americans bear `costs of almost $20 billion annually_ due to unsolicited commercial email. Justin M. Rao & David H. Reiley, The Economics of Spam, 26 J. of Econ. Perspectives 87, 88 (2012).

19.   Even when bulk commercial email marketers are operating under color of consumer consent, the reality is that `[m]ost privacy consent_´ especially under the `notice-and-choice_ approach predominant in the United States´ `is a fiction._ Daniel J. Solove, Murky Consent: An Approach to the Fictions of Consent in Privacy Law, 104 Boston Univ. L. Rev. 593, 596 (2024).

20.   Consumers therefore routinely `consent_ to receive flurries of commercial emails

CLASS ACTION COMPLAINT ⁻ 3

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ; FAX 872.863.1109
straussborrelli.com

which they did not meaningfully request and in which they have no genuine interest.

21. This includes emails sent to consumers from businesses with which they have no prior relationship´ by virtue of commercial data brokers and commercial data sharing agreements.

22. Simply conducting the routine affairs of daily life often exposes consumers to unanticipated and unwanted volumes of commercial email. `Nowadays, you need an email address for everything from opening a bank account to getting your dog´s nails trimmed, and ũ [o]nce you hand over your email address, companies often use it as an all-access pass to your inbox: Think of shopping websites that send account updates, deals, :we miss you˜messages, and holiday promotions throughout the year. It´s too much._ Kaitlyn Wells, Email Unsubscribe Services Don´t Really Work, N.Y. Times Wirecutter (Aug. 19, 2024), https://perma.cc/U8S6-R8RU/.

23. The Legislature presciently intended CEMA to `provide some immediate relief_ for these problems by prohibiting among other things commercial emails that `contain untrue or misleading information in the subject line._ Laws of 1998, ch. 149, í 1.

24. CEMA thereby protects Washington consumers against the `harms resulting from deceptive commercial e-mails,_ which `resemble the type of harms remedied by nuisance or fraud actions._ Harbers v. Eddie Bauer, LLC, 415 F. Supp. 3d 999, 1008 (W.D. Wash. 2019).

25. CEMA´s `truthfulness requirements_ increase the costs of sending deceptive commercial emails and thereby reduce their volume. Heckel, 143 Wn. 2d at 836.

26. CEMA´s `truthfulness requirements_ thereby advance the statute´s aim of protecting consumers `from the problems associated with commercial bulk e-mail_ while facilitating commerce `by eliminating fraud and deception._ Id.

27. CEMA `mean[s] exactly what it says_: in `broad_ but `patently clear_ language, CEMA unambiguously prohibits `sending Washington residents commercial e-mails that contain any false or misleading information in the subject lines of such e-mails._ Certification from

CLASS ACTION COMPLAINT ˜ 4

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ¿ FAX 872.863.1109
straussborrelli.com

U.S. Dist. Ct. for W. Dist. of Wash. in Brown v. Old Navy, LLC, 567 P.3d 38, 44, 46‾47 (Wash. 2025).

28.   CEMA's protections do not depend on whether an email was (really or fictively) solicited by consumers, nor on whether consumers relied on any false or misleading statement contained in its subject line. See Harbers, 415 F. Supp. 3d at 1011.

29.   The statute's only concern is to suppress false or misleading information in the subject line of commercial emails. See Brown, 567 P.3d at 44‾45.

B.   The subject lines of Lenox's marketing emails make false time scarcity claims.

30.   One common way online marketers `manipulate consumer choice by inducing false beliefs_ is to create a false sense of urgency or to falsely claim that consumers˜time to act is scarce. Fed. Trade Comm'n, Bringing Dark Patterns to Light 4 (2022), https://perma.cc/847M-EY69/; see also U.K. Competition & Mkts. Auth., Online Choice Architecture´ How Digital Design Can Harm Competition and Consumers 26 (2022), https://perma.cc/V848-7TVV/.

31.   The FTC has identified the `False Limited Time Message_ as one example of false time scarcity claims, in which the marketer creates `pressure to buy immediately by saying the offer is good only for a limited time or that the deal ends soon´ but without a deadline or with a meaningless deadline that just resets when reached._ Bringing Dark Patterns to Light, supra para. 30, at 22.

32.   `False or misleading scarcity claims can change the behavior of consumers._ Online Choice Architecture, supra para. 30, at 27.

33.   Representations about the timing and duration of sales, discounts, and other special offers are fundamentally representations about prices, and such representations matter to ordinary consumers. See, e.g., Huiliang Zhao et al., Impact of Pricing and Product Information on Consumer Buying Behavior with Customer Satisfaction in a Mediating Role, 12 Frontiers in

CLASS ACTION COMPLAINT ‾ 5

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100; FAX 872.863.1109
straussborrelli.com

Psychology 720151 (2021), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC8710754/pdf/fpsyg-12-720151.pdf/.

34. False scarcity claims are psychologically effective. As `considerable evidence_ suggests, `consumers react to scarcity and divert their attention to information where they might miss opportunities._ Online Choice Architecture, supra para. 30, at 26.

35. Invoking this time pressure achieves a seller's aim to narrow the field of competitive products and deals, by `induc[ing] consumers to rely on heuristics (mental shortcuts), like limiting focus to a restricted set of attributes or deciding based on habit._ Id.

36. Under time pressure, `consumers might take up an offer to minimize the uncertainty of passing it up._ Id.

37. False time scarcity claims thus harm consumers by manipulatively distorting their decision-making to their detriment´ and the seller's benefit.

38. Indeed, one 2019 study found that `customers who took timed deals rather than waiting to see wider options ended up worse off than those who waited._ Id. at 27.

39. False time scarcity claims also harm market competition. Consumers learn to ignore scarcity claims, `meaning that when a product [or offer] is truly scarce, the seller will not be able to credibly communicate this information._ Id.

40. These false time scarcity claims are a staple of Lenox's marketing scheme to compel consumers to purchase its products.

41. Lenox manufactures, distributes, and sells tableware and collectibles. It sells its products directly through its website, www.lenox.com, as well as through brick-and-mortar retailers in Washington, including Macy's and The Home Depot.

42. To advertise its products and encourage purchases, Lenox routinely sends spam emails to consumers. These emails are part of a calculated marketing strategy that Lenox

CLASS ACTION COMPLAINT ˜ 6

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ¿ FAX 872.863.1109
straussborrelli.com

orchestrates in advance to maximize sales by distorting factual information about the duration and availability of its promotions.

43.    Unfortunately for those recipients, Lenox regularly titles its emails with urgent subject headings that do not reflect the true availability of the advertised deal. This strategy is demonstrated in the examples discussed below.

44.    Lenox has tailored its approach to fit a number of offers, including promotion extensions. In these examples, Lenox sends consumers marketing emails to advertise an offer, promotion, or sale. Then, it uses the subject lines of follow-up emails to present the promotional pricing as a scarce or time-limited opportunity. This strategy commands consumers` attention and pressures them to purchase Lenox`s products. Finally, once the originally advertised `deadline_ has passed, Lenox knowingly extends the same or a better promotion to a new end date.

45.    This misleading marketing strategy allows Lenox to maximize sales during both the initial promotion, as well as the subsequent extension. While Lenox may present these extensions as though they are a favor or unexpected blessing to consumers, they are anything but. By deploying false time pressure with surprise extensions´ which are only disclosed once the original promotion has ended´ Lenox compels consumers to purchase quickly while withholding terms that consumers need so they can make informed buying decisions.

46.    As an example of Lenox`s marketing scheme, on December 2, 2025, Lenox sent consumers a mass email with the subject line, `LAST CALL 30% OFF + CYBER DEALS + FREE Shipping_. The body of the email explained that the promotions offered in the subject line were part of Lenox`s `Cyber Monday_ sale.

47.    The subject line of the December 2 email was false or misleading. It was not the `last call_ for anything, as Lenox knew and intended when it or its contractors crafted this marketing campaign.

CLASS ACTION COMPLAINT - 7

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ₂ FAX 872.863.1109
straussborrelli.com

48. Just days later, on December 8, Lenox gleefully informed consumers, `Cyber Monday is Back: 30% Off + Free Shipping_.

49. As another example of Lenox's marketing scheme, on November 17, 2025, Lenox sent consumers a mass email with the subject line, `LAST DAY for 30% OFF SITEWIDE! 恁綾_.

50. The subject line of the November 17 email was false or misleading. Again, it wasn't the `last day_ for anything, as Lenox knew and intended when it or its contractors crafted this marketing campaign.

51. The very next day, on November 18, Lenox informed consumers, `Offer Extended! 30% Off $100_, falsely `extending_ the same promotion it had represented as ending the day before.

52. As another example of Lenox's marketing scheme, on October 22, 2025, Lenox sent consumers a mass email with the subject line, `  $50 Gift Card Expires Tonight_.

53. The subject line of the October 22 email was false or misleading. The offer did not expire that night, as Lenox knew and intended when it or its contractors crafted this marketing campaign.

54. The next day, on October 23, Lenox informed consumers, `$50 Gift Card Extended!_, again falsely `extending_ the same promotion it had represented as ending the day before.

55. As another example of Lenox's marketing scheme, on August 6, 2025, Lenox sent consumers a mass email with the subject line, `25% Off Disappears Tonight _.

56. The subject line of the August 6 email was false or misleading. The 25 percent discount would not `disappear_ that night, as Lenox knew and intended when it or its contractors crafted this marketing campaign.

CLASS ACTION COMPLAINT - 8

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100; FAX 872.863.1109
straussborrelli.com

57.    Just two days later, on August 8, Lenox informed consumers, `25% Off 🦁 Happy Birthday, Lenox!_ Indeed, this new offer was superior to the previous offer, in that it offered the same discount on all products sitewide, whereas the previous offer had been limited to select items only.

58.    As another example of Lenox's marketing scheme, on July 20, 2025, Lenox sent consumers a mass email with the subject line, `Last Day: 25% Off Sitewide_.

59.    The subject line of the July 20 email was false or misleading. It was not the `last day_ for the 25 percent sitewide discount, as Lenox knew and intended when it or its contractors crafted this marketing campaign.

60.    The next day, on July 21, Lenox informed consumers, `FREE Shipping + SALE Extended!_. Again, the subsequent offer was superior to the previous offer, in that it offered the same percentage discount, this time with free shipping.

61.    As another example of Lenox's marketing scheme, on July 16, 2025, Lenox sent consumers a mass email with the subject line, `🦇 Summerween Sale´ Today Only!_.

62.    The subject line of the July 16 email was false or misleading. The sale would not last for that day only, as Lenox knew and intended when it or its contractors crafted this marketing campaign.

63.    The very next day, July 17, Lenox informed consumers, `Hey, Boo 👻 Here's 25% Off_. The body of the email explained that this promotion was the same `Summerween_ sale Lenox had represented as ending the day before.

64.    As another example of Lenox's marketing scheme, on June 29, 2025, Lenox sent consumers a mass email with the subject line, `Last Day for Summer Shop Sale!_. The body of the email explained that a 25 percent discount on Lenox's `Summer Shop_ line would be ending that day.

CLASS ACTION COMPLAINT ~ 9

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL 872.263.1100; FAX 872.863.1109
straussborrelli.com

65. The subject line of the June 29 email was false or misleading. It was not the `last day` for the 25 percent discount, as Lenox knew and intended when it or its contractors crafted this marketing campaign.

66. Just days later, on July 4, Lenox informed consumers, `Cue the Fireworks´ You Get 25% Off`. Again, this second offer was superior to the `Summer Shop` promotion, in that it applied sitewide.

67. As another example of Lenox's marketing scheme, on June 1, 2025, Lenox sent consumers two mass emails with the subject lines, `Final Hours for 25% Off 🦋` and `25% Off Flutters Away Tonight`.

68. The subject lines of the June 1 emails were false or misleading. It was not the `final hours` for the 25 percent discount, which was not in any danger of `fluttering away` that night, as Lenox knew and intended when it or its contractors crafted this marketing campaign.

69. Just days later, on June 6, Lenox announced a superior, 30 percent discount sitewide under the heading, `☐ We´re SALE-ing into Summer!`.

70. As another example of Lenox's marketing scheme, on May 18, 2025, Lenox sent consumers two mass emails with the subject lines, `Last Day for up to 30% Off` and `🌻 Last Call for Sunny Savings`. These mails advertised a tiered set of discounts of up to 30 percent for qualifying orders.

71. The subject lines of the May 18 emails were false or misleading. It was not the `last day` or the `last call` for the 30 percent discount, as Lenox knew and intended when it or its contractors crafted this marketing campaign.

72. Just days later, on May 22, Lenox enticed consumers with a superior, sitewide offer: `☐ SAVE 30% SITEWIDE ☐`.

73. As another example of Lenox's marketing

CLASS ACTION COMPLAINT – 10

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ¿ FAX 872.863.1109
straussborrelli.com

scheme, on May 6, 2025, Lenox sent consumers a mass email with the subject line, `LAST DAY: 25% Off Flatware'

74. The subject line of the May 6 email was false or misleading. It was not the `last day_ for the 25 percent discount, as Lenox knew and intended when it or its contractors crafted this marketing campaign.

75. Just days later, on May 9, Lenox announced a superior 25 percent discount sitewide: `Sitewide Mother's Day Sale Starts Now!_.

76. As another example of Lenox`s marketing scheme, on April 10 and 11, 2025, Lenox sent consumers two mass emails with the subject lines, `25% Off Ends Tomorrow!_ and `Last Day of Friends & Family Sale_, respectively.

77. The subject lines of the April 10 and April 11 emails were false or misleading. The 25 percent discount offered as part of the `Friends & Family_ sale would not be ending on April 11, as Lenox knew and intended when it or its contractors crafted this marketing campaign.

78. Only a week later, on April 18, Lenox offered consumers the same 25 percent discount sitewide: `Fill Your Basket with 25% Off_.

79. As another example of Lenox`s marketing scheme, on March 16, 2025, Lenox sent consumers a mass email with the subject line, `Last Chance: 40% Off Clearance _.

80. The subject line of the March 16 email was false or misleading. It was not the `last chance_ for the 40 percent discount, as Lenox knew and intended when it or its contractors crafted this marketing campaign.

81. Just days later, on March 19, Lenox informed consumers the promotion was `Back Today Only: Extra 40% Off Sale!_

82. As another example of Lenox`s marketing scheme, on December 3, 2024, Lenox sent consumers a mass email with the subject line,

CLASS ACTION COMPLAINT - 11

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ; FAX 872.863.1109
straussborrelli.com

`▩ ▬ LAST CALL FOR 30% OFF + CYBER DEALS_. The body of the email explained the promotion was offered as part of Lenox's `Cyber Monday_ sale.

83.     The subject line of the December 3 email was false or misleading. It was not the `last call_ for the `Cyber Monday_ promotion, as Lenox knew and intended when it or its contractors crafted this marketing campaign.

84.     Not one week later, on December 9, Lenox announced the return of the `Cyber Monday_ promotion: `Cyber Monday's Back! 30% Off_.

85.     As another example of Lenox's marketing scheme, on November 18, 2024, Lenox sent consumers two mass emails with the subject lines, `Last Day to Save up to 30%!_ and `▩ Last Call for Sitewide Savings▩_. These mails advertised a tiered set of discounts of up to 30 percent for qualifying orders.

86.     The subject lines of the November 18 emails were false or misleading. It was not the `last day_ or `last call_ for the 30 percent discount, as Lenox knew and intended when it or its contractors crafted this marketing campaign.

87.     Just days later, on November 23, Lenox announced an across-the-board 30 percent discount `± BLACK FRIDAY SALE Starts Now ±_. Again, this promotion was superior to the previous offer, in that it was available on all orders.

88.     As another example of Lenox's marketing scheme, on July 14, 2024, Lenox sent consumers a mass email with the subject line, `▯ 蠡 July Black Friday Ends Tonight蠡 ▯_. The body of the email explained that Lenox's `Black Friday in July_ 25 percent discount sitewide would be ending that day.

89.     The subject line of the July 14 email was false or misleading. The 25 percent sitewide discount would not end that night, as Lenox knew and intended when it or its contractors crafted this marketing campaign.

CLASS ACTION COMPLAINT - 12

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100¿ FAX 872.863.1109
straussborrelli.com

90. The very next day, July 15, Lenox announced `Cyber Monday in July_: `Cyber Monday FREE SHIPPING_. Again, this offer was superior to the previous offer, in that it extended the same percentage discount sitewide plus free shipping.

91. As another example of Lenox's marketing scheme, on July 4, 2024, Lenox sent consumers a mass email with the subject line, `25% OFF ENDS IN HOURS_. The body of the email offered discounts of 25 percent sitewide.

92. The subject line of the July 4 email was false or misleading. The 25 percent discount sitewide would not be `ending in hours,_ as Lenox knew and intended when it or its contractors crafted this marketing campaign.

93. A week later, on July 12, Lenox announced the beginning of its `Black Friday in July_ promotion, offering identical discounts of 25 percent sitewide.

94. As another example of Lenox's marketing scheme, on May 27, 2024, Lenox sent consumers two mass emails with the subject lines, `LAST CALL: SALE ENDS IN HOURS_ and `Sitewide Sale Ends Tonight!_. These emails described another tiered set of discounts of up to 30 percent for qualifying orders.

95. The subject lines of the May 27 emails were false or misleading. It was not the `last call_ for this promotion, which would not be ending that night or `in hours,_ as Lenox knew and intended when it or its contractors crafted this marketing campaign.

96. The very next day, May 28, Lenox announced, `SALE EXTENDED!_, falsely `extending_ the same promotion Lenox had represented would be ending the day before.

97. As the subject lines of these examples of Lenox's marketing tactics demonstrate, Lenox is engaged in a scheme where it pressures consumers to purchase its products by falsely representing the limited availability of its offers.

98. This complicated and seemingly perpetual series of promotions, threatened

CLASS ACTION COMPLAINT - 13

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100; FAX 872.863.1109
straussborrelli.com

terminations, and renewals of the same or better offer is a strong indication that these promotions do not reflect any underlying business realities of supply or demand. To the contrary, they are just marketing tricks, components of preplanned, preconceived marketing strategies' all at consumers' expense.

C.    Lenox knows when it sends emails to Washington residents.

99.    A sophisticated commercial enterprise, like Lenox, which is engaged in persistent marketing through mass email campaigns across the United States, has several ways of knowing where the recipients of its marketing emails are located. The means it employs are peculiarly within its knowledge.

100.    First, the sheer volume of email marketing that Lenox engages in put it on notice that Washington residents would receive its emails. For instance, over the past year, Lenox has sent, on average, more than seven emails per week, every week.

101.    Second, Lenox may obtain location information tied to email addresses when consumers purchase Lenox's products, or otherwise self-report such information to Lenox.

102.    Third, Lenox may obtain location information tied to email addresses by tracking the IP addresses of devices used to open Lenox's emails, which in turn can be correlated to physical location (as illustrated, for example, by the website https://whatismyipaddress.com/).

103.    Specifically, Lenox appears to use Klaviyo to manage its email marketing campaigns. Klaviyo tells Lenox where the recipients of its marketing emails are located using IP geolocation and other data extracted from recipients' interactions with Lenox, which Klaviyo tracks in detail. See 'Understanding when and how Klaviyo sets a profile's location,_ Klaviyo (July 7, 2025) (describing 'how a profile's location and timezone information are set and updated_), https://help.klaviyo.com/hc/en-us/articles/115005073907; 'Understanding profiles in Klaviyo,_ Klaviyo (Aug. 5, 2025) ('Each individual profile features an activity log to capture a

CLASS ACTION COMPLAINT - 14

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ; FAX 872.863.1109
straussborrelli.com

timeline of their interactions with your business, including receiving emails, opening emails, and clicking links within emails.), https://help.klaviyo.com/hc/en-us/articles/115005247088/.

104. Fourth, Lenox may obtain location information tied to email addresses by purchasing consumer data from commercial data brokers such as Acxiom, Oracle, and Equifax, which sell access to databases linking email addresses to physical locations, among other identifiers.

105. Fifth, Lenox may obtain location information tied to email addresses by using `identity resolution_ services offered by companies such as LiveRamp, which can connect consumers email addresses to their physical locations, among other identifiers.

106. Sixth, Lenox may obtain information that the recipients of its marketing emails are Washington residents because that information is available, upon request, from the registrant of the Internet domain names contained in the recipients email addresses. See RCW 19.190.020(2).

107. It is thus highly probable that a seller of Defendant's size and sophistication employs not just one but several means of tying consumers email addresses to their physical locations, at least at the state level.

D. Lenox violated Plaintiff's right under CEMA to be free from deceptive commercial emails.

108. Lenox has spammed Wildman with commercial emails whose subject lines contain false or misleading statements in violation of his right to be free from such annoyance and harassment under CEMA.

109. Wildman received, for example, the following emails from Lenox, each of which is discussed above, at a personal email address:

110. `LAST CALL ☀ 30% OFF + CYBER DEALS + FREE Shipping_ on December 2, 2025;

111. `Last Day: 25% Off Sitewide_ on July 20,

CLASS ACTION COMPLAINT ~ 15

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ; FAX 872.863.1109
straussborrelli.com

2025;

112. `☐ 🍫 Summerween Sale´ Today Only! _ on Julu 16, 2025;

113. `Last Day for Summer Shop Sale! _ on June 29, 2025;

114. `25% Off Flutters Away Tonight_ and `Final Hours for 25% Off 🦋 _ on June 1, 2025;

115. `🎉 🎁 LAST CALL FOR 30% OFF + CYBER DEALS _ on December 3, 2024;

116. `Last Day to Save up to 30%!_ and `🎉 Last Call for Sitewide Savings🎉 _ on November 18, 2024;

117. `☐ 🎊 July Black Friday Ends Tonight🎊 ☐ _ on July 14, 2024; and

118. `LAST CALL: SALE ENDS IN HOURS_ and `Sitewide Sale Ends Tonight! _ on May 27, 2024.

119. The subject lines of these emails are false or misleading in violation of CEMA.

120. The subject line contained false statements of fact as to the `duration or availability of a promotion._ Brown, 567 P.3d at 47.

## V.    CLASS ALLEGATIONS

121. Plaintiff brings this action under Civil Rule 23 on behalf of the following putative class (`Class_):

> All Washington residents who, during the Class Period, received a commercial email sent by Defendant, on behalf of Defendant, or with Defendant's assistance, that contained messaging in the email subject line which misrepresented the facts of a sale, deal, or promotion.

122. Excluded from this definition of the Class are Defendant's officers, directors, and employees; Defendant's parents, subsidiaries, affiliates, and any entity in which Defendant has a controlling interest; undersigned counsel for Plaintiff; and all judges and court staff to whom this action may be assigned, as well as their immediate family

CLASS ACTION COMPLAINT ˉ 16

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ¿ FAX 872.863.1109
straussborrelli.com

members.

123.   The Class Period extends from the date four years before this Class Action Complaint is filed to the date a class certification order is entered in this action.

124.   Plaintiff reserves the right to amend the Class definition as discovery reveals additional emails containing false or misleading information in the subject line that Defendant sent or caused to be sent during the Class Period to email addresses held by Washington residents.

125.   The Class is so numerous that joinder of all members is impracticable because the Class is estimated to minimally contain thousands of members.

126.   There are questions of law or fact common to the class, including without limitation whether Defendant sent commercial emails containing false or misleading information in the subject line; whether Defendant sent such emails to email addresses it knew or had to reason to know were held by Washington residents; whether Defendant's conduct violated CEMA; whether Defendant's violation of CEMA constituted a per se violation of the Consumer Protection Act, RCW 19.86.020 (CPA); and whether Defendant should be enjoined from such conduct.

127.   Plaintiff's claims are typical of the Class's because, among other reasons, Plaintiff and Class members share the same statutory rights under CEMA and the CPA, which Defendant violated in the same way by the uniform false or misleading marketing messages it sent to all putative members.

128.   Plaintiff will fairly and adequately protect the Class's interests because, among other reasons, Plaintiff shares the Class's interest in avoiding unlawful false or misleading marketing; has no interest adverse to the Class; and has retained competent counsel extensively experienced in consumer protection and class action litigation.

129.   Defendant has acted on grounds generally applicable to the Class, in that, among other ways, it engaged in the uniform conduct of sending uniform commercial emails to Plaintiff

CLASS ACTION COMPLAINT – 17

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100; FAX 872.863.1109
straussborrelli.com

and the Class, which violate CEMA and the CPA in the same way, and from which it may be enjoined as to Plaintiff and all Class members, thereby making appropriate final injunctive relief with respect to the Class as a whole.

130.    The questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, in that, among other ways, Defendant has violated their rights under the same laws by the same conduct, and the only matters for individual determination are the number of false or misleading emails received by each Class member and that Class member's resulting damages.

131.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy because, among other reasons, the claims at issue may be too small to justify individual litigation and management of this action as a class presents no special difficulties.

## VI.    CLAIMS TO RELIEF

### First Claim to Relief

### Violation of the Commercial Electronic Mail Act, RCW 19.190.020

132.    Plaintiff incorporates and realleges paragraphs 1¯120 above.

133.    CEMA provides that `[n]o person may initiate the transmission, conspire with another to initiate the transmission, or assist the transmission, of a commercial electronic mail message ŭ to an electronic mail address that the sender knows, or has reason to know, is held by a Washington resident that ŭ [c]ontains false or misleading information in the subject line._ RCW 19.190.020(1)(b).

134.    Defendant is a `person_ within the meaning of CEMA. RCW 19.190.010(11).

135.    Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transition of `commercial electronic mail messages_ within the

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ¿ FAX 872.863.1109
straussborrelli.com

meaning of CEMA. RCW 19.190.010(2).

136.  Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages to electronic mail addresses that Defendant knew, or had reason to know, were held by Washington residents, including because Defendant knew that Plaintiff and putative members were Washington residents through `information is available, upon request, from the registrant of the internet domain name contained in the recipient's electronic mail address`. RCW 19.190.020(b)(2).

137.  Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages that contained false or misleading information in the subject line, as described herein, in violation of CEMA. RCW 19.190.020(1)(b).

138.  For Defendant's violation of CEMA, Plaintiff is entitled to all available relief, including an injunction against further violations.

### Second Claim to Relief

#### Violation of the Consumer Protection Act, RCW 19.86.020

139.  Plaintiff incorporates and realleges paragraphs 1‒120 above.

140.  The CPA provides that `[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.` RCW 19.86.020.

141.  A violation of CEMA is a per se violation of the CPA. RCW 19.190.030.

142.  A violation of CEMA establishes all the elements necessary to bring a private action under the CPA. Wright v. Lyft, 189 Wn. 2d 718 (2017).

143.  CEMA provides that `[n]o person may initiate the transmission, conspire with another to initiate the transmission, or assist the transmission, of a commercial electronic mail message ŭ to an electronic mail address that the sender knows, or has reason to know, is held by

CLASS ACTION COMPLAINT ‑ 19

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ; FAX 872.863.1109
straussborrelli.com

a Washington resident that ü [c]ontains false or misleading information in the subject line._ RCW 19.190.020(1)(b).

144.    Defendant is a `person_ within the meaning of CEMA. RCW 19.190.010(11).

145.    Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transition of `commercial electronic mail messages_ within the meaning of CEMA. RCW 19.190.010(2).

146.    Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages to electronic mail addresses that Defendant knew, or had reason to know, were held by Washington residents.

147.    Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages that contained false or misleading information in the subject line, as described herein, in violation of CEMA. RCW 19.190.020(1)(b).

148.    For Defendant's violation of the CPA, Plaintiff and putative members are entitled to an injunction against further violations; the greater of Plaintiff's actual damages or liquidated damages of $500 per violation, trebled; and costs of the suit, including a reasonable attorney's fee.

## VII.   JURY DEMAND

149.    Plaintiff will demand a jury trial by separate document in accordance with Local Civil Rule 38(b).

## VIII.   PRAYER FOR RELIEF

Plaintiff asks that the Court:

A.    Certify the proposed Class, appoint Plaintiff as Class representative, and appoint undersigned counsel as Class counsel;

B.    Enter a judgment in Plaintiff's and the Class's favor permanently enjoining Defendant from the unlawful conduct alleged;

CLASS ACTION COMPLAINT - 20

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100; FAX 872.863.1109
straussborrelli.com

C.    Enter a judgment in Plaintiff's and the Class's favor awarding actual or liquidated damages, trebled, according to proof;

D.    Award Plaintiff costs of suit, including reasonable attorneys' fees; and

E.    Order such further relief the Court finds appropriate.

[Counsel signatures to follow on next page.]

CLASS ACTION COMPLAINT - 21

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ; FAX 872.863.1109
straussborrelli.com

Date:  May 8, 2026

Respectfully submitted,

/s/ Samuel J. Strauss
Samuel J. Strauss, WSBA No. #46971
Raina C. Borrelli*
STRAUSS BORRELLI PLLC
980 N. Michigan Avenue, Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
sam@straussborrelli.com
raina@straussborrelli.com

Lynn A. Toops*
Natalie A. Lyons*
Ian R. Bensberg*
COHENMALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
ltoops@cohenmalad.com
nlyons@cohenmalad.com
ibensberg@cohenmalad.com

Gerard J. Stranch, IV*
Michael C. Tackeff*
Andrew K. Murray*
STRANCH, JENNINGS &
GARVEY, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
gstranch@stranchlaw.com
mtackeff@stranchlaw.com
amurray@stranchlaw.com

Counsel for Plaintiff and the Putative Class

*Applications for admission
pro hac vice forthcoming

CLASS ACTION COMPLAINT - 22

# EXHIBIT D

FILED
2026 MAY 11 03:46 PM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 26-2-15588-7 SEA

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR THE COUNTY OF KING

| | |
|---|---|
| MATTHEW WILDMAN, on his own behalf and on behalf of others similarly situated, | Case No.: _____ SEA |
| Plaintiff, | CLASS ACTION COMPLAINT |
| v. | <u>JURY TRIAL DEMANDED</u> |
| COOKUNITY, INC., | |
| Defendant. | |

Plaintiff Matthew Wildman, on his own behalf and on behalf of others similarly situated, on information and belief except to his own experiences and matters of public record, complains of CookUnity, Inc. (`Defendant_ or `CookUnity_), as follows:

I.    INTRODUCTION

1.    In 1998, to protect Washington consumers from the annoyance and harassment caused by the burgeoning spam email industry, the Washington State Legislature enacted the Commercial Electronic Mail Act (CEMA), codified at chapter 190 of title 19 of the Revised Code of Washington (RCW).

2.    Among other things, CEMA prohibits transmitting a commercial email with `false or misleading information in the subject line_ to the email address of a Washington resident. RCW

CLASS ACTION COMPLAINT ` 1

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ¿ FAX 872.863.1109
straussborrelli.com

19.190.020(1)(b).

3.    Defendant CookUnity engages in the precise activity which CEMA prohibits.

4.    CookUnity spams Washington consumers, including Plaintiff, with commercial emails featuring subject lines which employ various tactics to create a false sense of urgency in consumers´ minds´ and ultimately, from consumers´ wallets.

5.    This false urgency wastes consumers´ time by enticing them to engage with the defendant´s marketing efforts for fear of missing out. It also floods consumers´ email inboxes with repeated false notifications that the time to act´ i.e., purchase´ is short.

6.    Through this deceptive time-sensitivity, CookUnity falsely narrows the field´ steering consumers away from shopping for better deals´ to its own products that must be purchased now.

7.    Plaintiff challenges CookUnity´s harassment of Washington consumers with deceptive marketing for violations of the Commercial Electronic Mail Act (RCW 19.190.020) and the Consumer Protection Act (RCW 19.86.020) for injuries caused, additionally seeking injunctive relief against such violations in the future.

## II.    JURISDICTION AND VENUE

8.    The Court has jurisdiction of this case under RCW 2.08.010.

9.    Venue is proper in King County under RCW 4.12.020(3) because Plaintiff´s cause of action, or some part thereof, arose in King County.

## III.    PARTIES

10.    Plaintiff Matthew Wildman is a resident of King County, Washington.

11.    Defendant CookUnity, Inc., is a Delaware corporation with its principal address at 630 Flushing Ave., 3rd Floor, Brooklyn, NY 11206, and a registered agent in the State of

CLASS ACTION COMPLAINT - 2

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ; FAX 872.863.1109
straussborrelli.com

Washington at Corporation Service Company, 300 Deschutes Way SW, Suite 208 MC-CSC1, Tumwater, WA, 98501.

12.     Defendant sells its products in Washington through its website and is thus subject to the personal jurisdiction in this Court. See, e.g., Ford Motor Co. v. Montana Eighth Jud. Dist. Ct., 592 U.S. 351 (2021).

## IV.     FACTUAL ALLEGATIONS

A.     CEMA protects Washington consumers from deceptive spam emails.

13.     The Supreme Court of Washington has made clear: `[A]ll Internet users ŭ   bear the cost of deceptive spam._ State v. Heckel, 143 Wn. 2d 824, 835 (2001) (en banc).

14.     In 1998, the Legislature found that the `volume of commercial electronic mail_ was `growing,_ generating an `increasing number of consumer complaints._ Laws of 1998, ch. 149, í 1.

15.     While it's been nearly three decades since CEMA's enactment, the problems caused by unsolicited commercial email, i.e. spam email, have grown exponentially.

16.     The problems, however, are not limited to email content. Subject lines of emails are framed to attract consumers˜ attention away from the spam barrage to a message that entices consumers to click and, ultimately, purchase.

17.     In 2003, the United States Congress found that `[m]any senders of unsolicited commercial electronic mail purposefully include misleading information in the messages˜subject lines in order to induce the recipients to view the messages._ 15 U.S.C. í 7701(a)(8).

18.     In 2012, one study estimated that Americans bear `costs of almost $20 billion annually_ due to unsolicited commercial email. Justin M. Rao & David H. Reiley, The Economics of Spam, 26 J. of Econ. Perspectives 87, 88 (2012).

CLASS ACTION COMPLAINT ˜ 3

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL 872.263.1100 ¿ FAX 872.863.1109
straussborrelli.com

19.    Even when bulk commercial email marketers are operating under color of consumer consent, the reality is that `[m]ost privacy consent_' especially under the `notice-and-choice_ approach predominant in the United States' `is a fiction._ Daniel J. Solove, Murky Consent: An Approach to the Fictions of Consent in Privacy Law, 104 Boston Univ. L. Rev. 593, 596 (2024).

20.    Consumers therefore routinely `consent_ to receive flurries of commercial emails which they did not meaningfully request and in which they have no genuine interest.

21.    This includes emails sent to consumers from businesses with which they have no prior relationship' by virtue of commercial data brokers and commercial data sharing agreements.

22.    Simply conducting the routine affairs of daily life often exposes consumers to unanticipated and unwanted volumes of commercial email. `Nowadays, you need an email address for everything from opening a bank account to getting your dog's nails trimmed, and ŭ [o]nce you hand over your email address, companies often use it as an all-access pass to your inbox: Think of shopping websites that send account updates, deals, :we miss you~messages, and holiday promotions throughout the year. It's too much._ Kaitlyn Wells, Email Unsubscribe Services Don't Really Work, N.Y. Times Wirecutter (Aug. 19, 2024), https://perma.cc/U8S6-R8RU/.

23.    The Legislature presciently intended CEMA to `provide some immediate relief_ for these problems by prohibiting among other things commercial emails that `contain untrue or misleading information in the subject line._ Laws of 1998, ch. 149, í 1.

24.    CEMA thereby protects Washington consumers against the `harms resulting from deceptive commercial e-mails,_ which `resemble the type of harms remedied by nuisance or fraud actions._ Harbers v. Eddie Bauer, LLC, 415 F. Supp. 3d 999, 1008 (W.D. Wash. 2019).

25.    CEMA's `truthfulness requirements_ increase the costs of sending deceptive commercial emails and thereby reduce their volume. Heckel, 143 Wn. 2d at 836.

CLASS ACTION COMPLAINT - 4

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100; FAX 872.863.1109
straussborrelli.com

26. CEMA's `truthfulness requirements_ thereby advance the statute's aim of protecting consumers `from the problems associated with commercial bulk e-mail_ while facilitating commerce `by eliminating fraud and deception._ Id.

27. CEMA `mean[s] exactly what it says_: in `broad_ but `patently clear_ language, CEMA unambiguously prohibits `sending Washington residents commercial e-mails that contain any false or misleading information in the subject lines of such e-mails._ Certification from U.S. Dist. Ct. for W. Dist. of Wash. in Brown v. Old Navy, LLC, 567 P.3d 38, 44, 46⁻47 (Wash. 2025).

28. CEMA's protections do not depend on whether an email was (really or fictively) solicited by consumers, nor on whether consumers relied on any false or misleading statement contained in its subject line. See Harbers, 415 F. Supp. 3d at 1011.

29. The statute's only concern is to suppress false or misleading information in the subject line of commercial emails. See Brown, 567 P.3d at 44⁻45.

B.     The subject lines of CookUnity's marketing emails make false time scarcity claims.

30. One common way online marketers `manipulate consumer choice by inducing false beliefs_ is to create a false sense of urgency or to falsely claim that consumers `time to act is scarce. Fed. Trade Comm'n, Bringing Dark Patterns to Light 4 (2022), https://perma.cc/847M-EY69/; see also U.K. Competition & Mkts. Auth., Online Choice Architecture´ How Digital Design Can Harm Competition and Consumers 26 (2022), https://perma.cc/V848-7TVV/.

31. The FTC has identified the `False Limited Time Message_ as one example of false time scarcity claims, in which the marketer creates `pressure to buy immediately by saying the offer is good only for a limited time or that the deal ends soon´ but without a deadline or with a meaningless deadline that just resets when reached._ Bringing Dark Patterns to Light, supra

CLASS ACTION COMPLAINT - 5

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ¿ FAX 872.863.1109
straussborrelli.com

para. 30, at 22.

32.    `False or misleading scarcity claims can change the behavior of consumers._ Online Choice Architecture, supra para.30, at 27.

33.    Representations about the timing and duration of sales, discounts, and other special offers are fundamentally representations about prices, and such representations matter to ordinary consumers. See, e.g., Huiliang Zhao et al., Impact of Pricing and Product Information on Consumer Buying Behavior with Customer Satisfaction in a Mediating Role, 12 Frontiers in Psychology 720151 (2021), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC8710754/pdf/fpsyg-12-720151.pdf/.

34.    False scarcity claims are psychologically effective. As `considerable evidence_ suggests, `consumers react to scarcity and divert their attention to information where they might miss opportunities._ Online Choice Architecture, supra para. 30, at 26.

35.    Invoking this time pressure achieves a seller's aim to narrow the field of competitive products and deals, by `induc[ing] consumers to rely on heuristics (mental shortcuts), like limiting focus to a restricted set of attributes or deciding based on habit._ Id.

36.    Under time pressure, `consumers might take up an offer to minimize the uncertainty of passing it up._ Id.

37.    False time scarcity claims thus harm consumers by manipulatively distorting their decision-making to their detriment` and the seller's benefit.

38.    Indeed, one 2019 study found that `customers who took timed deals rather than waiting to see wider options ended up worse off than those who waited._ Id. at 27.

39.    False time scarcity claims also harm market competition. Consumers learn to ignore scarcity claims, `meaning that when a product [or offer] is truly scarce, the seller will not be able

CLASS ACTION COMPLAINT - 6

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ; FAX 872.863.1109
straussborrelli.com

to credibly communicate this information._ Id.

40.    These false time scarcity claims are a staple of the defendant's marketing scheme to compel consumers to purchase its products.

41.    CookUnity offers consumers a meal delivery subscription service. Consumers may subscribe to a plan with CookUnity through its website, www.cookunity.com.

42.    To advertise its products and encourage purchases, CookUnity routinely sends spam emails to consumers. These emails are part of a calculated marketing strategy that Defendant orchestrates in advance to maximize sales by distorting factual information about the duration and availability of its promotions.

43.    Urgent Spam Emails. Unfortunately for those recipients, CookUnity regularly titles its emails with urgent subject headings that do not reflect the true availability of the advertised deal. This strategy is demonstrated in the examples discussed below.

44.    CookUnity has tailored its approach to fit a variety of offers. In these examples, CookUnity uses the subject lines of its marketing emails to present a promotion, sale, discount, or other offer as a scarce or time-limited opportunity. This strategy commands consumers' attention and pressures them to purchase from CookUnity's website. However, the timing and duration claims made in CookUnity's email subject lines communicate false and misleading information to consumers. Once the originally advertised `deadline_ has passed, CookUnity knowingly revives the same offer shortly thereafter.

45.    This misleading marketing strategy allows CookUnity to maximize sales during both the initial promotion, as well as the subsequent promotion. CookUnity's use of false time scarcity claims compels consumers to purchase quickly while withholding terms that consumers need so they can make informed buying decisions. A 2023 `Today Only_ discount promotion

CLASS ACTION COMPLAINT - 7

provides an apt example of this strategy at work.

46.     On January 18, 2023, it transmitted an email with the subject line: `Today Only: 50% OFF your first week!_ The body of the email repeated the `Today Only_ warning and specified that the offer entailed `50% off your entire first week when you sign up[.]_

47.     The very next day, CookUnity confirmed the falsity of the January 18 subject line.

48.     On January 19, 2023, it transmitted an email titled: `Subscribe with 50% off your first week[.]_ Inside, the email invited consumers to `Save 50% off on your first week of meals when you sign up for CookUnity._

49.     CookUnity never intended to limit the 50% off offer to a single day, despite the unambiguous deadline it presented to consumers in its January 18, 2023, subject line. The `Today Only_ warning was a misleading strategy meant to increase sales by presenting the 50% off discount as a scarce opportunity. Clearly, it was not.

50.     CookUnity dished up more deception the following week.

51.     On January 25, 2023, CookUnity sent an email with the subject heading: `Today Only: 50% OFF a week's worth of food 🍽 [.]_ Again, the body of the email encouraged recipients to `Get HALF OFF your first week of fantastic food._

52.     Again, the `Today Only_ claim in the January 25 subject line was demonstrably false.

53.     The next day, January 26, 2023, CookUnity transmitted an email titled: `Get rewarded for eating well[.]_ Inside, the email extended the same terms from the previous offer: `When you get started with CookUnity today, you'll save 50% on your first week of meals._

54.     Despite the clear deadline articulated in the January 25, 2023, subject line, the opportunity did not conclude on January 25, as advertised. Instead of providing consumers with

CLASS ACTION COMPLAINT - 8

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100; FAX 872.863.1109
straussborrelli.com

accurate terms, Defendant chose to keep them in the dark regarding the promotion's end date and orchestrated a scheme to promulgate false information.

55.    CookUnity served at least two more examples of its misleading marketing strategy in February 2023. In both instances, CookUnity presented the 50% off offer as a one-day opportunity, only to advertise the same discount, pursuant to the same terms, shortly thereafter. The email subject lines which CookUnity transmitted to advertise the offer demonstrate the company's deceptive pattern:

    a.    February 1, 2023: `Fall in love with 50% off TODAY ONLY ▓ [.]_

    b.    February 3, 2023: `50% off food that makes you feel something ▓ [.]_

    c.    February 22, 2023: `Upgrade date night with 50% off TODAY ONLY ▓ [.]_

    d.    February 26, 2023: `Good food, good life - 50% off ▓ [.]_

56.    The subject lines transmitted on February 1 and February 22 falsely stated that the opportunity to obtain 50% off a weeks' worth of meals was limited to a one-day duration. Yet, as the February 3 and February 26 emails confirm, consumers could access the same offer at multiple times throughout the month of February.

57.    Rather than put the scheme on ice, CookUnity deployed it again in the months to follow. In these examples, CookUnity warned consumers that the 50% off promotion was limited to a single day, only to advertise the same deal within a week's time, as demonstrated by the subject lines used to perpetuate the ruse:

    a.    March 1, 2023: `50% OFF your first week fantastic food for Today Only!_

    b.    March 3, 2023: `50% off food to escape the world or to discover it[.]_

    c.    March 8, 2023: `Empower yourself with 50% off TODAY ONLY ▓ [.]_

CLASS ACTION COMPLAINT ~ 9

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100; FAX 872.863.1109
straussborrelli.com

d.  March 12, 2023: `Fueling the future with flavor and 50% off ▓ [.]_

e.  March 15, 2023: `You´re in luck with 50% off TODAY ONLY 凛 [.]_

f.  March 17, 2023: `Half off a whole lotta plate-licking luck 懿 [.]_

g.  March 22, 2023: `Spring for 50% Off Today Only 茶 [.]_

h.  March 24, 2023: `Say goodbye to the cold with [] a hot 50% Off 執[.]_

i.  March 27, 2023: `Have a plan of attack with 50% off TODAY ONLY ▒ [.]_

j.  March 29, 2023: `TODAY ONLY! Half off, served in full ▌ [.]_

k.  April 10, 2023: `TODAY ONLY! Half off your first week of your new favorite food ≠ [.]_

l.  April 12, 2023: `50% off your first week of mind-blowing meals ▓ [.]_

58.  The false deadlines for the `50% off_ deal is simply one element of Defendant´s cohesive marketing strategy meant to persuade consumers to act quickly and purchase its merchandise.

59.  In an example from May 2023, CookUnity seasoned its scheme with a new twist.

60.  On May 2, 2023, it transmitted an email with the subject line: `TODAY ONLY 60% off chef-prepared meals[.]_ Text within the email specified that the 60% discount would apply for two weeks of food from the subscription service.

61.  But much like the 50% offer advertised earlier in the year, the purported `TODAY ONLY_ for `60% off_ was a ruse.

62.  The next day, May 3, CookUnity advertised the same 60% off deal as confirmed by an email titled: `How about a festive 60% off? ▯ [.]_

63.  CookUnity repackaged its scheme in time for the Mother´s Day holiday later that

CLASS ACTION COMPLAINT - 10

month.

64.     On May 11, 2023, it sent an email with the subject heading: `60% off TODAY ONLY for Mom[.]_

65.     Despite clearly announcing that the 60% off discount was a one-day offering in the May 11, 2023, subject line, CookUnity proved its own lie the very next day.

66.     On May 12, 2023, it sent consumers an email titled, `For Mother's Day, take 60% off ☰ [.]_ confirming that the `TODAY ONLY _ warning in the May 11 subject line was false.

67.     In other examples from May 2023, CookUnity continued to misrepresent the availability of the 50% off discount, as these email subject lines demonstrate:

        a.  May 18, 2023: `Get 50% Off Today Only! Order now! _

        b.  May 19, 2023: `Don't miss out on 50% OFF[.]_

        c.  May 29, 2023: `TODAY ONLY: 50% off new & exciting food[.]_

        d.  May 31, 2023: `50% OFF for 2 weeks of flavorful food[.]_

68.     In an example from later in the year, CookUnity paired a false deadline with a surprise extension to perpetuate its ruse during a Black Friday promotion.

69.     On November 24, 2023, it sent consumers an email with the subject line: `☐ FINAL HOURS: Get 60% Off + 20% Off Your Next 3 Weeks! ☐ [.]_ The advertised promotion offered consumers 60% off the cost of their first weeks meals, followed by 20% off the three subsequent weeks.

70.     Unfortunately for consumers, however, the `FINAL HOURS_ that CookUnity urgently invoked its November 24 subject line did not actually run out that day.

71.     The following day, November 25, 2023, CookUnity sent an email with the subject heading: ` Black Friday Sale EXTENDED [.]_ The email confirmed that the `60% Off +

CLASS ACTION COMPLAINT - 11

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ; FAX 872.863.1109
straussborrelli.com

20% Off_ offer was still available.

72.     CookUnity recycled the promotion and the deception for its Cyber Monday Promotion.

73.     On November 27, 2023, it sent an email titled: `60% Off Today Only: Amazing Cyber Monday deal on chef-made meals[.]_ Again, recipients who accepted the offer would receive 60% off the cost of their first weeks˜meals and 20% off during the three weeks to follow.

74.     The next day, November 28, 2023, CookUnity sent an email advertising the same promotion in its subject line: `☆ Cyber Monday Extended! 60% off chef-made meals[.]_ The email˜s preview text exclaimed, `🗓 You can still get yesterday˜s discount today!_ confirming that the November 27, 2023, subject line communicated a false deadline.

75.     The following year, 2024, brought additional examples of CookUnity˜s misleading marketing scheme for its `60% Off + 20% Off_ promotion. CookUnity claimed that the offer was coming to a quick end in its March 29, April 5, April 12, and April 27 subject lines. However, quickly thereafter, CookUnity returned to consumers˜inboxes to advertise the very same deal. The email subject lines which CookUnity transmitted to advertise the offer demonstrate its deceptive pattern:

    a.  March 29, 2024: `⏰ Tick-tock... 60% OFF ENDS TODAY [.]_

    b.  April 1, 2024: `🍽 Get 60% Off Ready-To-Eat Meals...[.]_

    c.  April 5, 2024: `🍴 Last Chance! Get 60% Off Restaurant Quality Meals!_

    d.  April 9, 2024: `🚪 Convenience at Your Doorstep, Now 60% Off[.]_

    e.  April 12, 2024: `🍴 Last Chance! Get 60% Off Restaurant Quality Meals!_

    f.  April 15, 2024: `🔓 Unlock 60% Off Chef Crafted Meals Today!_

CLASS ACTION COMPLAINT ˜ 12

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ; FAX 872.863.1109
straussborrelli.com

g. April 27, 2024: `Hurry! 60% off chef-crafted meals ends soon ▦ [.]_

h. April 29, 2024: `Craving Convenience, ´ ? Get 60% OFF on chef-crafted meals ▦ [.]_

76. CookUnity altered its approach in an example from later in the year. Instead of extending or reviving a promotion once its advertised deadline had lapsed, CookUnity opted to offer a subsequent promotion with better terms.

77. On November 27, 2024, CookUnity sent an email with the subject line: `Your last chance for 60% Off Chef-Made meals!_ According to terms within the email, the promotion offered 60% off recipients`first week of meals, then 10% off the cost of meals for the three weeks thereafter.

78. Two days later, on November 29, 2024, CookUnity transmitted an email with the subject heading: `▦ BLACK FRIDAY BONUS - 60% Off ▦ [.]_ Text within the email offered consumers 60% off the cost of their first week`s meals and 20% off the cost of meals for weeks two through four.

79. Thus, CookUnity leveraged the false time scarcity claim in its November 27, 2024, subject line to pressure consumers to buy quickly´ because the opportunity to obtain the advertised discounts was purportedly coming to an end´ only to advertise better terms shortly thereafter. The misleading nature of these communications couldn`t be clearer. Consumers in receipt of the November 27 email are urged to purchase a subscription on CookUnity`s website quickly because, according to the subject line sent on that date, the special pricing is ending soon. However, within days, CookUnity advertised an offer with better terms.

80. By stuffing consumer inboxes with such misinformation, CookUnity ensures that email recipients lack the accurate details needed to make educated buying decisions.

CLASS ACTION COMPLAINT ` 13

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ¿ FAX 872.863.1109
straussborrelli.com

81. An additional example of CookUnity's deceptive practices occurred in the beginning of 2025.

82. On January 11, 2025, CookUnity transmitted an email with the subject line: `Last Call ˜ 60% Off Flash Sale! _ Inside, the email replicated the 60% off week 1 + 20% off weeks 2 through 4 offer. A banner at the top of the email featured large text urging consumers to: `ACT NOW: NEW YEAR SALE YOU CAN'T MISS! _

83. However, January 11 was not the last call for the offer.

84. On January 13, 2025, CookUnity sent another email titled: `60% off meals made to win weight goals! _ Text within the email repeated the same terms contained in the January 11, 2025, email.

85. Unfortunately for consumers, CookUnity continued to deploy deceptive subject lines as the year went on.

86. For example, CookUnity advertised an Easter Sale in its April 22, 2025, email titled: `Hey, last call for the Easter sale! _ Inside the email, CookUnity repeated the offer: `60% OFF 1 WEEK + 20% OFF THE NEXT THREE WEEKS[.] _ The email's preview text warned consumers to, `Grab 4 weeks of savings while you still can. _

87. It was not the `last call _ for the advertised discount, however.

88. Days later, on April 25, 2025, CookUnity sent an email with the subject line: `Nothing tastes better than 60% off. _ Within the email, CookUnity advertised the same `60% OFF 1 WEEK + 20% OFF THE NEXT THREE WEEKS_ offer.

89. Thus, the April 22, 2025 subject line falsely stated that the discount opportunity was coming to an end.

90. CookUnity repackaged the same offer yet again the following month as a Memorial

CLASS ACTION COMPLAINT ˜ 14

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ¿ FAX 872.263.1109
straussborrelli.com

Day Sale.

91.    On May 26, 2025, it sent an email carrying the subject heading, `Last call for the Memorial Day Sale ☐ [.]_ and offering the same `60% OFF + 20% OFF THE NEXT THREE WEEKS_ discount inside.

92.    An email sent on May 28, 2025, and titled, `Bold flavors, big deal[.]_ confirmed that the exact same offer was still available. Large text within the email repeated the terms: `60% OFF + 20% OFF THE NEXT THREE WEEKS[.]_

93.    Thus, May 26, 2025, was not the `last call_ for the deal. CookUnity advertised the same discount a mere two days later.

94.    CookUnity continued to transmit subject lines with false and misleading information in the second half of 2025. Several examples arose in the context of holiday-themed sales.

95.    For instance, CookUnity sent an email promoting a Black Friday sale on November 28, 2025. The email subject heading stated, `Final hours: Your 60% OFF Black Friday deal ends soon[.]_ while the body of the email specified the offer, `60% OFF + 20% OFF THE NEXT THREE WEEKS[.]_

96.    Consistent with its typical pattern, however, November 28 did not constitute the `final hours_ for the advertised discount.

97.    On November 29, 2025, CookUnity transmitted an email with the subject line: `The Black Friday Sale is BACK ON! ᴮᴬ [.]_ Inside the email, CookUnity stated that the Black Friday sale had been extended.

98.    So, the November 28, 2025, subject line didn't convey accurate information upon which consumers could rely. Instead, CookUnity used it to deploy a false deadline for the Black

CLASS ACTION COMPLAINT ~ 15

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ¿ FAX 872.863.1109
straussborrelli.com

Friday Sale.

99. CookUnity deployed the same trick for Cyber Monday, a few days later.

100. On December 1, 2025, CookUnity sent an email titled: ` ☐ Last call for Cyber Monday ☐ [.]` Inside the email, CookUnity advertised the same discount, `60% OFF + 20% OFF THE NEXT THREE WEEKS[.]` offered during its Black Friday Sale.

101. Later that day, CookUnity transmitted another email urging consumers to act. The email carried the subject heading: `Ends tonight 60% off for Cyber Monday!` The email's preview text layered on additional time pressure, informing recipients that it was their `Last chance to let our chefs craft your holiday menu[.]`

102. Despite the clear deadline communicated in the December 1, 2025, subject lines, the promotion did not end on that date.

103. CookUnity confirmed that December 1 was a false deadline the following day. On December 2, 2025, it sent an email titled: `Hey, our 60% off Cyber deal is back ON!` Flashing text within the email proclaimed: `CYBER MONDAY EXTENDED[.]`

104. As these examples demonstrate, CookUnity is engaged in a scheme where it pressures consumers to purchase products from its website using subject lines which falsely represent the availability of its offers.

C. CookUnity knows when it sends emails to Washington residents.

105. A sophisticated commercial enterprise, like CookUnity, which is engaged in persistent marketing through mass email campaigns across the United States, has several ways of knowing where the recipients of its marketing emails are located. The means it employs are peculiarly within its knowledge.

106. First, the sheer volume of email marketing that CookUnity engages in put it on

CLASS ACTION COMPLAINT - 16

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100; FAX 872.863.1109
straussborrelli.com

notice that Washington residents would receive its emails. For instance, for the years 2025, CookUnity transmitted roughly 35 emails per month, 8 emails per week, and 1.16 emails per day.

107.    Second, CookUnity may obtain location information tied to email addresses when consumers make purchases from CookUnity through digital platforms, or otherwise self-report such information to CookUnity.

108.    Third, CookUnity may obtain location information tied to email addresses by tracking the IP addresses of devices used to open CookUnity emails, which in turn can be correlated to physical location (as illustrated, for example, by the website https://whatismyipaddress.com/).

109.    Specifically, CookUnity appears to use Braze to manage its email marketing campaigns. This platform should allow CookUnity to access a list of every email address that was sent a marketing email. It should also allow CookUnity to determine who viewed the emails and who clicked on any links within them.

110.    Fourth, CookUnity may obtain location information tied to email addresses by purchasing consumer data from commercial data brokers such as Acxiom, Oracle, and Equifax, which sell access to databases linking email addresses to physical locations, among other identifiers.

111.    Fifth, CookUnity may obtain location information tied to email addresses by using `identity resolution_ services offered by companies such as LiveRamp, which can connect consumers~email addresses to their physical locations, among other identifiers.

112.    Sixth, CookUnity may obtain information that the recipients of its marketing emails are Washington residents because that information is available, upon request, from the registrant of the Internet domain names contained in the recipients~ email addresses. See RCW

CLASS ACTION COMPLAINT ~ 17

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ; FAX 872.863.1109
straussborrelli.com

19.190.020(2).

113.   It is thus highly probable that a seller of Defendant's size and sophistication employs not just one but several means of tying consumers' email addresses to their physical locations, at least at the state level.

D.   CookUnity violated Plaintiff's right under CEMA to be free from deceptive commercial emails.

114.   CookUnity has spammed Plaintiff with commercial emails whose subject lines contain false or misleading statements in violation of his right to be free from such annoyance and harassment under CEMA.

115.   For example, Plaintiff received the following emails from CookUnity:

a.   An email sent on November 27, 2024, titled: `Your last chance for 60% Off Chef-Made meals! _ This email contained a false or misleading subject line sent by CookUnity as described above at paragraphs 76 through 79.

b.   An email sent on November 28, 2025, titled: `Final hours: Your 60% OFF Black Friday deal ends soon[.] _ This email contained a false or misleading subject line sent by CookUnity as described above at paragraphs 94 through 98.

c.   An email sent on December 1, 2025, titled: ` ⬜ Last call for Cyber Monday ⬜ [.] _ This email contained a false or misleading subject line sent by CookUnity as described above at paragraphs 100 through 103.

d.   An email sent on December 1, 2025, titled: `Ends tonight 60% off for Cyber Monday! _ This email contained a false or misleading subject line sent by CookUnity as described above at paragraphs 100 through 103.

116.   The subject lines of these emails are false or misleading in violation of CEMA.

CLASS ACTION COMPLAINT ~ 18

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ₵ FAX 872.863.1109
straussborrelli.com

117. The subject line contained false statements of fact as to the `duration or availability of a promotion._ Brown, 567 P.3d at 47.

## V.    CLASS ALLEGATIONS

118. Plaintiff brings this action under Civil Rule 23 on behalf of the following putative class (`Class_):

> All Washington residents who, during the Class Period, received a commercial email sent by the Defendant, on behalf of the Defendant, or with the Defendant`s assistance, that contained messaging in the email subject line which misrepresented the facts of a sale, deal or promotion.

119. Excluded from this definition of the Class are Defendant`s officers, directors, and employees; Defendant`s parents, subsidiaries, affiliates, and any entity in which Defendant has a controlling interest; undersigned counsel for Plaintiff; and all judges and court staff to whom this action may be assigned, as well as their immediate family members.

120. The Class Period extends from the date four years before this Class Action Complaint is filed to the date a class certification order is entered in this action.

121. Plaintiff reserves the right to amend the Class definition as discovery reveals additional emails containing false or misleading information in the subject line that Defendant sent or caused to be sent during the Class Period to email addresses held by Washington residents.

122. The Class is so numerous that joinder of all members is impracticable because the Class is estimated to minimally contain thousands of members.

123. There are questions of law or fact common to the class, including without limitation whether Defendant sent commercial emails containing false or misleading information in the subject line; whether Defendant sent such emails to email addresses it knew or had to reason to know were held by Washington residents; whether Defendant`s conduct violated CEMA; whether

CLASS ACTION COMPLAINT - 19

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100; FAX 872.863.1109
straussborrelli.com

Defendant's violation of CEMA constituted a per se violation of the Consumer Protection Act, RCW 19.86.020 (CPA); and whether Defendant should be enjoined from such conduct.

124.    Plaintiff's claims are typical of the Class's because, among other reasons, Plaintiff and Class members share the same statutory rights under CEMA and the CPA, which Defendant violated in the same way by the uniform false or misleading marketing messages it sent to all putative members.

125.    Plaintiff will fairly and adequately protect the Class's interests because, among other reasons, Plaintiff shares the Class's interest in avoiding unlawful false or misleading marketing; has no interest adverse to the Class; and has retained competent counsel extensively experienced in consumer protection and class action litigation.

126.    Defendant has acted on grounds generally applicable to the Class, in that, among other ways, it engaged in the uniform conduct of sending uniform commercial emails to Plaintiff and the Class, which violate CEMA and the CPA in the same way, and from which it may be enjoined as to Plaintiff and all Class members, thereby making appropriate final injunctive relief with respect to the Class as a whole.

127.    The questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, in that, among other ways, Defendant has violated their rights under the same laws by the same conduct, and the only matters for individual determination are the number of false or misleading emails received by each Class member and that Class member's resulting damages.

128.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy because, among other reasons, the claims at issue may be too small to justify individual litigation and management of this action as a class presents no special

CLASS ACTION COMPLAINT - 20

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ; FAX 872.263.1109
straussborrelli.com

difficulties.

## VI.   CLAIMS TO RELIEF

### First Claim to Relief

#### Violation of the Commercial Electronic Mail Act, RCW 19.190.020

129.   Plaintiff incorporates and realleges paragraphs 1-117 above.

130.   CEMA provides that `[n]o person may initiate the transmission, conspire with another to initiate the transmission, or assist the transmission, of a commercial electronic mail message ŭ to an electronic mail address that the sender knows, or has reason to know, is held by a Washington resident that ŭ [c]ontains false or misleading information in the subject line.` RCW 19.190.020(1)(b).

131.   Defendant is a `person` within the meaning of CEMA. RCW 19.190.010(11).

132.   Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transition of `commercial electronic mail messages` within the meaning of CEMA. RCW 19.190.010(2).

133.   Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages to electronic mail addresses that Defendant knew, or had reason to know, were held by Washington residents, including because Defendant knew that Plaintiff and putative members were Washington residents through `information is available, upon request, from the registrant of the internet domain name contained in the recipient's electronic mail address`. RCW 19.190.020(b)(2).

134.   Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages that contained false or misleading information in the subject line, as described herein, in violation of CEMA. RCW 19.190.020(1)(b).

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100; FAX 872.863.1109
straussborrelli.com

135.    For Defendant's violation of CEMA, Plaintiff is entitled to all available relief, including an injunction against further violations.

### Second Claim to Relief

### Violation of the Consumer Protection Act, RCW 19.86.020

136.    Plaintiff incorporates and realleges paragraphs 1–117 above.

137.    The CPA provides that `[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful._ RCW 19.86.020.

138.    A violation of CEMA is a per se violation of the CPA. RCW 19.190.030.

139.    A violation of CEMA establishes all the elements necessary to bring a private action under the CPA. Wright v. Lyft, 189 Wn. 2d 718 (2017).

140.    CEMA provides that `[n]o person may initiate the transmission, conspire with another to initiate the transmission, or assist the transmission, of a commercial electronic mail message ŭ  to an electronic mail address that the sender knows, or has reason to know, is held by a Washington resident that ŭ  [c]ontains false or misleading information in the subject line._ RCW 19.190.020(1)(b).

141.    Defendant is a `person_ within the meaning of CEMA. RCW 19.190.010(11).

142.    Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transition of `commercial electronic mail messages_ within the meaning of CEMA. RCW 19.190.010(2).

143.    Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages to electronic mail addresses that Defendant knew, or had reason to know, were held by Washington residents.

CLASS ACTION COMPLAINT – 22

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL 872.263.1100; FAX 872.863.1109
straussborrelli.com

144.    Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages that contained false or misleading information in the subject line, as described herein, in violation of CEMA. RCW 19.190.020(1)(b).

145.    For Defendant's violation of the CPA, Plaintiff and putative members are entitled to an injunction against further violations; the greater of Plaintiff's actual damages or liquidated damages of $500 per violation, trebled; and costs of the suit, including a reasonable attorney's fee.

## VII.    JURY DEMAND

146.    Plaintiff will demand a jury trial by separate document in accordance with Local Civil Rule 38(b).

## VIII.    PRAYER FOR RELIEF

Plaintiff asks that the Court:

A.    Certify the proposed Class, appoint Plaintiff as Class representative, and appoint undersigned counsel as Class counsel;

B.    Enter a judgment in Plaintiff's and the Class's favor permanently enjoining Defendant from the unlawful conduct alleged;

C.    Enter a judgment in Plaintiff's and the Class's favor awarding actual or liquidated damages, trebled, according to proof;

D.    Award Plaintiff costs of suit, including reasonable attorneys' fees; and

E.    Order such further relief the Court finds appropriate.

[Counsel signatures to follow on next page.]

CLASS ACTION COMPLAINT - 23

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL 872.263.1100 ; FAX 872.863.1109
straussborrelli.com

Date:  May 11, 2026

Respectfully submitted,

/s/ Samuel J. Strauss
Samuel J. Strauss, WSBA No. #46971
Raina C. Borrelli*
STRAUSS BORRELLI PLLC
980 N. Michigan Avenue, Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
sam@straussborrelli.com
raina@straussborrelli.com

Lynn A. Toops*
Natalie A. Lyons*
Ian R. Bensberg*
COHENMALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
ltoops@cohenmalad.com
nlyons@cohenmalad.com
ibensberg@cohenmalad.com

Gerard J. Stranch, IV*
Michael C. Tackeff*
Andrew K. Murray*
STRANCH, JENNINGS &
GARVEY, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
gstranch@stranchlaw.com
mtackeff@stranchlaw.com
amurray@stranchlaw.com


Counsel for Plaintiff and the Putative Class

*Applications for admission
pro hac vice forthcoming

CLASS ACTION COMPLAINT - 24

# EXHIBIT E

FILED
2026 MAY 14 02:28 PM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 26-2-16060-1 SEA

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR THE COUNTY OF KING

MATTHEW WILDMAN, on his own behalf
and on behalf of others similarly situated,

Plaintiff,

v.

MOTOROLA MOBILITY, LLC,

Defendant.

Case No.: _____ SEA

CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

Plaintiff Matthew Wildman, on his own behalf and on behalf of others similarly situated, on information and belief except to his own experiences and matters of public record, complains of Defendant Motorola Mobility, LLC, ("Motorola_) as follows:

## I.   INTRODUCTION

1.    In 1998, to protect Washington consumers from the annoyance and harassment caused by the burgeoning spam email industry, the Washington State Legislature enacted the Commercial Electronic Mail Act (CEMA), codified at chapter 190 of title 19 of the Revised Code of Washington (RCW).

2.    Among other things, CEMA prohibits transmitting a commercial email with `false or misleading information in the subject line_ to the email address of a Washington resident. RCW

STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL: 872-263 1100; FAX 872-263-1109
strausssborrelli.com

19.190.020(1)(b).

3.      Defendant Motorola engages in the precise activity which CEMA prohibits.

4.      Motorola engages Washington consumers, including Plaintiff, with commercial emails featuring subject lines which employ various tactics to create a false sense of urgency in consumers´ minds´ and ultimately, from consumers´ wallets.

5.      This false urgency wastes consumers´ time by enticing them to engage with the defendant´s marketing efforts for fear of missing out. It also floods consumers´ email inboxes with repeated false notifications that the time to act´ i.e., purchase´ is short.

6.      Through this deceptive time-sensitivity, Motorola falsely narrows the field´ steering consumers away from shopping for better deals´ to its own products that must be purchased now.

7.      Plaintiff challenges Motorola´s harassment of Washington consumers with deceptive marketing for violations of the Commercial Electronic Mail Act (RCW 19.190.020) and the Consumer Protection Act (RCW 19.86.020) for injuries caused, additionally seeking injunctive relief against such violations in the future.

## II.      JURISDICTION AND VENUE

8.      The Court has jurisdiction of this case under RCW 2.08.010.

9.      Venue is proper in King County under RCW 4.12.020(3) because Plaintiff´s cause of action or some part of it arose in King County.

## III.      PARTIES

10.      Plaintiff Matthew Wildman is a resident of King County, Washington.

11.      Defendant Motorola Mobility, LLC has a principal place of business of 222 W. Merchandise Mart Plaza, Suite 1800, Chicago, IL 60654, and a registered agent of CT Corporation

CLASS ACTION COMPLAINT
Page 2

STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 ; FAX 872.263.1109
straussborrelli.com

System, 208 SO LASALLE ST, Suite 814, Chicago, ILL 60604-1101.

12. Defendant sells its products in Washington through their website and are thus subject to personal jurisdiction in this Court. See, e.g., Ford Motor Co. v. Montana Eighth Jud. Dist. Ct., 592 U.S. 351 (2021).

## IV.    FACTUAL ALLEGATIONS

A. CEMA protects Washington consumers from deceptive spam emails.

13. The Supreme Court of Washington has made clear: `[A]ll Internet users ŭ bear the cost of deceptive spam._ State v. Heckel, 143 Wn. 2d 824, 835 (2001) (en banc).

14. In 1998, the Legislature found that the `volume of commercial electronic mail_ was `growing,_ generating an `increasing number of consumer complaints._ Laws of 1998, ch. 149, í 1.

15. While it's been nearly three decades since CEMA's enactment, the problems caused by unsolicited commercial email, i.e. spam email, have grown exponentially.

16. The problems, however, are not limited to email content. Subject lines of emails are framed to attract consumers" attention away from the spam barrage to a message that entices consumers to click and, ultimately, purchase.

17. In 2003, the United States Congress found that `[m]any senders of unsolicited commercial electronic mail purposefully include misleading information in the messages "subject lines in order to induce the recipients to view the messages._ 15 U.S.C. í 7701(a)(8).

18. In 2012, one study estimated that Americans bear `costs of almost $20 billion annually_ due to unsolicited commercial email. Justin M. Rao & David H. Reiley, The Economics of Spam, 26 J. of Econ. Perspectives 87, 88 (2012).

19. Even when bulk commercial email marketers are operating under color of consumer

STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100, FAX 872.263-1109
straussborrelli.com

consent, the reality is that `[m]ost privacy consent_´ especially under the `notice-and-choice_ approach predominant in the United States´ `is a fiction._ Daniel J. Solove, Murky Consent: An Approach to the Fictions of Consent in Privacy Law, 104 Boston Univ. L. Rev. 593, 596 (2024).

20. Consumers therefore routinely `consent_ to receive flurries of commercial emails which they did not meaningfully request and in which they have no genuine interest.

21. This includes emails sent to consumers from businesses with which they have no prior relationship´ by virtue of commercial data brokers and commercial data sharing agreements.

22. Simply conducting the routine affairs of daily life often exposes consumers to unanticipated and unwanted volumes of commercial email. `Nowadays, you need an email address for everything from opening a bank account to getting your dog's nails trimmed, and ŭ [o]nce you hand over your email address, companies often use it as an all-access pass to your inbox: Think of shopping websites that send account updates, deals, :we miss you" messages, and holiday promotions throughout the year. It's too much._ Kaitlyn Wells, Email Unsubscribe Services Don't Really Work, N.Y. Times Wirecutter (Aug. 19, 2024), https://perma.cc/U8S6-R8RU/.

23. The Legislature presciently intended CEMA to `provide some immediate relief_ for these problems by prohibiting among other things commercial emails that `contain untrue or misleading information in the subject line._ Laws of 1998, ch. 149, i 1.

24. CEMA thereby protects Washington consumers against the `harms resulting from deceptive commercial e-mails,_ which `resemble the type of harms remedied by nuisance or fraud actions._ Harbers v. Eddie Bauer, LLC, 415 F. Supp. 3d 999, 1008 (W.D. Wash. 2019).

25. CEMA's `truthfulness requirements_ increase the costs of sending deceptive commercial emails and thereby reduce their volume. Heckel, 143 Wn. 2d at 836.

26. CEMA's `truthfulness requirements_ thereby advance the statute's aim of

CLASS ACTION COMPLAINT
Page 4

protecting consumers `from the problems associated with commercial bulk e-mail_ while facilitating commerce `by eliminating fraud and deception._ Id.

27.    CEMA `mean[s] exactly what it says_: in `broad_ but `patently clear_ language, CEMA unambiguously prohibits `sending Washington residents commercial e-mails that contain any false or misleading information in the subject lines of such e-mails._ Certification from U.S. Dist. Ct. for W. Dist. of Wash. in Brown v. Old Navy, LLC, 567 P.3d 38, 44, 46‾47 (Wash. 2025).

28.    CEMA`s protections do not depend on whether an email was (really or fictively) solicited by consumers, nor on whether consumers relied on any false or misleading statement contained in its subject line. See Harbers, 415 F. Supp. 3d at 1011.

29.    The statute`s only concern is to suppress false or misleading information in the subject line of commercial emails. See Brown, 567 P.3d at 44‾45.

B.    The subject lines of Motorola`s marketing emails make false time scarcity claims.

30.    One common way online marketers `manipulate consumer choice by inducing false beliefs_ is to create a false sense of urgency or to falsely claim that consumers `time to act is scarce._ Fed. Trade Comm`n, Bringing Dark Patterns to Light 4 (2022), https://perma.cc/847M-EY69/; see also U.K. Competition & Mkts. Auth., Online Choice Architecture´ How Digital Design Can Harm Competition and Consumers 26 (2022), https://perma.cc/V 848-7TVV/.

31.    The FTC has identified the `False Limited Time Message_ as one example of false time scarcity claims, in which the marketer creates `pressure to buy immediately by saying the offer is good only for a limited time or that the deal ends soon´ but without a deadline or with a meaningless deadline that just resets when reached._ Bringing Dark Patterns to Light, supra para. 30, at 22.

STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.203.1100, FAX 872.263-1109
straussborrelli.com

32.    `False or misleading scarcity claims can change the behaviour of consumers._ Online Choice Architecture, supra para. 30, at 27.

33.    Representations about the timing and duration of sales, discounts, and other special offers are fundamentally representations about prices, and such representations matter to ordinary consumers. See, e.g., Huiliang Zhao et al., Impact of Pricing and Product Information on Consumer Buying Behavior with Customer Satisfaction in a Mediating Role, 12 Frontiers in Psychology 720151 (2021), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC8710754/pdf/fpsyg-12-720151.pdf/.

34.    False scarcity claims are psychologically effective. As `considerable evidence_ suggests, `consumers react to scarcity and divert their attention to information where they might miss opportunities._ Online Choice Architecture, supra para. 30, at 26.

35.    Invoking this time pressure achieves a seller's aim to narrow the field of competitive products and deals, by `induc[ing] consumers to rely on heuristics (mental shortcuts), like limiting focus to a restricted set of attributes or deciding based on habit._ Id.

36.    Under time pressure, `consumers might take up an offer to minimise the uncertainty of passing it up._ Id.

37.    False time scarcity claims thus harm consumers by manipulatively distorting their decision-making to their detriment´ and the seller's benefit.

38.    Indeed, one 2019 study found that `customers who took timed deals rather than waiting to see wider options ended up worse off than those who waited._ Id. at 27.

39.    False time scarcity claims also harm market competition. Consumers learn to ignore scarcity claims, `meaning that when a product [or offer] is truly scarce, the seller will not be able to credibly communicate this information._ Id.

CLASS ACTION COMPLAINT
Page 6

STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 . FAX 872.263-1109
straussborrelli.com

40. These false time scarcity claims are a staple of Motorola's email scheme to compel consumers to purchase its products.

41. Motorola is a consumer electronics retailer and manufacturer of smart phones, smart products like wearable tech, tech accessories, and related software and support systems and services.

42. To advertise the products, accessories, and other offers available on its website, Motorola sends spam emails to consumers.

43. Urgent Spam Emails. Unfortunately for those recipients, Motorola regularly titles its emails with urgent subject headings that do not reflect the true availability of the advertised deal. This strategy is demonstrated in the examples discussed below.

44. Motorola has tailored its approach to fit a variety of offers, including promotion extensions. In these examples, Motorola sends consumers emails to advertise an offer, promotion, or sale and represents in the subject headings of those emails that the promotion will end imminently. These emails present the promotional pricing as a scarce or time-limited opportunity. This strategy commands consumers' attention and pressures them to purchase from Motorola's website. Finally, once the originally advertised `deadline` has passed, Motorola knowingly extends the promotion to a new end date.

45. While Motorola may present these extensions as though they are a favor or some unexpected blessing to consumers, they are anything but. By pairing false time pressures with surprise extensions´ which are only disclosed once the original promotion has ended´ Motorola compels consumers to purchase quickly while withholding terms that consumers need so they can make informed buying decisions.

46. This misleading marketing strategy allows Motorola to maximize sales during both

CLASS ACTION COMPLAINT
Page 7

STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100; FAX 872.263-1109
strauss borrelli.com

the initial promotion, as well as the subsequent extension.

47.    A 2024 promotion provides an apt example of this strategy at work.

48.    On December 2, 2024, Motorola sent a commercial email to consumers with the subject heading: `ONE DAY ONLY! Cyber Monday t⁣i̇ _Inside, a banner running across the body of the email repeated in the urgent warning in large text `ONE DAY ONLY!_

49.    But the promotion wasn't ending that day.

50.    A few days later, on December 4, 2024, Motorola sent another commercial email with the subject heading: `EXTENDED! Cyber Monday Savings .⣿ _

51.    The information contained within the subject heading of the December 2, 2024, email was false and misleading. By warning consumers that it was their last chance to participate in the promotion, Motorola draws the consumer in using false urgency premised upon the false deadline.

52.    December 2, 2024, was not the only day to obtain this promotion. The information contained in the subject heading of the December 2, 2024 email was false and misleading. The subject heading of the December 4, 2024 email confirms the falsity of the subject line sent on December 2, 2024.

53.    The heading of the second email confirmed that the promotion would continue beyond the deadline that Motorola previously, and unambiguously, communicated to consumers in its December 2, 2024, subject line.

54.    Thus, after warning consumers that the opportunity was ending, Motorola extended the sale, thereby proving the falsity of its December 2, 2024, subject line. Consumers in receipt of the December 2 email were not at risk of missing the offer because Motorola did not end the sale on December 2, as it originally advertised. The false deadline and the false time scarcity presented

CLASS ACTION COMPLAINT
Page 8

STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100, FAX 872.263.1109
straussborrelli.com

in the December 2 subject line are key elements in Motorola's cohesive marketing strategy. These tactics are a coordinated marketing strategy designed on the front end and meant to compel consumers to purchase products from Motorola's website.

55.  The subject headings of these emails are designed for a busy consumer skimming their inbox. They draw the consumer in with false information that Motorola knows to be inaccurate when it sends the initial email.

56.  Motorola continued this strategy in 2025.

57.  In an example from February 28, 2025, Motorola sent a commercial email to consumers with the subject heading: `Last Call: Iconic Deals Ending Soon!    _ The email advertised `red carpet deals_ and stated `This is your last chance to get up to $300 off our fashionable smartphone!_ The words `last chance_ were italicized in red text against a black background.

58.  But it was not `last call_ for this promotion.

59.  On March 5, 2025, Motorola sent another commercial email with the subject heading: `These deals are still blooming    _ The body of the email advertised a promotion stating, `Get up to $350 off a new smartphone for spring._

60.  The first email contained information in its subject heading that was false and misleading. The language in the subject heading is designed by Motorola to gin up consumer urgency when the promotion is not actually ending imminently. The information in the subject heading misleads the consumer into thinking that to obtain the value of the promotion, they must act now. The emails on February 28 and March 5 concern the same promotion on the same product. It was not a consumer's `last chance_ or `last call_ to act on February 28, because a similar if not better promotion was available mere days later.

STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100, FAX 872.263.1109
straussborrelli.com

61.    All of this is part of a coordinated marketing strategy to gin up urgency where there is none and create a mindset for consumers that they must act quickly to obtain a certain promotion that is not, in fact, ending when Motorola says it is.

62.    Motorola remained dialed into its deceptive strategy a few months later.

63.    On April 18, 2025, Motorola sent a commercial email to consumers with the subject heading: `Final Call on these spring deals 🌸 🌼 _Within the email, large text appearing at the top announced, `FINAL CALL UP TO $400 OFF._ Further down, additional text warned, `This is the last chance to spring on these deals. Get up to $400 off the season's hottest phones. _Then, in small text at the bottom of the email, Motorola specified the deals included in the promotion: `$200 off motorola razr+ 2024 and up to $100 off with trade-in. $350 off Motorola razr - 2023, as low as $1 with trade-in and up to 20% off Moto Care. $30 off moto g 5G - 2024 and up to 15% off Moto Care. $20 off moto g play - 2024 and up to 15% off Moto Care. $400 off Motorola edge+ 2023 and as low as $1 with trade-in. $90 off moto g power 5G - 2024 and up to 15% off Moto Care._

64.    But it wasn't the `final call_ for these deals.

65.    On April 21, 2025, Motorola sent another commercial email with the subject heading: `New Blooms 🌷 UP TO $400 OFF_ Again, the first text greeting consumers within the email was Defendant's announcement of `UP TO $400 OFF[.]_ Additional text confirmed that Motorola had `extended_ the sale. Then, within fine print at the bottom of the email, Motorola specified the offered deals. Much like the April 18, 2024, email, the April 21 promotion included the `$200 off motorola razr+ 2024 and an extra $100 off with trade-in_ and `$400 off motorola edge+ 2023 and as low as $1 with trade-in_ offers.

66.    Thus, the subject heading of the April 18, 2025 email was false and misleading. The promotion was not ending imminently, and in fact, deals referenced in the April 18 subject line

STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100; FAX 872.263.1109
straussborrelli.com

continued for days after the original deadline was communicated to consumers as ending imminently.

67.    Motorola was at it again this year.

68.    On January 23, 2026, Motorola transmitted a commercial email to consumers with the subject heading: `Final call on these frosty finds ☐ ▨ _

69.    The body of the email reiterated `FINAL CALL _ in all-caps, stating that the offers to get $500 off a new phone would end January 25, 2026. Fine print at the bottom of the email indicated that the promotion would last until January 25, 2026, at 11:59pm CST. The email also detailed the products included in the sale. For example, a motorola razr ultra (1TB) was offered for $500 off and a moto g power 5G ˉ 2024 was offered at $129.99.

70.    But it wasn't the final call for this promotion.

71.    The promotion did not end on January 25.

72.    On January 27, 2026, Motorola spammed consumers again with a commercial email with the subject heading: ` ☐ 12 HOURS LEFT ☐ _

73.    The red alarm emoji heighten the false sense of urgency created by Motorola.

74.    The body of the January 27, 2026 email advertised the same promotion - $500 off winter bundles and new phones. The fine print at the bottom of the email indicated the promotion would end on January 27, 2026 at 11:59pm. The email also offered the same pricing on the motorola razr ultra (1TB) and moto g power 5G ˉ 2024 phones that were advertised in the January 23, 2026, email.

75.    But there wasn't twelve hours left on this deal.

76.    On January 28, 2026, Motorola sent another commercial email with the subject heading: `JUST LANDED: New winter deals ☐   ☐ _

STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100, FAX 872.263-1109
straussborrelli.com

77. The body of the January 28, 2026 email advertised $700 off new phones and winter deals, including $700 off a motorola razr ultra (1TB) (priced at $799.99) and $170 off a moto g power 5G - 2024 (priced at $129.99).

78. A consumer in receipt of the January 25 and 27, 2026, emails was better off waiting for the pricing on January 28. The information in the subject headings of the January 25 and 27 emails was false and misleading. It ginned up urgency where there was none as part of a cohesive marketing scheme to make consumers think promotions were ending imminently when they were not. And the `new winter deal_ on the moto g power 5G - 2024 was in fact the same promotional pricing included in the earlier emails - the promotion had not ended on that item.

79. Similarly, on February 5, 2026, Motorola sent a commercial email to consumers with the subject heading: `Our Valentine's bundle won't wait 🎁 0 _

80. The information in the subject heading of the February 5 email was false and misleading.

81. On February 9, 2026, Motorola sent another commercial email to consumers with the subject heading: `DEAL EXTENDED慮 $700 off motorola razr ultra 1TB_

82. The body of the email contained Valentine's Day themed colors and an image of a cake in the shape of a heart with the text: `From: Moto To: You._

83. The February 9 email confirmed the falsity of the information in the subject heading of the February 5 email.

84. The information in the examples above communicated by Motorola to consumers in the subject headings of its commercial emails was false and misleading - it was not the last chance for consumers to obtain the promotion. Motorola misrepresented the duration and availability of the promotions.

CLASS ACTION COMPLAINT
Page 12

STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 / FAX 872.263.1109
straussborrelli.com

85. As the subject lines of its marketing emails demonstrate, Motorola employs a strategy where it pressures consumers to make purchases from its website by falsely representing the limited availability of its offers.

C. Motorola knows when it sends emails to Washington residents.

86. A sophisticated commercial enterprise, like Motorola, which is engaged in persistent marketing through mass email campaigns across the United States, has several ways of knowing where the recipients of its marketing emails are located. The means it employs are peculiarly within its knowledge.

87. First, the sheer volume of email marketing that Motorola engages in put it on notice that Washington residents would receive its emails.

88. Second, Motorola may obtain location information tied to email addresses when consumers make purchases from Motorola through digital platforms, or otherwise self-report such information to Motorola.

89. Third, Motorola may obtain location information tied to email addresses by tracking the IP addresses of devices used to open Motorola emails, which in turn can be correlated to physical location (as illustrated, for example, by the website https://whatismyipaddress.com/).

90. Specifically, Motorola appears to use third-party applications to manage its email marketing campaigns, including Salesforce. These platforms should allow Motorola to access a list of every email address that was sent a marketing email. It should also allow Motorola to determine which email recipients viewed the emails and who clicked on any links within them.

91. Fourth, Motorola may obtain location information tied to email addresses by purchasing consumer data from commercial data brokers such as Acxiom, Oracle, and Equifax, which sell access to databases linking email addresses to physical locations, among other

CLASS ACTION COMPLAINT
Page 13

identifiers.

92.    Fifth, Motorola may obtain location information tied to email addresses by using `identity resolution_ services offered by companies such as LiveRamp, which can connect consumers`email addresses to their physical locations, among other identifiers.

93.    Sixth, Motorola may obtain information that the recipients of its marketing emails are Washington residents because that information is available, upon request, from the registrant of the Internet domain names contained in the recipients` email addresses. See RCW 19.190.020(2).

94.    It is thus highly probable that a seller of Motorola`s size and sophistication employs not just one but several means of tying consumers`email addresses to their physical locations, at least at the state level.

D.    Motorola violated Plaintiff`s right under CEMA to be free from deceptive commercial emails.

95.    Motorola has spammed Plaintiff with commercial emails whose subject lines contain false or misleading statements in violation of his right to be free from such annoyance and harassment under CEMA.

96.    For example, Plaintiff received an email containing false or misleading subject lines sent by Motorola as described above in Section B, including:

    a.    The December 2, 2024 email with the subject heading: `ONE DAY ONLY! Cyber Monday 🕙 _ as discussed in paragraphs 47 through 55.

    b.    The April 18, 2025 email with the subject heading `Final Call on these spring deals 🌱 🌷 _ as discussed in paragraphs 62 through 66.

    c.    The January 27, 2026 email with the subject heading: ` 🔔 12 HOURS

CLASS ACTION COMPLAINT
Page 14

STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100; FAX 872.263.1109
straussborrelli.com

LEFT ___ as discussed in paragraphs 67 through 78.

97. The subject lines of these emails are false or misleading in violation of CEMA as described above.

98. These subject lines contained false statements of fact as to the `duration or availability of a promotion._ Brown, 567 P.3d at 47.

## V.    CLASS ALLEGATIONS

99. Plaintiff brings this action under Civil Rule 23 on behalf of the following putative class (`Class_):

> All Washington residents who, during the Class Period, received a commercial email sent by the Defendant, on behalf of the Defendant, or with the Defendant's assistance, that contained messaging in the email subject line which misrepresented the facts of a sale, deal or promotion.

100. Excluded from this definition of the Class are Defendant's officers, directors, and employees; Defendant's parents, subsidiaries, affiliates, and any entity in which Defendant has a controlling interest; undersigned counsel for Plaintiff; and all judges and court staff to whom this action may be assigned, as well as their immediate family members.

101. The Class Period extends from the date four years before this Class Action Complaint is filed to the date a class certification order is entered in this action.

102. Plaintiff reserves the right to amend the Class definition as discovery reveals additional emails containing false or misleading information in the subject line that Defendant sent or caused to be sent during the Class Period to email addresses held by Washington residents.

103. The Class is so numerous that joinder of all members is impracticable because the Class is estimated to minimally contain thousands of members.

104. There are questions of law or fact common to the class, including without limitation

CLASS ACTION COMPLAINT
Page 15

STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100; FAX 872.263-1109
straussborrelli.com

whether Defendant sent commercial emails containing false or misleading information in the subject line; whether Defendant sent such emails to email addresses it knew or had to reason to know were held by Washington residents; whether Defendant's conduct violated CEMA; whether Defendant's violation of CEMA constituted a per se violation of the Consumer Protection Act, RCW 19.86.020 (CPA); and whether Defendant should be enjoined from such conduct.

105.    Plaintiff's claims are typical of the Class's because, among other reasons, Plaintiff and Class members share the same statutory rights under CEMA and the CPA, which Defendant violated in the same way by the uniform false or misleading marketing messages it sent to all putative members.

106.    Plaintiff will fairly and adequately protect the Class's interests because, among other reasons, Plaintiff shares the Class's interest in avoiding unlawful false or misleading marketing; has no interest adverse to the Class; and has retained competent counsel extensively experienced in consumer protection and class action litigation.

107.    Defendant has acted on grounds generally applicable to the Class, in that, among other ways, it engaged in the uniform conduct of sending uniform commercial emails to Plaintiff and the Class, which violate CEMA and the CPA in the same way, and from which it may be enjoined as to Plaintiff and all Class members, thereby making appropriate final injunctive relief with respect to the Class as a whole.

108.    The questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, in that, among other ways, Defendant has violated their rights under the same laws by the same conduct, and the only matters for individual determination are the number of false or misleading emails received by each Class member and that Class member's resulting damages.

CLASS ACTION COMPLAINT
Page 16

STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 ; FAX 872.263.1109
straussborrelli.com

109.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy because, among other reasons, the claims at issue may be too small to justify individual litigation and management of this action as a class presents no special difficulties.

## VI.    CLAIMS TO RELIEF

### First Claim to Relief

Violation of the Commercial Electronic Mail Act, RCW 19.190.020

110.    Plaintiff incorporates and realleges paragraphs 1–98 above.

111.    CEMA provides that `[n]o person may initiate the transmission, conspire with another to initiate the transmission, or assist the transmission, of a commercial electronic mail message ü to an electronic mail address that the sender knows, or has reason to know, is held by a Washington resident that ü [c]ontains false or misleading information in the subject line._ RCW 19.190.020(1)(b).

112.    Defendant is a `person_ within the meaning of CEMA. RCW 19.190.010(11).

113.    Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transition of `commercial electronic mail messages_ within the meaning of CEMA. RCW 19.190.010(2).

114.    Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages to electronic mail addresses that Defendant knew, or had reason to know, were held by Washington residents, including because Defendant knew that Plaintiff and putative members were Washington residents through `information is available, upon request, from the registrant of the internet domain name contained in the recipient's electronic mail address_. RCW 19.190.020(b)(2).

CLASS ACTION COMPLAINT
Page 17

STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL: 872-263-1100, FAX 872-263-1109
straussborrelli.com

115. Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages that contained false or misleading information in the subject line, as described herein, in violation of CEMA. RCW 19.190.020(1)(b).

116. For Defendant's violation of CEMA, Plaintiff is entitled to all available relief, including an injunction against further violations.

### Second Claim to Relief

### Violation of the Consumer Protection Act, RCW 19.86.020

117. Plaintiff incorporates and realleges paragraphs 1–98 above.

118. The CPA provides that `[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful._ RCW 19.86.020.

119. A violation of CEMA is a per se violation of the CPA. RCW 19.190.030.

120. A violation of CEMA establishes all the elements necessary to bring a private action under the CPA. Wright v. Lyft, 189 Wn. 2d 718 (2017).

121. CEMA provides that `[n]o person may initiate the transmission, conspire with another to initiate the transmission, or assist the transmission, of a commercial electronic mail message ŭ to an electronic mail address that the sender knows, or has reason to know, is held by a Washington resident that ŭ [c]ontains false or misleading information in the subject line._ RCW 19.190.020(1)(b).

122. Defendant is a `person_ within the meaning of CEMA. RCW 19.190.010(11).

123. Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transition of `commercial electronic mail messages_ within the meaning of CEMA. RCW 19.190.010(2).

CLASS ACTION COMPLAINT
Page 18

124. Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages to electronic mail addresses that Defendant knew, or had reason to know, were held by Washington residents.

125. Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages that contained false or misleading information in the subject line, as described herein, in violation of CEMA. RCW 19.190.020(1)(b).

126. For Defendant's violation of the CPA, Plaintiff and putative members are entitled to an injunction against further violations; the greater of Plaintiff's actual damages or liquidated damages of $500 per violation, trebled; and costs of the suit, including a reasonable attorney's fee.

## VII.   JURY DEMAND

127. Plaintiff will demand a jury trial by separate document in accordance with Local Civil Rule 38(b).

## VIII.   PRAYER FOR RELIEF

Plaintiff asks the Court to:

A.   Certify the proposed Class, appoint Plaintiff as Class representative, and appoint undersigned counsel as Class counsel;

B.   Enter a judgment in Plaintiff's and the Class's favor permanently enjoining Defendant from the unlawful conduct alleged;

C.   Enter a judgment in Plaintiff's and the Class's favor awarding actual or liquidated damages, trebled, according to proof;

D.   Award Plaintiff costs of suit, including reasonable attorneys' fees; and

CLASS ACTION COMPLAINT
Page 19

STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL 872 263 1100   FAX 872-263-1109
straussborrelli.com

E. Order such further relief the Court finds appropriate.

Date: May 14, 2026

Respectfully submitted,

/s/ Samuel J. Strauss
Samuel J. Strauss, WSBA No. #46971
Raina C. Borrelli*
STRAUSS BORRELLI PLLC
980 N. Michigan Avenue, Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
sam@straussborrelli.com
raina@straussborrelli.com

Lynn A. Toops*
Natalie A. Lyons*
Ian R. Bensberg*
COHENMALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
ltoops@cohenmalad.com
nlyons@cohenmalad.com
ibensberg@cohenmalad.com

Gerard J. Stranch, IV*
Michael C. Tackeff*
Andrew K. Murray*
STRANCH, JENNINGS &
GARVEY, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
gstranch@stranchlaw.com
mtackeff@stranchlaw.com
amurray@stranchlaw.com

Counsel for Plaintiff and the Putative Class

*Applications for admission
pro hac vice forthcoming

CLASS ACTION COMPLAINT
Page 20

# EXHIBIT F

FILED
2026 MAY 21 10:07 AM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 26-2-16754-1 SEA

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR THE COUNTY OF KING

| | |
|---|---|
| MATTHEW WILDMAN, on his own behalf and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>PHILADELPHIA INQUIRER, LLC,<br><br>Defendant. | Case No: _____ SEA<br><br>CLASS ACTION COMPLAINT<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Matthew Wildman, on his own behalf and on behalf of others similarly situated, on information and belief except to his own experiences and matters of public record, complains of Philadelphia Inquirer, LLC (`Defendant,_ or `The Inquirer_), as follows:

## I.    INTRODUCTION

1.    In 1998, to protect Washington consumers from the annoyance and harassment caused by the burgeoning spam email industry, the Washington State Legislature enacted the Commercial Electronic Mail Act (CEMA), codified at chapter 190 of title 19 of the Revised Code of Washington (RCW).

2.    Among other things, CEMA prohibits transmitting a commercial email with `false or misleading information in the subject line_ to the email address of a Washington resident.

CLASS ACTION COMPLAINT ˉ 1

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100; FAX 872.863.1109
straussborrellcom

RCW 19.190.020(1)(b).

3. Defendant engages in the precise activity which CEMA prohibits.

4. The Inquirer spams Washington consumers, including Plaintiff, with commercial emails featuring subject lines which employ various tactics to create a false sense of urgency in consumers' minds' and ultimately, from consumers' wallets.

5. This false urgency wastes consumers' time by enticing them to engage with the defendant's marketing efforts for fear of missing out. It also floods consumers' email inboxes with repeated false notifications that the time to act' i.e., purchase' is short.

6. Through this deceptive time-sensitivity, The Inquirer falsely narrows the field' steering consumers away from shopping for better deals' to its own products that must be purchased now.

7. Plaintiff challenges The Inquirer's harassment of Washington consumers with deceptive marketing for violations of CEMA and the Consumer Protection Act (RCW 19.86.020) for injuries caused, additionally seeking injunctive relief against such violations in the future.

## II.   JURISDICTION AND VENUE

8. The Court has jurisdiction of this case under RCW 2.08.010.

9. Venue is proper in King County under RCW 4.12.020(3) because Plaintiff's cause of action, or some part thereof, arose in King County.

## III.   PARTIES

10. Plaintiff Matthew Wildman is a resident of King County, Washington.

11. Defendant Philadelphia Inquirer, LLC, is a Delaware company with its principal address at 100 S. Independence Mall W., Floor 6, Philadelphia, PA 19106-2320.

12. Defendant offers its products in Washington through its website and through digital

CLASS ACTION COMPLAINT - 2

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 / FAX 872.263.1109
straussborrelli.com

and print subscriptions to its newspaper; it is thus subject to personal jurisdiction in this Court. See, e.g., Ford Motor Co. v. Montana Eighth Jud. Dist. Ct., 592 U.S. 351 (2021).

## IV.    FACTUAL ALLEGATIONS

A.    CEMA protects Washington consumers from deceptive spam emails.

13.    The Supreme Court of Washington has made clear: `[A]ll Internet users ü bear the cost of deceptive spam._ State v. Heckel, 143 Wn. 2d 824, 835 (2001) (en banc).

14.    In 1998, the Legislature found that the `volume of commercial electronic mail_ was `growing,_ generating an `increasing number of consumer complaints._ Laws of 1998, ch. 149, i 1.

15.    While it's been nearly three decades since CEMA's enactment, the problems caused by unsolicited commercial email, i.e. spam email, have grown exponentially.

16.    The problems, however, are not limited to email content. Subject lines of emails are framed to attract consumers" attention away from the spam barrage to a message that entices consumers to click and, ultimately, purchase.

17.    In 2003, the United States Congress found that `[m]any senders of unsolicited commercial electronic mail purposefully include misleading information in the messages" subject lines in order to induce the recipients to view the messages._ 15 U.S.C. i 7701(a)(8).

18.    In 2012, one study estimated that Americans bear `costs of almost $20 billion annually_ due to unsolicited commercial email. Justin M. Rao & David H. Reiley, The Economics of Spam, 26 J. of Econ. Perspectives 87, 88 (2012).

19.    Even when bulk commercial email marketers are operating under color of consumer consent, the reality is that `[m]ost privacy consent_' especially under the `notice-and-choice_ approach predominant in the United States' `is a fiction._ Daniel J. Solove, Murky Consent: An

CLASS ACTION COMPLAINT - 3

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL 872.263.1100 / FAX 872.863.1109
straussborrelli.com

Approach to the Fictions of Consent in Privacy Law, 104 Boston Univ. L. Rev. 593, 596 (2024).

20.    Consumers therefore routinely `consent_ to receive flurries of commercial emails which they did not meaningfully request and in which they have no genuine interest.

21.    This includes emails sent to consumers from businesses with which they have no prior relationship` by virtue of commercial data brokers and commercial data sharing agreements.

22.    Simply conducting the routine affairs of daily life often exposes consumers to unanticipated and unwanted volumes of commercial email. `Nowadays, you need an email address for everything from opening a bank account to getting your dog's nails trimmed, and ŭ [o]nce you hand over your email address, companies often use it as an all-access pass to your inbox: Think of shopping websites that send account updates, deals, :we miss you" messages, and holiday promotions throughout the year. It's too much._ Kaitlyn Wells, Email Unsubscribe Services Don't Really Work, N.Y. Times Wirecutter (Aug. 19, 2024), https://perma.cc/U8S6-R8RU/.

23.    The Legislature presciently intended CEMA to `provide some immediate relief_ for these problems by prohibiting among other things commercial emails that `contain untrue or misleading information in the subject line._ Laws of 1998, ch. 149, í 1.

24.    CEMA thereby protects Washington consumers against the `harms resulting from deceptive commercial e-mails,_ which `resemble the type of harms remedied by nuisance or fraud actions._ Harbers v. Eddie Bauer, LLC, 415 F. Supp. 3d 999, 1008 (W.D. Wash. 2019).

25.    CEMA's `truthfulness requirements_ increase the costs of sending deceptive commercial emails and thereby reduce their volume. Heckel, 143 Wn. 2d at 836.

26.    CEMA's `truthfulness requirements_ thereby advance the statute's aim of protecting consumers `from the problems associated with commercial bulk e-mail_ while facilitating commerce `by eliminating fraud and deception._ Id.

CLASS ACTION COMPLAINT - 4

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ¿ FAX 872.863.1109
straussborrelli.com

27. CEMA `mean[s] exactly what it says`: in `broad` but `patently clear` language, CEMA unambiguously prohibits `sending Washington residents commercial e-mails that contain any false or misleading information in the subject lines of such e-mails.` Certification from U.S. Dist. Ct. for W. Dist. of Wash. in Brown v. Old Navy, LLC, 567 P.3d 38, 44, 46`47 (Wash. 2025).

28. CEMA`s protections do not depend on whether an email was (really or fictively) solicited by consumers, nor on whether consumers relied on any false or misleading statement contained in its subject line. See Harbers, 415 F. Supp. 3d at 1011.

29. The statute`s only concern is to suppress false or misleading information in the subject line of commercial emails. See Brown, 567 P.3d at 44`45.

B. The subject lines of The Inquirer`s marketing emails make false time scarcity claims.

30. One common way online marketers `manipulate consumer choice by inducing false beliefs` is to create a false sense of urgency or to falsely claim that consumers `time to act is scarce. Fed. Trade Comm`n, Bringing Dark Patterns to Light 4 (2022), https://perma.cc/847M-EY69/; see also U.K. Competition & Mkts. Auth., Online Choice Architecture` How Digital Design Can Harm Competition and Consumers 26 (2022), https://perma.cc/V 848-7TVV/.

31. The FTC has identified the `False Limited Time Message` as one example of false time scarcity claims, in which the marketer creates `pressure to buy immediately by saying the offer is good only for a limited time or that the deal ends soon` but without a deadline or with a meaningless deadline that just resets when reached.` Bringing Dark Patterns to Light, supra para. 30, at 22.

32. `False or misleading scarcity claims can change the behavior of consumers.` Online Choice Architecture, supra para. 30, at 27.

CLASS ACTION COMPLAINT `5

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100; FAX 872.863.1109
straussborrelli.com

33.   Representations about the timing and duration of sales, discounts, and other special offers are fundamentally representations about prices, and such representations matter to ordinary consumers. See, e.g., Huiliang Zhao et al., Impact of Pricing and Product Information on Consumer Buying Behavior with Customer Satisfaction in a Mediating Role, 12 Frontiers in Psychology 720151 (2021), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC8710754/pdf/fpsyg-12-720151.pdf/.

34.   False scarcity claims are psychologically effective. As `considerable evidence suggests, `consumers react to scarcity and divert their attention to information where they might miss opportunities._ Online Choice Architecture, supra para. 30, at 26.

35.   Invoking this time pressure achieves a seller's aim to narrow the field of competitive products and deals, by `induc[ing] consumers to rely on heuristics (mental shortcuts), like limiting focus to a restricted set of attributes or deciding based on habit._ Id.

36.   Under time pressure, `consumers might take up an offer to minimize the uncertainty of passing it up._ Id.

37.   False time scarcity claims thus harm consumers by manipulatively distorting their decision-making to their detriment´ and the seller's benefit.

38.   Indeed, one 2019 study found that `customers who took timed deals rather than waiting to see wider options ended up worse off than those who waited._ Id. at 27.

39.   False time scarcity claims also harm market competition. Consumers learn to ignore scarcity claims, `meaning that when a product [or offer] is truly scarce, the seller will not be able to credibly communicate this information._ Id.

40.   These false time scarcity claims are a staple of The Inquirer's marketing scheme to compel consumers to purchase its products.

CLASS ACTION COMPLAINT - 6

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ; FAX 872.863.1109
straussborrelli.com

41.    The Inquirer is a nationally distributed daily newspaper, based in Philadelphia, Pennsylvania, that offers newspaper subscriptions in print format and digital format via its website, inquirer.com.

42.    To advertise and encourage subscriptions, The Inquirer routinely sends spam emails to consumers. These emails are part of a calculated marketing strategy that Defendant orchestrates in advance to maximize sales by distorting factual information about the duration and availability of its promotions.

43.    Urgent Spam Emails. Unfortunately for those recipients, The Inquirer regularly sends its emails with urgent subject headings that do not reflect the true availability of the advertised deal. This strategy is demonstrated in the examples discussed below.

44.    Defendant has tailored its approach to fit a number of offers, including promotion extensions. In these examples, The Inquirer sends consumers marketing emails to advertise an offer, promotion, or sale. Then, it uses the subject lines of follow-up emails to present the promotional pricing as a scarce or time-limited opportunity. This strategy commands consumers' attention and pressures them to purchase. Finally, once the originally advertised `deadline_ has passed, The Inquirer knowingly extends the promotion to a new end date.

45.    This misleading marketing strategy allows The Inquirer to maximize sales during both the initial promotion and the subsequent `extension._ While The Inquirer may present these extensions as though they are a favor or unexpected blessing to consumers, they are anything but. By deploying false time pressure with surprise extensions´ which are only disclosed once the original promotion has ended´ The Inquirer urges consumers to purchase quickly while withholding the time consumers need to make informed buying decisions. A 2023 Labor Day sale provides an apt example of this strategy at work.

CLASS ACTION COMPLAINT - 7

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 / FAX 872.863.1109
straussborrellicom

46.    First, The Inquirer sends consumers marketing emails advertising a new promotion. For its Labor Day 2023 sale, it started its email marketing as early as August 22, when it sent an email with the subject line, `⁊ Labor Day Sale: 10¢/WEEK for 4 MONTHS._

47.    Throughout late August and into early September 2023, the Inquirer continued to prime consumers about this `10¢ a week for 4 months_ Labor Day Sale with spam emails, including one on August 31, 2023 with the subject line: `増 Work is hard. This is EASY: Just 10¢!_

48.    For the next step in its scheme, The Inquirer uses the subject lines of its follow-up emails to impose false time pressure on recipients. Such subject lines urge consumers to purchase from The Inquirer's website by falsely warning them that the offer is coming to an end.

49.    That time pressure came on Labor Day itself, September 4, 2023 when The Inquirer clogged consumers' inboxes with an email purportedly reminding them, in the subject heading, of this advertised end to the sale: ` 釾 Happy Labor Day! Sale ends today!_. This urgent deadline' amplified by emoji and exclamation marks' was reinforced by text in the body of the email, telling consumers to `act fast_ and that this was their `LAST CALL_ to take advantage of the `10¢ a week for 4 months_ Labor Day Sale.

50.    The subject line of the September 4, 2023 email was false or misleading.

51.    Labor Day was not the final opportunity to obtain the Labor Day deal. The next day, September 5, after Labor Day had come and gone, the Inquirer sent another email with the headline: ` ロ SALE EXTENDED: Just 10¢ a week!_

52.    The September 5, 2023 email confirms the misleading nature of The Inquirer's misstatement on September 4 that the 10¢ deal would `end[ ] today._ The Labor Day Sale didn't end on September 4. Put another way, the Labor Day deal did not end on its namesake day.

53.    The Inquirer redeployed this ruse that very same month, yet again pairing a false

CLASS ACTION COMPLAINT ⁻ 8

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ¿ FAX 872.863.1109
straussborrelli.com

deadline with a surprise `extension._

54. On September 18, 2023, The Inquirer announced a deal on subscriptions in a marketing email sent to consumers that urged them, with firework emojis in the subject line, to be expeditious or lose out: ` 🎆 ACT NOW: 25ê/MONTH for 6 MONTHS 🎆 _.

55. The very next day, September 19, 2023, following the urgent call to action, The Inquirer spammed consumers with an email conveying, in the subject heading, the imminent expiration to this 25ê subscription deal: ` ⏳ ENDING: 25ê/MONTH for 6 MONTHS ⏳ _.

56. The subject line of the September 19, 2023 email was false or misleading.

57. The urgent representation, in caps, that the deal is presently `ending_ misleads consumers that time is immediately running out. The body of the email reinforced this deceptive messaging, stating, in bolded font: `Time left on this sale? Not much._

58. But there was more time before the purportedly `ending_ 25ê subscription deal would actually end. On September 20, 2023, The Inquirer sent another spam email to consumers, informing them, in the subject line, that there was a whole other day to take advantage of the deal: ` ⏰ 25ê/MONTH FOR 6 MONTHS: TODAY ONLY ⏰ ._ As the email further made clear: this next-day `today only_ offer was effectively a post-deadline extension, telling consumers to `Consider this overtime._

59. The Inquirer continued its misleading representations about deal deadlines in 2024. It started off the year with `flash sales_ designed to capture consumers" attention.

60. For example, on January 23, 2024, The Inquirer spammed consumers with an email that announced in the subject heading: ` ⚡ FLASH SALE: $1/WEEK for 1 YEAR ⚡ _.

61. The subject line of the January 23, 2024 email was false or misleading.

62. The subject line conveyed that, just like a lightning bolt ( ⚡ ), the $1 per week deal

CLASS ACTION COMPLAINT - 9

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100; FAX 872.863.1109
straussborrelli.com

would be gone in the same flash it had appeared in. It made this representation knowing´ as it stated in the body of this email´ that the deal would be available for `48 hours._

63.    Then, on January 24, 2024, The Inquirer sent an email to consumers urgently conveying, in the subject line: `* $1/WEEK for 1 YEAR ends today! * _, strategically invoking road signs to get consumers to stop and take notice of the `today_ deadline for the $1 per week deal. The body of the email reinforced the `today_ deadline, calling it the `LAST CHANCE,_ and emphasizing that `This sale is slipping away._

64.    The subject line of the January 24, 2024 email was false or misleading.

65.    January 24 was not the deadline. On January 25, 2024, The Inquirer spammed consumers with another email, saying, in the subject line: ` SALE EXTENDED: $1/WEEK for 1 YEAR _, confirming in the body of the email that, in fact, January 25´ not January 24´ was the `Last chance!_ to take advantage of the promotion.

66.    One month later, The Inquirer re-upped this `flash sale_ variation on its false deal deadline theme, with an email on February 20, 2024, announcing, in the subject heading: ` 25ê A MONTH for 6 MONTHS  FLASH SALE _.

67.    The subject line of the February 20, 2024 email was false or misleading.

68.    Again, the `flash sale_ marketing, supported by lightning bolt emoji and nearly all-caps formatting, falsely conveyed the message that the promotion would be gone in a flash.

69.    Right on The Inquirer´s usual schedule, the very next day, February 21, 2024, it spammed consumers with an email flagging down consumers, in the subject heading, to emphasize the purportedly imminent deadline on the 25ê deal: ` [24 HOURS LEFT] 25ê a month for 6 months _. The email itself reinforced this alleged deadline with the bolded message: `Time left

CLASS ACTION COMPLAINT - 10

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611 4501
TEL. 872.263.1100 ¸ FAX 872.863.1109
straussborrelli.com

on this sale? Not much.

70. The subject line of the February 21, 2024 email was false or misleading.

71. Again as before, The Inquirer sent an email on February 22 informing consumers, in the subject line: `[SALE EXTENDED]  25¢ A MONTH for 6 MONTHS!`, giving the lie to the February 21 representation that there were just `24 HOURS LEFT` on the deal.

72. Another example of this deal deadline deception came in March 2024.

73. On March 12, 2024, The Inquirer spammed consumers with an email putting consumers on the clock with a subject heading saying: `  ENDING NOW: $1 for 6 months  `, further urging consumers in the body of the email that `there's not much time left on this sale!` and telling them this was their `LAST CHANCE.`

74. The subject line of the March 12, 2024 email was false or misleading.

75. The deal did not `end now` (i.e. that same day), as The Inquirer made clear in a next-day marketing email on March 13, saying in the subject line: `  SALE EXTENDED: $1 for 6 months  `. In fact, as it told consumers in that email, March 13 was the true `FINAL CALL` for the $1 deal, not March 12.

76. And again, in July 2024, The Inquirer re-deployed this misleading time-scarcity messaging, sending an email on July 16, 2024 to consumers with the subject heading: `  TODAY ONLY: $1 FOR 6 MONTHS`, using the hourglass emoji to emphasize that time on the $1 deal would soon run out.

77. The subject line of the July 16, 2024 email was false or misleading.

78. The $1 deal would survive another day, as announced in the subject line of an email the next day, July 17, purportedly `extending` the `TODAY ONLY` deal: `  SALE EXTENDED: $1 for 6 MONTHS`.

CLASS ACTION COMPLAINT - 11

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ; FAX 872.863.1109
straussborrelli.com

79. In a 2025 reprise of The Inquirer's familiar scheme, it spammed consumers with an email on July 10, 2025 urgently telling them, in the subject line, that this was their `Last Chance: 99% OFF 6 MONTHS`, offering a 6-month subscription for $1.

80. The subject line of the July 10, 2025 email was false or misleading.

81. July 10th was not the `last chance`. On July 11, 2025, the Inquirer purported to offer a deal extension in an email, saying in the subject heading: `SALE EXTENDED: $1 for 6 MONTHS`.

82. As these examples demonstrate, The Inquirer is engaged in a scheme by which it pressures consumers to purchase products from its website using subject lines which falsely represent the availability of its offers.

C.   The Inquirer knows when it sends emails to Washington residents.

83. A sophisticated commercial enterprise, like The Inquirer, which is engaged in persistent marketing through mass email campaigns across the United States, has several ways of knowing where the recipients of its marketing emails are located. The means it employs are peculiarly within its knowledge.

84. First, the sheer volume of email marketing that The Inquirer engages in puts it on notice that Washington residents would receive its emails.

85. Second, The Inquirer may obtain location information tied to email addresses when consumers make purchases through its digital platforms or otherwise self-report such information to the Inquirer.

86. Third, The Inquirer may obtain location information tied to email addresses by tracking the IP addresses of devices used to open Inquirer emails, which in turn can be correlated to physical location (as illustrated, for example, by the website https://whatismyipaddress.com/).

CLASS ACTION COMPLAINT - 12

87.    Specifically, The Inquirer appears to use Salesforce Marketing Cloud to manage its email marketing campaigns, which allows The Inquirer to collect and track detailed data about the behavior of its email recipients, including open and click-through rates,[1] as well as 'geographical data.'[2]

88.    Fourth, The Inquirer may obtain location information tied to email addresses by purchasing consumer data from commercial data brokers such as Acxiom, Oracle, and Equifax, which sell access to databases linking email addresses to physical locations, among other identifiers.

89.    Fifth, The Inquirer may obtain location information tied to email addresses by using 'identity resolution' services offered by companies such as LiveRamp, which can connect consumers' email addresses to their physical locations, among other identifiers.

90.    Sixth, The Inquirer may obtain information that the recipients of its marketing emails are Washington residents because that information is available, upon request, from the registrant of the Internet domain names contained in the recipients' email addresses. See RCW 19.190.020(2).

91.    It is thus highly probable that a seller of Defendant's size and sophistication employs not just one but several means of tying consumers' email addresses to their physical locations, at least at the state level.

D.    The Inquirer violated Plaintiff's right under CEMA to be free from deceptive commercial emails.

92.    The Inquirer has spammed Plaintiff with commercial emails whose subject lines

---

[1] See Salesforce, Tracking in Email Studio, https://help.salesforce.com/s/articleView?id=mktg.mc_es_tracking_overview.htm&type=5 (last accessed May 19, 2026).
[2] Salesforce, What Is Email Tracking?, https://www.salesforce.com/marketing/email/tracking/?bc=OTH (last accessed May 19, 2026).

CLASS ACTION COMPLAINT ‑ 13

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ; FAX 872.863.1109
straussborrelli.com

contain false or misleading statements in violation of his right to be free from such annoyance and harassment under CEMA.

93. Plaintiff has received emails as part of marketing scheme described supra, òò, including the following emails from The Inquirer:

94. An email sent on September 4, 2023 titled `   Happy Labor Day! Sale ends today! _ described above at òò 46-52.

95. An email sent on September 19, 2023 titled `   ENDING: 25ê/MONTH for 6 MONTHS   _ described above at òò 53-58.

96. An email sent on January 23, 2024 titled `   FLASH SALE: $1/WEEK for 1 YEAR   _ described above at òò 60-65.

97. An email sent on January 24, 2024 titled `*   $1/WEEK for 1 YEAR ends today! *  _ described above at òò 63-65.

98. An email sent on February 20, 2024 titled `   25ê A MONTH for 6 MONTHS   FLASH SALE _ described above at òò 66-71.

99. An email sent on February 21, 2024 titled `   [24 HOURS LEFT] 25ê a month for 6 months   _ described above at òò 69-71.

100. An email sent on March 12, 2024 titled `   ENDING NOW: $1 for 6 months   _ described above at òò 73-75.

101. An email sent on July 16, 2024 titled `   TODAY ONLY: $1 FOR 6 MONTHS _ described above at òò 76-78.

102. An email sent on July 10, 2025 titled `Last Chance: 99% OFF 6 MONTHS _

CLASS ACTION COMPLAINT ˜ 14

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL 872.263.1100 ¿ FAX 872.863.1109
straussborrelli.com

described above at ¶¶ 79-81.

103.    The subject lines of these emails are false or misleading in violation of CEMA.

104.    The subject lines contained false statements of fact as to the `duration or availability of a promotion._ Brown, 567 P.3d at 47.

## V.    CLASS ALLEGATIONS

105.    Plaintiff brings this action under Civil Rule 23 on behalf of the following putative class (`Class_):

All Washington residents who, during the Class Period, received a commercial email sent by the Defendant, on behalf of the Defendant, or with the Defendant's assistance, that contained messaging in the email subject line which misrepresented the facts of a sale, deal or promotion.

106.    Excluded from this definition of the Class are Defendant's officers, directors, and employees; Defendant's parents, subsidiaries, affiliates, and any entity in which Defendant has a controlling interest; undersigned counsel for Plaintiff; and all judges and court staff to whom this action may be assigned, as well as their immediate family members.

107.    The Class Period extends from the date four years before this Class Action Complaint is filed to the date a class certification order is entered in this action.

108.    Plaintiff reserves the right to amend the Class definition as discovery reveals additional emails containing false or misleading information in the subject line that Defendant sent or caused to be sent during the Class Period to email addresses held by Washington residents.

109.    The Class is so numerous that joinder of all members is impracticable because the Class is estimated to minimally contain thousands of members.

110.    There are questions of law or fact common to the class, including without limitation whether Defendant sent commercial emails containing false or misleading information in the subject line; whether Defendant sent such emails to email addresses it knew or had to reason to

CLASS ACTION COMPLAINT ˉ 15

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100; FAX 872.363.1109
straussborrelli.com

know were held by Washington residents; whether Defendant's conduct violated CEMA; whether Defendant's violation of CEMA constituted a per se violation of the CPA; and whether Defendant should be enjoined from such conduct.

111.    Plaintiff's claims are typical of the Class's because, among other reasons, Plaintiff and Class members share the same statutory rights under CEMA and the CPA, which Defendant violated in the same way by the uniform false or misleading marketing messages it sent to all putative members.

112.    Plaintiff will fairly and adequately protect the Class's interests because, among other reasons, Plaintiff shares the Class's interest in avoiding unlawful false or misleading marketing; has no interest adverse to the Class; and has retained competent counsel extensively experienced in consumer protection and class action litigation.

113.    Defendant has acted on grounds generally applicable to the Class, in that, among other ways, it engaged in the uniform conduct of sending uniform commercial emails to Plaintiff and the Class, which violate CEMA and the CPA in the same way, and from which it may be enjoined as to Plaintiff and all Class members, thereby making appropriate final injunctive relief with respect to the Class as a whole.

114.    The questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, in that, among other ways, Defendant has violated their rights under the same laws by the same conduct, and the only matters for individual determination are the number of false or misleading emails received by each Class member and that Class member's resulting damages.

115.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy because, among other reasons, the claims at issue may be too small

CLASS ACTION COMPLAINT − 16

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ; FAX 872.863.1109
straussborrelli.com

to justify individual litigation and management of this action as a class presents no special difficulties.

## VI.    CLAIMS TO RELIEF

### First Claim to Relief

#### Violation of the Commercial Electronic Mail Act, RCW 19.190.020

116.    Plaintiff incorporates and realleges paragraphs 1 - 104 above.

117.    CEMA provides that `[n]o person may initiate the transmission, conspire with another to initiate the transmission, or assist the transmission, of a commercial electronic mail message ũ to an electronic mail address that the sender knows, or has reason to know, is held by a Washington resident that ũ [c]ontains false or misleading information in the subject line._ RCW 19.190.020(1)(b).

118.    Defendant is a `person_ within the meaning of CEMA. RCW 19.190.010(11).

119.    Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transition of `commercial electronic mail messages_ within the meaning of CEMA. RCW 19.190.010(2).

120.    Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages to electronic mail addresses that Defendant knew, or had reason to know, were held by Washington residents, including because Defendant knew that Plaintiff and putative members were Washington residents because that `information is available, upon request, from the registrant of the internet domain name contained in the recipient's electronic mail address._ RCW 19.190.020(b)(2).

121.    Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages that contained false or misleading

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL 872.263.1100 / FAX 872.863.1109
straussborrelli.com

information in the subject line, as described herein, in violation of CEMA. RCW 19.190.020(1)(b).

122.   For Defendant's violation of CEMA, Plaintiff is entitled to all available relief, including an injunction against further violations.

### Second Claim to Relief

### Violation of the Consumer Protection Act, RCW 19.86.020

123.   Plaintiff incorporates and realleges paragraphs 1 – 104 above.

124.   The CPA provides that `[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful._ RCW 19.86.020.

125.   A violation of CEMA is a per se violation of the CPA. RCW 19.190.030.

126.   A violation of CEMA establishes all the elements necessary to bring a private action under the CPA. Wright v. Lyft, 189 Wn. 2d 718 (2017).

127.   CEMA provides that `[n]o person may initiate the transmission, conspire with another to initiate the transmission, or assist the transmission, of a commercial electronic mail message ǔ  to an electronic mail address that the sender knows, or has reason to know, is held by a Washington resident that ǔ  [c]ontains false or misleading information in the subject line._ RCW 19.190.020(1)(b).

128.   Defendant is a `person_ within the meaning of CEMA. RCW 19.190.010(11).

129.   Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transition of `commercial electronic mail messages_ within the meaning of CEMA. RCW 19.190.010(2).

130.   Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages to electronic mail addresses that

CLASS ACTION COMPLAINT ˉ 18

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872-263-1100 ; FAX 872-263-1109
straussborrelli.com

Defendant knew, or had reason to know, were held by Washington residents.

131. Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages that contained false or misleading information in the subject line, as described herein, in violation of CEMA. RCW 19.190.020(1)(b).

132. For Defendant's violation of the CPA, Plaintiff and putative members are entitled to an injunction against further violations; the greater of Plaintiff's actual damages or liquidated damages of $500 per violation, trebled; and costs of the suit, including a reasonable attorney's fee.

## VII. JURY DEMAND

133. Plaintiff will demand a jury trial by separate document in accordance with Local Civil Rule 38(b).

## VIII. PRAYER FOR RELIEF

Plaintiff asks that the Court:

A. Certify the proposed Class, appoint Plaintiff as Class representative, and appoint undersigned counsel as Class counsel;

B. Enter a judgment in Plaintiff's and the Class's favor permanently enjoining Defendant from the unlawful conduct alleged;

C. Enter a judgment in Plaintiff's and the Class's favor awarding actual or liquidated damages, trebled, according to proof;

D. Award Plaintiff costs of suit, including reasonable attorneys' fees; and

E. Order such further relief the Court finds appropriate.

[Counsel signatures to follow on next page.]

CLASS ACTION COMPLAINT - 19

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 ; FAX 872.863.1109
straussborrelli.com

Date: May 21, 2026

Respectfully submitted,

/s/ Samuel J. Strauss
Samuel J. Strauss, WSBA No. #46971
Raina C. Borrelli*
STRAUSS BORRELLI PLLC
980 N. Michigan Avenue, Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
sam@straussborrelli.com
raina@straussborrelli.com

Lynn A. Toops*
Natalie A. Lyons*
Ian R. Bensberg*
COHENMALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
ltoops@cohenmalad.com
nlyons@cohenmalad.com
ibensberg@cohenmalad.com

Gerard J. Stranch, IV*
Michael C. Tackeff*
Andrew K. Murray*
STRANCH, JENNINGS &
GARVEY, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
gstranch@stranchlaw.com
mtackeff@stranchlaw.com
amurray@stranchlaw.com

Counsel for Plaintiff and the Putative Class

*Applications for admission
pro hac vice forthcoming

CLASS ACTION COMPLAINT - 20

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of July, 2026, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which in turn automatically generated a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system.  The NEF for the foregoing specifically identifies recipients of electronic notice.

_____
Amanda Saeteurn

CERTIFICATE OF SERVICE
2:26-cv-01952-JNW

FENNEMORE CRAIG, P.C.
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500